**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**OFFICE OF THE CLERK**

Alfred A. Arraj
United States Courthouse
901 19th Street
Denver, Colorado 80294
www.cod.uscourts.gov

Jeffrey P. Colwell
*Clerk*

Phone: (303) 844-3433

Date: 7/27/2015

☐Pro Se   ☒Retained   ☐CJA   ☐FPD   USA or other
☐Federal Agency
(Appeal Fee Exempt)

Case No: <u>14-cv-3118 WYD-MEH</u>

☐Amended Notice of Appeal
☐Other pending appeals
☐Transferred Successive
§2254 or §2255

Date Filed: <u>7/27/2015</u>

Appellant: <u>CEEG(Shanghi) Solar</u>

<u>Science & Technology Co., Ltd</u>
Pro Se Appellant:
☐IFP forms mailed/given   ☐Motion IFP pending   ☐Appeal fee paid
☐IFP denied   ☐Appeal fee not paid

Retained Counsel:
☒Appeal fee paid   ☐Appeal fee not paid   ☐Motion IFP filed

The Preliminary Record on Appeal is hereby transmitted to the Tenth Circuit Court of Appeals.   Please refer to the forms, procedures, and requirements for ordering transcripts, preparing docketing statements and briefs, and designations of the record that are found on the Tenth Circuit's website, www.ca10.uscourts.gov.

If not already completed, either an appeal fee payment for filing this case or filing of a motion to proceed *in forma pauperis* will be made to this District Court.

The transcript order form must be filed in the District Court as well as the Court of Appeals within 14 days after the notice of appeal was filed with the District Court.

If you have questions, please contact this office.

Sincerely,

JEFFREY P. COLWELL, CLERK

by:   s/E. Van Alphen
Deputy Clerk

Rev. 10/2/2014

cc:     Clerk of the Court, Tenth Circuit Court of Appeals

Rev. 10/2/2014

Case 1:14-cv-03118-WYD-MEH   Document 39-1   Filed 07/27/15   USDC Colorado   Page 1 of 5
Case: 1:14-cv-03118-WYD-MEH   As of: 07/27/2015 10:23 AM MDT   1 of 5
Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 3
APPEAL,NDISPO,TERMED

# U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:14−cv−03118−WYD−MEH

CEEG (Shanghai) Solar Science &Technology Co., Ltd. v. LUMOS LLC
Assigned to: Judge Wiley Y. Daniel
Referred to: Magistrate Judge Michael E. Hegarty
Demand: $1,628,000
Cause: 09:201 Conv. on the Recog. &Enf. of Foreign Arbitral Awards

Date Filed: 11/19/2014
Date Terminated: 05/29/2015
Jury Demand: None
Nature of Suit: 896 Other Statutes: Arbitration
Jurisdiction: Federal Question

**Petitioner**

**CEEG (Shanghai) Solar Science &Technology Co., Ltd.**

represented by **Courtney Paige Hirsekorn**
Fairfield &Woods, P.C.
1801 California Street
Suite 2600
Denver, CO 80202−2645
303−894−4451
Fax: 303−830−1033
Email: chirsekorn@fwlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Shafroth Lutz**
Fairfield &Woods, P.C.
1801 California Street
Suite 2600
Denver, CO 80202−2645
303−830−2400
Fax: 303−830−1033
Email: jlutz@fwlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Lumos LLC**
*also known as*
Lumos Solar LLC

represented by **James R. Nelson**
DLA Piper US, LLP−Dallas
1717 Main Street
#4600
Dallas, TX 75201
214−743−4500
Fax: 214−743−4545
Email: jr.nelson@dlapiper.com
*ATTORNEY TO BE NOTICED*

**Meghan Paulk Ingle**
DLA Piper US, LLP−Austin
400 Congress Avenue
Suite 2500
Austin, TX 78701−3799
512−457−7000
Fax: 512−457−8001
Email: Meghan.PaulkIngle@dlapiper.com
*ATTORNEY TO BE NOTICED*

**Thomas Jay Overton**
Overton Law Firm
165 South Union Boulevard
Suite 542

Case 1:14-cv-03118-WYD-MEH   Document 39-1   Filed 07/27/15   USDC Colorado   Page 2 of 5

Case: 1:14-cv-03118-WYD-MEH   As of: 07/27/2015 10:23 AM MDT   2 of 5
Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 4

Lakewood, CO 80228
303−832−9249
Email: tom.overton@overtonlawfirm.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/19/2014 | 1 | Administrative Notice: No initiating document. Attorney contacted with instructions to file the initiating document within 24 hours. (Text Only Entry) (jofox ) (Entered: 11/19/2014) |
| 11/20/2014 | 2 | PETITION *TO CONFIRM ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT* (Filing fee $ 400, Receipt Number 1082−4148175)Attorney John Shafroth Lutz added to party CEEG (Shanghai) Solar Science &Technology Co., Ltd.(pty:pet), filed by CEEG (Shanghai) Solar Science &Technology Co., Ltd.. (Attachments: # 1 Exhibit Exhibit 1 Certificate of Entity Name Change from Secretary of State, # 2 Exhibit Exhibit 2 Signed Declaration of Liu Qian (Chinese lawyer), # 3 Exhibit Exhibit A to Exhibit 2 Certified Arbitration Award in Chinese, # 4 Exhibit Exhibit B to Exhibit 2 Certified Arbitration Award in English, # 5 Exhibit Exhibit C to Exhibit 2 Redacted Sales Contract, # 6 Exhibit Exhibit 4 Signed Declaration of Translator, # 7 Exhibit Exhibit A to Exhibit 4 Certified Arbitration Award in English, # 8 Civil Cover Sheet, # 9 Proposed Order (PDF Only) [Proposed] Order Granting Petition to Confirm Arbitration Award and For Entry of Judgment)(Lutz, John) (Entered: 11/20/2014) |
| 11/20/2014 | 3 | Case assigned to Judge Wiley Y. Daniel and drawn to Magistrate Judge Michael E. Hegarty. Text Only Entry. (jofox, ) (Entered: 11/20/2014) |
| 11/20/2014 | 4 | Magistrate Judge Consent Form issued pursuant to Local Rule. No Summons Issued. (jofox, ) (Entered: 11/20/2014) |
| 11/20/2014 | 5 | MOTION for Leave to Restrict by Petitioner CEEG (Shanghai) Solar Science &Technology Co., Ltd.. (Attachments: # 1 Exhibit Exhibit 3 Sales Contract, # 2 Proposed Order (PDF Only) [Proposed] Order Granting Motion to Restrict Public Access (Level 1) in Connection With Petition to Confirm Arbitration Award and For Entry of Judgment)(Lutz, John) (Entered: 11/20/2014) |
| 11/20/2014 | 6 | NOTICE re 2 Petition/Application,,, *to Confirm Arbitration Award and For Entry of Judgment* by Petitioner CEEG (Shanghai) Solar Science &Technology Co., Ltd. (Attachments: # 1 Exhibit Exhibit 4 Declaration of Translator, # 2 Exhibit Exhibit A to Exhibit 4 Certified Arbitration Award in English)(Lutz, John) (Entered: 11/20/2014) |
| 11/21/2014 | 7 | ORDER REFERRING CASE to Magistrate Judge Michael E. Hegarty for non−dispositive matters. That pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this matter is referred to the assigned United States Magistrate Judge is designated to conduct proceedings in this civil action as follows: (1) Convene a scheduling conference under Fed.R.Civ.P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2. (2) Conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause. (3) Hear and determine pretrial matters, including discovery and other non−dispositive motions. (4) Alternative Dispute Resolution Authority: Court sponsored alternative dispute resolution is governed by D.C.COLOLCivR 16.6. On the recommendation or informal request of the magistrate judge, or on the request of the parties by motion, the court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. (5) Conduct a pretrial conference and enter a pretrial order. It is further ORDERED that parties and counsel shall be familiar and comply with the above judge's requirements found at www.cod.uscourts.gov. Entered by Judge Wiley Y. Daniel on 11/21/14. Text Only Entry (rkeec) (Entered: 11/21/2014) |
| 11/21/2014 | 8 | MEMORANDUM regarding 5 MOTION for Leave to Restrict filed by CEEG (Shanghai) Solar Science &Technology Co., Ltd. Motion referred to Magistrate Judge Michael E. Hegarty by Judge Wiley Y. Daniel on 11/21/14. Text Only Entry |

Case 1:14-cv-03118-WYD-MEH   Document 39-1   Filed 07/27/15   USDC Colorado   Page 3 of 5

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 5
Case: 1:14-cv-03118-WYD-MEH   As of: 07/27/2015 10:23 AM MDT   3 of 5

| | | (rkeec) (Entered: 11/21/2014) |
|---|---|---|
| 11/21/2014 | 9 | MINUTE ORDER Status Conference set for 1/6/2015 10:00 AM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty, by Magistrate Judge Michael E. Hegarty on 11/21/2014. (evana, ) (Entered: 11/21/2014) |
| 11/24/2014 | 10 | MINUTE ORDER denying without prejudice 5 Petitioners Motion to Restrict Public Access (Level 1) in Connection with Petition to Confirm Arbitration Award and for Entry of Judgment, by Magistrate Judge Michael E. Hegarty on 11/24/2014.(evana, ) (Entered: 11/24/2014) |
| 11/25/2014 | 11 | NOTICE re 2 Petition/Application,,, *of Filing of Corrected Exhibit C to Exhibit 2 to Petition to Confirm Arbitration Award and For Entry of Judgment* by Petitioner CEEG (Shanghai) Solar Science &Technology Co., Ltd. (Attachments: # 1 Exhibit Exhibit C to Exhibit 2)(Lutz, John) (Entered: 11/25/2014) |
| 11/25/2014 | 12 | SUMMONS REQUEST as to LUMOS LLC, now known as LUMOS SOLAR LLC re 2 Petition/Application,,, by Petitioner CEEG (Shanghai) Solar Science &Technology Co., Ltd.. (Lutz, John) (Entered: 11/25/2014) |
| 11/25/2014 | 13 | SUMMONS issued by Clerk as to Lumos Solar LLC. Magistrate Judge Consent form issued pursuant to Local Rule (Attachments: # 1 Magistrate Judge Consent Form) (evana, ) (Entered: 11/25/2014) |
| 12/02/2014 | 14 | Unopposed MOTION for Leave to *Restrict Public Access (Level 1) in Connection With Petition to Confirm Arbitration Award and For Entry of Judgment* by Petitioner CEEG (Shanghai) Solar Science &Technology Co., Ltd.. (Attachments: #(**RESTRICTED Level−1(1) Exhibit Exhibit 3 Unredacted Sales Contract,)** # 2 Proposed Order (PDF Only) [Proposed] Order Granting Unopposed Motion to Restrict Public Access (Level 1) in Connection With Petition to Confirm Arbitration Award and for Entry of Judgment)(Lutz, John) (Modified on 12/8/2014 Exhibit 14−1 is RESTRICTED Pursuant to the 17 Minute Order)(evana, ). (Entered: 12/02/2014) |
| 12/02/2014 | 15 | MEMORANDUM regarding 14 Unopposed MOTION for Leave to *Restrict Public Access (Level 1) in Connection With Petition to Confirm Arbitration Award and For Entry of Judgment* filed by CEEG (Shanghai) Solar Science &Technology Co., Ltd. Motion referred to Magistrate Judge Michael E. Hegarty by Judge Wiley Y. Daniel on 12/2/14. Text Only Entry (rkeec) (Entered: 12/02/2014) |
| 12/03/2014 | 16 | SUMMONS Returned Executed by CEEG (Shanghai) Solar Science &Technology Co., Ltd.. Lumos LLC served on 11/26/2014, answer due 12/17/2014. (Lutz, John) (Entered: 12/03/2014) |
| 12/08/2014 | 17 | MINUTE ORDER granting 14 Petitioners Unopposed Motion to Restrict Public Access (Level 1) in Connection with Petition to Confirm Arbitration Award and for Entry of Judgment. The Clerk of the Court is directed to maintain under seal at Restriction Level 1 docket #[14−1] until further order of the Court, by Magistrate Judge Michael E. Hegarty on 12/8/2014.(evana, ) (Entered: 12/08/2014) |
| 12/16/2014 | 18 | NOTICE of Entry of Appearance by James R. Nelson on behalf of Lumos LLCAttorney James R. Nelson added to party Lumos LLC(pty:dft) (Nelson, James) (Entered: 12/16/2014) |
| 12/16/2014 | 19 | STIPULATION for Extension of Time to Answer or Respond to the Complaint *Joint Stipulation of Extension of Time to Respond to Petition* by Defendant Lumos LLC. Lumos LLC answer due 1/7/2015. (Nelson, James) (Entered: 12/16/2014) |
| 12/29/2014 | 20 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 12/29/2014. Status Conference is reset for 2/11/2015 09:30 AM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty (mdave) (Entered: 12/30/2014) |
| 01/07/2015 | 21 | NOTICE of Entry of Appearance by Meghan Paulk Ingle on behalf of Lumos LLCAttorney Meghan Paulk Ingle added to party Lumos LLC(pty:dft) (Ingle, Meghan) (Entered: 01/07/2015) |
| 01/07/2015 | 22 | MOTION to Dismiss *Respondent's Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Petitioner's Motion for Entry of Judgment* by |

Case 1:14-cv-03118-WYD-MEH   Document 39-1   Filed 07/27/15   USDC Colorado   Page 4 of 5
Case: 1:14-cv-03118-WYD-MEH   As of: 07/27/2015 10:23 AM MDT   4 of 5
Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 6

| | | |
|---|---|---|
| | | Defendant Lumos LLC. (Attachments: #_1_ Affidavit Declaration of Scott Franklin, #_2_ Exhibit A to Franklin Declaration, #_3_ Exhibit B to Franklin Declaration, #_4_ Exhibit C to Franklin Declaration, #_5_ Exhibit D to Franklin Declaration, #_6_ Exhibit E to Franklin Declaration, #_7_ Exhibit F to Franklin Declaration, #_8_ Exhibit G to Franklin Declaration, #_9_ Exhibit H to Franklin Declaration, #_10_ Exhibit I to Franklin Declaration, #_11_ Exhibit J to Franklin Declaration, #_12_ Exhibit K to Franklin Declaration, #_13_ Exhibit L to Franklin Declaration, #_14_ Exhibit M to Franklin Declaration, #_15_ Exhibit N to Franklin Declaration, #_16_ Proposed Order (PDF Only))(Ingle, Meghan) (Entered: 01/07/2015) |
| 01/16/2015 | 23 | NOTICE of Entry of Appearance *of Courtney P. Hirsekorn* by John Shafroth Lutz on behalf of CEEG (Shanghai) Solar Science &Technology Co., Ltd. (Lutz, John) (Entered: 01/16/2015) |
| 01/16/2015 | 24 | Unopposed MOTION for Extension of Time to File Response/Reply as to 22 MOTION to Dismiss *Respondent's Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Petitioner's Motion for Entry of Judgment* by Petitioner CEEG (Shanghai) Solar Science &Technology Co., Ltd.. (Attachments: #_1_ Proposed Order (PDF Only) [Proposed] Order Granting Unopposed Motion for Extension of Time to File Reply in Support of Petition to Confirm Arbitration Award and For Entry of Judgment)(Lutz, John) (Entered: 01/16/2015) |
| 01/20/2015 | 25 | ORDER granting 24 Motion for Extension of Time to File Response to Motion to Dismiss and Reply in support of Petition to Confirm Arbitration Award up to and including February 6, 2015. by Judge Wiley Y. Daniel on 1/20/15. Text Only Entry(wydlc2, ) (Entered: 01/20/2015) |
| 02/05/2015 | 26 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 2/5/2015. The Status Conference currently set for 2/11/2015 is CANCELED. (mdave) (Entered: 02/05/2015) |
| 02/06/2015 | 27 | **STRICKEN** REPLY to Response to 22 MOTION to Dismiss *Respondent's Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Petitioner's Motion for Entry of Judgment* filed by Petitioner CEEG (Shanghai) Solar Science &Technology Co., Ltd.. (Attachments: #_1_ Exhibit 5 − December 19, 2012 Letter, #_2_ Exhibit 6 − Proof of Service, #_3_ Exhibit 7 − Excerpt of Arbitral Award)(Lutz, John) (Modified on 2/9/2015 Stricken pursuant to the 28 Minute Order)(evana, ). (Entered: 02/06/2015)* |
| 02/09/2015 | 28 | MINUTE ORDER re: 27 Reply to Response to Motion, filed by CEEG (Shanghai) Solar Science &Technology Co., Ltd, is STRICKEN from the record with leave to refile in accordance with my Practice Standards. The filing exceeds my standards for page limitations, by Judge Wiley Y. Daniel on 2/9/2015. (evana, ) (Entered: 02/09/2015) |
| 02/09/2015 | 29 | REPLY in Support of 2 Petition to Confirm Arbitration Award and for Entry of Judgment and RESPONSE to 22 MOTION to Dismiss *Respondent's Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Petitioner's Motion of Judgment* filed by Petitioner CEEG (Shanghai) Solar Science &Technology Co Ltd. (Attachments: #_1_ Exhibit 5 − Proof of Service, #_2_ Exhibit 6 − Excerpt of Arbital Award, #_3_ Exhibit 7 − December 19, 2012 Letter)(Lutz, John) (Entered: 02/09/2015) |
| 02/17/2015 | 30 | MOTION for Leave to *To File Reply (or Sur−reply) In Support of* 22 MOTION to Dismiss *Respondent's Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Petitioner's Motion for Entry of Judgment* by Defendant Lumos LLC. (Attachments: #_1_ Exhibit A, #_2_ Proposed Order (PDF Only))(Ingle, Meghan) (Entered: 02/17/2015) |
| 02/18/2015 | 31 | ORDER granting 30 Motion for Leave to File Reply (or Sur−Reply) in Support of Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Motion for Entry or Judgment. The attached pleading found at ECF No. 30−1 is accepted for filing. by Judge Wiley Y. Daniel on 2/18/15. Text Only Entry(wydlc2, ) (Entered: 02/18/2015) |
| 02/18/2015 | 32 | REPLY to Response to 22 MOTION to Dismiss *Respondent's Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Petitioner's Motion for* |

Case 1:14-cv-03118-WYD-MEH   Document 39-1   Filed 07/27/15   USDC Colorado   Page 5 of 5

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 7
Case: 1:14-cv-03118-WYD-MEH   As of: 07/27/2015 10:23 AM MDT   5 of 5

| | | |
|---|---|---|
| | | *Entry of Judgment* filed by Defendant Lumos LLC. (Ingle, Meghan) (Entered: 02/18/2015) |
| 05/07/2015 | 33 | MINUTE ORDER A hearing on the Petition to Confirm Arbitration Award and for Entry of Judgment ECF No. 2 is set for Wednesday, May 27, 2015 at 1:30 p.m. in courtroom A−1038, by Judge Wiley Y. Daniel on 5/7/2015. (evana, ) (Entered: 05/07/2015) |
| 05/26/2015 | 34 | NOTICE of Entry of Appearance by Thomas J. Overton on behalf of Lumos LLCAttorney Thomas J. Overton added to party Lumos LLC(pty:dft) (Overton, Thomas) (Entered: 05/26/2015) |
| 05/27/2015 | 36 | MINUTE ENTRY for proceedings held before Judge Wiley Y. Daniel: Evidentiary Hearing (In Court Hearing) held on 5/27/2015. Denying 2 Petition to Enforce Arbitration Award and for Entry of Judgment. Granting 22 Respondents Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Petitioners Motion for Entry of Judgment. Court indicates a written order shall follow. Court Reporter: Gwen Daniel. (rkeec) (Entered: 06/02/2015) |
| 05/29/2015 | 35 | ORDER Granting 22 Lumos Motion to Dismiss Petition to Confirm Arbitration Award for the reasons stated on the record at the May 27, 2015 hearing and set forth herein. This matter is DISMISSED WITH PREJUDICE, by Judge Wiley Y. Daniel on 5/29/2015.(evana, ) (Entered: 05/29/2015) |
| 06/24/2015 | 37 | FINAL JUDGMENT in favor of Lumos LLC against CEEG (Shanghai) Solar Science &Technology Co., Ltd. re: 35 Order on Motion to Dismiss Petition to Confirm Arbitration Award, by Judge Wiley Y. Daniel on 6/24/2015. (evana, ) (Entered: 06/24/2015) |
| 07/24/2015 | 38 | NOTICE OF APPEAL as to 37 Judgment, 22 MOTION to Dismiss *Respondent's Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Petitioner's Motion for Entry of Judgment*, 2 Petition/Application,,, 35 Order on Motion to Dismiss, by Petitioner CEEG (Shanghai) Solar Science &Technology Co., Ltd. (Filing fee $ 505, Receipt Number 1082−4520193) (Lutz, John) (Entered: 07/24/2015) |

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 8

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No.

CEEG (Shanghai) Solar Science & Technology Co., Ltd.,

      Petitioner,

v.

LUMOS LLC, now known as LUMOS SOLAR LLC,

      Respondent.

---

## PETITION TO CONFIRM ARBITRATION AWARD
## AND FOR ENTRY OF JUDGMENT

---

      Pursuant to the Federal Arbitration Act, 9 U.S.C. § 201 *et seq*., and the underlying arbitration agreement, Petitioner CEEG (Shanghai) Solar Science & Technology Co., Ltd. ("CEEG"), by and through their attorneys, Fairfield and Woods, P.C., submits this Petition to Confirm Arbitration Award and for Entry of Judgment ("Petition"), and in support thereof states as follows:

## I.    THE PARTIES

    1.    Petitioner CEEG (Shanghai) Solar Science & Technology Co., Ltd. (hereinafter, "CEEG"), is a Chinese company domiciled in Shanghai at Building 2, No. 68, Gangde Road, Xiaokunshan Town, Songjiang District, Shanghai Municipality, China.

    2.    Respondent LUMOS LLC, now known as LUMOS SOLAR LLC (hereinafter "LUMOS"), is a Delaware limited liability company registered as a foreign limited liability

company in the State of Colorado with its principal office in Boulder, Colorado, at 3550 Frontier

Avenue, # C2, Boulder, Colorado, USA.  On May 13, 2014, LUMOS LLC changed its name to

LUMOS SOLAR LLC.  A certificate of entity name change from the Colorado Secretary of State

is attached hereto as **Exhibit 1**.

## II.     JURISDICTION AND VENUE

3.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 and 9 U.S.C.

§ 203, which states, "[a]n action or proceeding falling under the [New York] Convention shall be

deemed to arise under the laws and treaties of the United States.  The district courts of the United

States . . . shall have original jurisdiction over such an action or proceeding, regardless of the

amount in controversy."  9 U.S.C. § 203.  Since this action is based on a contract and arbitration

award that falls under the New York Convention, jurisdiction is proper in United States District

Court.

4.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 and 9 U.S.C. § 204

because LUMOS resides in Boulder, Colorado, and took delivery of the goods in Denver,

Colorado.  Thus, the District of Colorado is the appropriate federal district in which to bring this

Petition.

## III.    FACTUAL BACKGROUND

5.      On May 14, 2010, CEEG and LUMOS entered into a commercial agreement

stipulating that CEEG shall sell solar battery modules to LUMOS and that LUMOS shall pay off

the money for the goods within 60 days from the departure date of the goods as listed on the bill

of lading ("Sales Contract").  A redacted copy of the Sales Contract between CEEG and LUMOS

is attached as Exhibit C to the Declaration of Liu Qian attached hereto as **Exhibit 2**.  A certified

Appellate Case: 15-1256    Document: 01019465886    Date Filed: 07/27/2015    Page: 10

and unredacted copy of the Sales Contract, **Exhibit 3**, is attached as a restricted document to CEEG's concurrent Motion to Restrict Public Access (Level 1) in Connection with Petition to Confirm Arbitration Award and for Entry of Judgment.

6.      CEEG delivered solar battery modules to LUMOS on October 23, 2010, and November 21, 2010, but in violation of the contractual agreement, LUMOS failed to pay the total amount due by the relative deadlines.

7.      After two years with no payment and multiple unsuccessful requests from CEEG for payment, on March 22, 2013, CEEG submitted an arbitration application to the China International Economic and Trade Arbitration Commission Shanghai Branch (now renamed as "Shanghai International Economic and Trade Arbitration Commission," also known as the "Shanghai International Arbitration Center" (referred to hereinafter as the "Commission") to handle the dispute with LUMOS pursuant to the arbitration clause set out in the Sales Contract. *See* Exhibit C of Exhibit 2, ¶ 15.

8.      CEEG alleged LUMOS breached the Sales Contract and sought to recover the overdue payment, interest on the overdue payment, exchange losses, attorneys' fees and the arbitration costs.  LUMOS alleged that the goods delivered by CEEG had quality defects and therefore should have been reduced in price.

9.      On April 1, 2013, the Commission accepted the arbitration and pursuant to the Sales Contract, the arbitration was governed by the Commission's arbitration rules in effect at the time of applying for arbitration (the Arbitration Rules of China International Economic and Trade Arbitration Commission Shanghai Branch implemented May 1, 2012).

10.     The arbitration tribunal was established on May 27, 2013, after all three arbitrators signed the Arbitrator's Declaration.

11.     On September 14, 2013, the arbitration tribunal opened a court session to hear the case in the location of the Commission (Shanghai).  The arbitration attorneys of both CEEG and LUMOS appeared in the court for hearing and exchanged evidence and argued their positions. Both parties made post hearing submissions.

12.     On December 12, 2013, the arbitration tribunal opened the court session for the second time and the attorneys for both CEEG and LUMOS appeared and made further presentations of facts and legal issues in the case.  Both parties again made post hearing submissions.

13.     On June 13, 2014, the arbitration tribunal issued a detailed 38-page award in Chinese (the "Award").  Certified copies of the Award in Chinese and in English are attached as Exhibit A and Exhibit B, respectively, to Exhibit 2; *see also* Exhibit A (certified English translation of Award) to the Declaration of Translator attached hereto as **Exhibit 4**.  The tribunal found that LUMOS had breached its payment obligation under the Sales Contract and rejected LUMOS' quality defect defense based on lack of jurisdiction.  Based on these findings, the tribunal ordered LUMOS to pay the amounts set forth in the Award as follows:

      a.     $1,372,445.10 for two outstanding payments for goods;

      b.     $74,991.00 in interest for the overdue payment, along with the interest for the overdue payment calculated from March 8, 2013, to the actual payment date with the annual interest rate at 2.53%;

     c.     $103,006.25 in costs due to changes in foreign currency exchange rates (converted from RMB633,489.67 based on the currency exchange rate as of September 29, 2014);

     d.     $37,398.40 in attorneys' fees (converted from RMB230,000 based on the currency exchange rate as of September 29, 2014); and

     e.     $33,041.29 in arbitration costs (converted from RMB203,203.80 based on the currency exchange rate as of September 29, 2014).

14.     CEEG now seeks to confirm the Award and have a judgment entered against LUMOS.

## IV.   ARGUMENT

15.     The confirmation of such an award is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention), as implemented by the Federal Arbitration Act, 9 U.S.C. § 201 *et seq*.  The rules set forth in the New York Convention and the Federal Arbitration Act result from the strong congressional policy favoring the resolution of disputes through arbitration.  They are clear and thus leave little room for discretion by the Court.  Since CEEG has satisfied all such applicable requirements, it respectfully requests that the Court confirm the arbitration award and enter judgment accordingly.

16.     Under Article I of the New York Convention and 9 U.S.C. § 202, the New York Convention governs the confirmation of an arbitral award when, as in this case, the arbitral award is made in a country other than the one where enforcement is sought.  New York Convention, art. I(1).  The New York Convention also applies when the award is not considered

a "domestic" award in the country where its enforcement is sought.  *Id*; *see Jain v. de Mere*, 51 F.3d 686, 688-89 (7th Cir. 1995); *see also Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 959 (10th Cir. 1992) (Chapter 2 of Federal Arbitration Act mandates enforcement of a written commercial arbitral agreement involving a party that is not an American citizen) (citing *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186-87 (1st Cir. 1982)); *Filanto, S.p.A. v. Chilewich Int'l Corp.*, 789 F. Supp. 1229, 1237 (S.D.N.Y. 1992) (one criteria of the New York Convention clearly satisfied where one of the parties was an Italian corporation); *see also Ministry of Defense of the Islamic Republic of Iran v. Gould Inc.*, 887 F.2d 1357, 1362 (9th Cir. 1989) (holding that the award at issue was "obviously not domestic in nature because Iran [was] one of the parties to the agreement"); *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir. 1983) (New York Convention governs awards "involving parties domiciled or having their principal place of business outside the enforcing jurisdiction"); *see also* 9 U.S.C. § 202.

17.     Additionally, the New York Convention only applies to awards that arise out of relationships considered "commercial" in nature and only to awards made in countries that are parties to the New York Convention.  New York Convention, art. I(3).

18.     The Commission's arbitration ruling and award was the final result from a commercial contract dispute.  *See* Exhibit B to Exhibit 2.  Moreover, CEEG, a <u>Chinese</u> company, submits this Petition to collect on a <u>Chinese</u> arbitral award entered against LUMOS, a <u>United States</u> company.  Both China and the United States are signatories to the New York Convention. The New York convention clearly applies.

19.     "Any party to the arbitration may apply for an order confirming the award as against any other party to the arbitration."  9 U.S.C. § 207.  Federal district courts possess

jurisdiction to confirm such awards falling under the New York Convention, "within three years

after" they are made. *Id.* Since the Commission made its ruling on June 13, 2014, CEEG is still

well within the period of limitations to petition the Court for enforcement of the award.

20.     The law governing the confirmation of foreign arbitral awards is clear and stems

from the strong congressional policy favoring the resolution of disputes through arbitration. *See*

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). The New

York Convention and its implementing legislation "have enforcement bias, a policy long

recognized by the Supreme Court." *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain*

*Co.,* 284 F.3d 1114, 1120 (9th Cir. 2002) (citing *Sherk v. Alberto-Culver Co.*, 417 U.S. 506, 520

n.15 (1974)). This body of law leaves no doubt that the Court should grant CEEG's Petition and

enter judgment confirming the Award.

21.     A petition to enforce an award is an expedited proceeding treated as a motion

under the Federal rules. *See* 9 U.S.C. § 6 (petition to enforce non-New York Convention award

treated as motion); 9 U.S.C. § 208 (chapter 1 of Federal Arbitration Act applies to New York

Convention awards unless inconsistent); *Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima*

*Petrolera, Indus. Y Comercial*, 745 F. Supp. 172, 182 (S.D.N.Y. 1990) ("A confirmation

proceeding under the [New York] Convention is not an original action, it is, rather in the nature

of a post-judgment enforcement proceeding." (alterations and internal quotation marks omitted)).

22.     Under Article IV of the New York Convention, "[t]o obtain the recognition and

enforcement" of an arbitral award, the petitioning party must simply provide "[t]he duly

authenticated original award or a duly certified copy thereof," and "[t]he original agreement" or

a duly certified copy thereof. *See* New York Convention, art. IV(1); *Linsen Int'l Ltd. v. Humpuss*

*Sea Transp. PTE LTD*, No. 09-CV-10393-GBD, 2011 WL 1795813, at *2 (S.D.N.Y. Apr. 29,

2011) (attorney-verified copy of agreement satisfied New York Convention Requirement);

*Arbitration between Overseas Cosmos, Inc. & NR Vessel Corp.*, No. 97-CV-5898-DC, 1997 WL

757041, at *5 (S.D.N.Y. Dec. 8, 1997) (same).

  23. Confirmation of international commercial arbitration awards is a summary

proceeding not intended to involve complex factual determinations. *Zeiler v. Deitsch*, 500 F.3d

157, 169 (2d Cir. 2007); *Dingo, Inc. v. Who Ya Gonna Call Bark Busters Pty., Ltd.*, No. 12-CV-

02583-PAB-KMT, 2013 WL 3357662, at *1 (D. Colo. July 3, 2013) (confirmation of an

arbitration award is a summary procedure").  "The court <u>shall</u> confirm the award <u>unless</u> it finds

one of the grounds for refusal or deferral or recognition or enforcement of the award specified in

the [New York] Convention."  9 U.S.C. § 207 (emphasis added); *Cobra N. Am., LLC v. Cold Cut

Sys. Svenska AB*, No. 08-CV-00873-DME-CBS, 2009 WL 4506404, at *3 (D. Colo. Nov. 30,

2009) (citing mandatory language of 9 U.S.C. § 207 and confirming arbitration award under

New York Convention); *see also Glencore*, 284 F.3d at 1120 (mandatory language of Federal

Arbitration Act leaves court with "little discretion").  The arbitrator's decision should be

enforced if it draws its essence from the parties' agreements and is not merely the arbitrator's

own brand of industrial justice.  *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363

U.S. 593, 597 (1960).  The Respondent bears the burden of proving that the Court should refuse

enforcement.  *See, e.g., Industrial Risk Ins. v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434,

1442 (11th Cir. 1998); *Cobra*, 2009 WL 4506404, at *3.

  24. CEEG has provided the required certified copies of the Award and the underlying

arbitration agreement, Exhibits A, B and C to Exhibit 2 and Exhibit A to Exhibit 4, and LUMOS

cannot demonstrate that any ground for refusing to enforce the Award applies.  Accordingly, the Court should enter judgment confirming the Award pursuant to the New York Convention and the Federal Arbitration Act.

25.    Lastly, pursuant to C.R.S. §§ 13-22-225, 13-22-505 and Fed. R. Civ. P. 54(d)(1), CEEG seeks reasonable attorney fees, expenses, and costs incurred in this proceeding upon confirmation of the Award and entry of judgment.

## V.    CONCLUSION

26.    For the foregoing reasons, CEEG is entitled to confirmation of the Award and entry of judgment.

WHEREFORE, for the foregoing reasons, CEEG respectfully prays that the Court

(a)    grant CEEG's Petition to Confirm Arbitration Award and for Entry of Judgment;

(b)    confirm the Award against LUMOS;

(c)    enter a judgment in the amount of the Award as follows:

    i.    $1,372,445.10 for two outstanding payments for goods;

    ii.    $74,991.00 in interest for the overdue payment, along with the interest for the overdue payment calculated from March 8, 2013, to the actual payment date with the annual interest rate at 2.53%;

    iii.    $103,006.25 in costs due to changes in foreign currency exchange rates (converted from RMB633,489.67 based on the currency exchange rate as of September 29, 2014);

      iv.        $37,398.40 in attorneys' fees (converted from RMB230,000 based

                  on the currency exchange rate as of September 29, 2014); and

      v.        $33,041.29 in arbitration costs (converted from RMB203,203.80

                  based on the currency exchange rate as of September 29, 2014);

(d)      grant CEEG the reasonable attorneys' fees, expenses, and costs of this

         proceeding; and

(e)      for such other and further relief as the Court deems appropriate.

Respectfully submitted this 19th day of November, 2014.

FAIRFIELD AND WOODS, P.C.

By:    *s/ John S. Lutz*

        John S. Lutz, Reg. #0870
        Courtney P. Hirsekorn, Reg. #46510
        Fairfield and Woods, P.C.
        1801 California Street, Suite 2600
        Denver, Colorado  80202
        (303) 830-2400
        (303) 830-1033 (fax)
        Email:  jlutz@fwlaw.com
        chirsekorn@fwlaw.com

ATTORNEYS FOR THE PETITIONER

Address of Plaintiff:
Building 2, No. 68, Gangde Road,
Xiaokunshan Town, Songjiang District,
Shanghai Municipality, China

**EXHIBIT**

tabbies



# STATE OF COLORADO

### DEPARTMENT OF STATE

## CERTIFICATE

*I, SCOTT GESSLER, SECRETARY OF STATE OF THE STATE OF*

*COLORADO HEREBY CERTIFY THAT ACCORDING TO THE RECORDS OF THIS*

*OFFICE, A STATEMENT OF CHANGE WAS FILED ON MAY 13, 2014*
*CHANGING THE ENTITY NAME OF*

*LUMOS LLC*
*(DELAWARE LIMITED LIABILITY COMPANY)*

*TO*

*LUMOS SOLAR LLC*

*I FURTHER CERTIFY THAT SAID ENTITY HAS COMPLIED WITH ALL*
*APPLICABLE REQUIREMENTS OF THIS OFFICE, AND IS IN GOOD*
*STANDING WITH THIS OFFICE.*

*Dated:  October 28, 2014*

SECRETARY OF STATE

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No.

CEEG (Shanghai) Solar Science Technology Co., Ltd.,

     Petitioner,

v.

Lumos Solar LLC fka. Lumos LLC,

     Respondent.

---

**DECLARATION OF LIU QIAN IN SUPPORT OF PETITION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT**

---

     I, Liu Qian, being of lawful age, hereby state and declare as follows:

     1.     I am an attorney licensed to practice law in China.  I am an attorney at the law firm of King & Wood Mallesons .  I represented CEEG (Shanghai) Solar Science & Technology Co., Ltd. ("Petitioner") in the arbitration case against LUMOS LLC ("Respondent").  I submit this declaration in support of Petitioner's Petition to Confirm Arbitration Award and for Entry of Judgment.  The statements in this declaration are true to the best of my knowledge, information, and belief.

     2.     An arbitration award in *CEEG (Shanghai) Solar Science & Technology Co., Ltd. v. Lumos LLC* was entered on June 13, 2014 by the China International Economic and Trade Arbitration Commission Shanghai Branch (now renamed as "Shanghai International Economic Trade Arbitration Commission," also known as "Shanghai International Arbitration Center") ("Arbitration Award"), ordering the Respondent to pay:

          a.    $1,372,445.10 for two outstanding payments for goods;

*LQ*

     b.  $74,991.00 in interest for the overdue payment, along with the interest for

        the overdue payment calculated from March 8, 2013 to the actual payment

        date with the annual interest rate at 2.53%;

     c.  $103,006.25 in costs due to changes in foreign currency exchange rates

        (converted from RMB633,489.67 based on the currency exchange rate as

        of September 29, 2014);

     d.  $37,398.40 in attorneys' fees (converted from RMB230,000 based on the

        currency exchange rate as of September 29, 2014); and

     e.  $33,041.29 in arbitration costs (converted from RMB203,203.80 based on

        the currency exchange rate as of September 29, 2014).

3.    A true and correct copy of the Arbitration Award in Chinese is attached hereto as

**Exhibit A**, and a certified English translation is attached hereto as **Exhibit B**.

4.    A true and correct redacted copy of the Sale Contract between the Petitioner and

Respondent, dated May 14, 2010, is attached to this declaration as **Exhibit C**. This redacted

copy comprises the contract's cover page, arbitration provision, and signature page.

5.    I declare under penalty of perjury under the laws of the United States of America

that, to the best of my knowledge, the foregoing is true and correct.


Executed this 14 day of October, 2014 in Shanghai China

EXHIBIT

A to 2

# 公 证 书

### 中华人民共和国上海市东方公证处

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 22

# 裁 决 书

## Arbitral Award

上海国际经济贸易仲裁委员会(上海国际仲裁中心)

Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center)

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 23

# 上海国际经济贸易仲裁委员会

# （上海国际仲裁中心）

# 裁 决 书

申　请　人：中电电气（上海）太阳能科技有限公司

住　　　所：上海市松江区小昆山镇港德路 68 号 2 幢

代　理　人：胡　梅　北京市金杜律师事务所上海分所律师

　　　　　　郁斯敏　北京市金杜律师事务所上海分所律师

　　　　　　刘　倩　北京市金杜律师事务所上海分所律师


被申　请　人：LUMOS LLC

住　　　所：3550 Frontier Avenue, #C2,Boulder,United States

代　理　人：熊　伟　广东敬海律师事务所上海分所律师

　　　　　　高　雅　广东敬海律师事务所上海分所律师


上　　海

二〇一四年六月十三日

# 裁 决 书

〔2014〕沪贸仲裁字第 138 号

中国国际经济贸易仲裁委员会上海分会（现已更名为"上海国际经济贸易仲裁委员会"，同时启用"上海国际仲裁中心"的名称，以下简称"本会"）根据申请人中电电气（上海）太阳能科技有限公司（下称"申请人"）和被申请人 LUMOS LLC（下称"被申请人"）签订的编号为 S69020043 的《销售合同》中的仲裁条款，以及申请人于 2013 年 3 月 22 日向本会提交的仲裁申请，在申请人办理了预缴仲裁费等相关手续后，于 2013 年 4 月 1 日受理了上述系争《销售合同》项下争议仲裁案。案件编号为 SG2013023。

本案仲裁程序适用 2012 年 5 月 1 日起施行的《中国国际经济贸易仲裁委员会上海分会仲裁规则》（以下简称"《仲裁规则》"）。

本会秘书处（以下称"秘书处"）于 2013 年 4 月 1 日向申请人及被申请人发出了受理通知/仲裁通知、《仲裁规则》及《仲裁员名册》，并向被申请人寄送了申请人提交的仲裁申请书和附件材料。

根据《仲裁规则》的规定，本案由三名仲裁员组成仲裁庭进行审理。申请人选定陈刚先生为仲裁员；被申请人未能在《仲裁规则》规定的期限内选定或委托本会主任指定仲裁

1

Appellate Case: 15-1256  Document: 01019465886  Date Filed: 07/27/2015  Page: 25

员，本会主任根据《仲裁规则》第二十二条第（一）款为其指定刘颖先生为仲裁员；鉴于申请人与被申请人未能按照《仲裁规则》的规定共同选定或共同委托本会主任指定首席仲裁员，本会主任根据《仲裁规则》第二十二条第（四）款的规定指定刘晓红女士担任首席仲裁员。前述三位仲裁员均签署了《仲裁员声明书》，于 2013 年 5 月 27 日组成仲裁庭共同审理本案。仲裁庭决定于 2013 年 6 月 27 日进行开庭审理，秘书处于 2013 年 5 月 27 日向申请人和被申请人寄送了《仲裁庭组成通知》及《开庭通知》。

被申请人于 2013 年 6 月 20 日提交了延期开庭申请，秘书处于 2013 年 6 月 21 日将该文件转寄申请人及仲裁庭，并提请申请人发表书面评述意见。申请人于 2013 年 6 月 24 日提交了对被申请人前述申请的书面评述意见，秘书处于同日将该文件转寄被申请人及申请人。仲裁庭经合议后，对于被申请人的延期开庭申请予以同意，并委托秘书处于 2013 年 6 月 24 日将上述决定函告双方当事人。

仲裁庭决定本案延期至 2013 年 9 月 14 日开庭，秘书处于 2013 年 7 月 29 日向双方当事人函寄了延期开庭通知。后仲裁庭决定将原定于 2013 年 9 月 14 日上午的开庭调整于同日下午，委托秘书处于 2013 年 8 月 5 日将该事宜函告双方当事人。

被申请人于 2013 年 9 月 11 日提交了管辖权异议，秘书

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 26

处于同日将该文件转寄申请人及仲裁庭，并提请申请人对该文件发表书面评述意见。申请人于 2013 年 9 月 12 日提交了对于被申请人前述管辖权异议的意见，秘书处于同日将该文件转寄被申请人与仲裁庭。

2013 年 9 月 13 日，本会作出"〔2013〕沪贸仲字第 4801 号"《管辖权决定》，驳回了被申请人的管辖权异议，认定本案仲裁程序应继续进行。

2013 年 9 月 14 日，仲裁庭在本会所在地开庭审理本案。申请人和被申请人的仲裁代理人均参加了开庭。双方就本案的事实和法律问题作了陈述，对证据进行了质证，回答了仲裁庭的提问，进行了辩论，并发表了最后陈述意见。庭审结束前，仲裁庭对庭后仲裁程序的进行作出了安排。

被申请人代理人于 2013 年 9 月 27 日提交了代理意见及补充证据，秘书处于 2013 年 9 月 29 日将该材料转寄申请人及仲裁庭，并提请申请人对被申请人提交的补充证据发表书面质证意见。

申请人代理人于 2013 年 9 月 30 日提交了代理意见及补充证据，秘书处于 2013 年 10 月 8 日将该材料转寄被申请人及仲裁庭，并提请被申请人对申请人提交的补充证据发表书面质证意见。

申请人于 2013 年 10 月 14 日提交了对被申请人庭后提交的补充证据的质证意见，秘书处于 2013 年 10 月 15 日将该文

件转寄被申请人及仲裁庭。被申请人于 2013 年 10 月 22 日提交了对前述质证意见的评述意见,秘书处于 2013 年 10 月 24 日将该文件转寄申请人及仲裁庭。

被申请人于 2013 年 10 月 28 日提交了《关于请求进一步对本案证据进行说明》的函件,向仲裁庭请求再次开庭审理本案。秘书处于 2013 年 10 月 29 日将该文件转寄申请人及仲裁庭。申请人于 2013 年 11 月 4 日提交了对被申请人前述文件的评述意见。仲裁庭经合议决定本案于 2013 年 12 月 12 日进行第二次开庭,并委托秘书处于 2013 年 11 月 13 日将该开庭通知函寄双方当事人。

2013 年 12 月 12 日,仲裁庭在本会所在地第二次开庭审理本案。申请人和被申请人的仲裁代理人均参加了开庭。双方就本案的事实和法律问题进一步作了陈述,对补充证据进行了质证,回答了仲裁庭的提问,进行了辩论,并发表了最后陈述意见。庭审结束前,仲裁庭对庭后仲裁程序的进行作出了安排。

被申请人代理人于 2013 年 12 月 26 日提交了补充代理意见,秘书处于 2013 年 12 月 27 日将该文件转寄申请人及仲裁庭。申请人代理人于 2014 年 1 月 28 日提交了补充代理意见,秘书处于 2014 年 2 月 7 日将该文件转寄被申请人及仲裁庭。

经仲裁庭申请,本会秘书长根据《仲裁规则》第四十三条第(三)款的规定,同意延长本案裁决期限延至 2014 年 6

Page: 28   Date Filed: 07/27/2015   Document: 01019465886   Appellate Case: 15-1256

月 13 日止。

有关本案的一切法律文件、通知和材料均已由秘书处依照《仲裁规则》第六十条之规定，有效送达本案当事人和仲裁庭。

本案业已审理终结。仲裁庭根据已查明的事实和证据，以及应当适用的法律，对本案做出终局裁决。现将本案案情、仲裁庭意见及裁决分述如下：

## 一、 本案案情

（一）申请人在仲裁申请书中陈述的主要意见及仲裁请求事项

2010 年 5 月，申请人与被申请人签订了涉争《销售合同》，约定申请人向被申请人出售太阳能电池组件。《销售合同》第七条约定被申请人应当在货运提单上所列货物离港日起算的 60 天内付清货款。

2010 年 10 月 23 日，申请人按照《销售合同》向被申请人运送了总价为 646,191 美元的太阳能电池组件。2010 年 11 月 21 日，申请人再向被申请人运送了总价为 878,748 美元的太阳能电池组件。之后，申请人向被申请人提供了两批货物相关的发票、装箱单和提单。

根据《销售合同》第七条的约定，被申请人应当在提单

5

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 29

所列离港日后的 60 天内付清全部货款。因此，前述两批货物的货款支付截止日应分别为 2010 年 12 月 22 日和 2011 年 1 月 20 日。在上述截止日，被申请人未能按照《销售合同》的约定支付全部货款，总计拖欠 1,372,445.10 美元，且至今尚未偿还。

此外，根据《销售合同》第九条的约定，如被申请人未能按照合同及时支付全款而给申请人造成汇率损失的，由被申请人承担。即在货款支付截止日时中国人民银行的美元兑换人民币汇率较被申请人实际支付日的汇率有所贬值，由此造成的汇率损失应由被申请人承担。

为此，申请人在 2012 年 12 月 19 日和 2013 年 1 月 24 日两次向被申请人发出律师函，要求被申请人支付所欠货款。然而，迄今为止，被申请人仍未能偿还货款，亦未赔付由此给申请人造成的损失。申请人在仲裁申请书中提出的仲裁请求如下：

1、请求裁决被申请人向申请人支付两笔未付货款共计 1,372,445.10 美元（第一笔货款总额 646,191 美元，扣除被申请人已经支付的预付款后，被申请人尚欠 581,571.90 美元；第二笔货款总额 878,748 美元，扣除被申请人已付的预付款后，被申请人尚欠 790,873.20 美元），总计折合人民币 8,611,407 元（按中国银行 2013 年 3 月 7 日公布的美元兑人民币的中间折算价 6.2745 元计算）；

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 30

2、请求裁决被申请人向申请人支付上述未付货款截止日到实际支付日止的利息，暂计人民币 1,251,930 元（其中：第一笔货款的利息，从付款截止日的第二天 2010 年 12 月 23 日起暂计到 2013 年 3 月 7 日止，暂计人民币 543,454 元；第二笔货款的利息，从付款截止日的第二天 2011 年 1 月 21 日起暂计到 2013 年 3 月 7 日止，暂计人民币 708,476 元。以上总暂计利息人民币 1,251,930 元；请求计算至被申请人实际履行全部付款义务之日）；

3、请求裁决被申请人向申请人赔偿逾期付款给申请人造成的汇率损失人民币 464,816 元（其中：第一笔货款的汇率损失为人民币 216,403 元，第二笔货款的汇率损失为人民币 248,413 元；请求计算至被申请人实际履行全部付款义务之日）；

4、请求裁决被申请人承担申请人律师费共计人民币 250,000 元（250,000 元为暂计金额，当实际支出律师费超过 250,00 元时，请求裁决被申请人承担申请人实际的支出）；

5、请求裁决被申请人承担本案仲裁费。

申请人在第一次开庭时对前述第 1 项、第 3 项仲裁请求作了修改：第 1 项请求确认以美元计价；第 3 项请求变更为：请求裁决被申请人向申请人赔偿逾期付款给申请人造成的汇率损失人民币 463,779 元。截止日到 2013 年 3 月 7 日，汇率

起算日比之前计算移动了一天，计算日是 2010 年 12 月 22 日和 2011 年 1 月 20 日；汇率损失按照被申请人实际支付日计算。

（二）被申请人庭审时发表的答辩意见及第一次开庭后发表的代理意见

被申请人在庭审中口头发表了答辩意见，并于第一次开庭后提交书面代理意见，其主要观点如下：

1、被申请人与申请人存在长期合同关系，双方就质量标准和质保期达成合意。

被申请人与申请人之间存在长期合同关系。2009 年 7 月 7 日，被申请人与申请人签订《CO-BRANDING AGREEMENT》（下称："《联合品牌协议》"），合同期限为三年，双方约定了每一年的太阳能电池组件采购量。根据《联合品牌协议》的约定，双方在该合同有效期的三年内陆续签订了包括涉争《销售合同》在内的一系列的销售合同，确定了各个批次采购的组件型号、数量、价格、付款时间，交付时间。《联合品牌协议》中的 Purchase Order 条款约定："Before every contract year starts, parties need to sign on the purchase contract for that period. If during that contract year there are additional orders from buyer, parties may have additional purchase contracts. Both year and additional contracts are as the integral parts of the OEM agreement"。可见，《联合品牌协议》有效期内双方订立的各个销售合同或订单均是在该长期采购

合同不可分割的组成部分。因此，被申请人与申请人之间存在长期、稳定的交易关系。《联合品牌协议》中有关质量保证的约定应适用于被申请人与申请人之间约定采购的所有批次、所有型号的产品。

双方约定了质量标准及质量保证条款。根据申请人向被申请人提供的《CSUN OEM 组件检验标准 Q/CSUN.J27.0002 V1.0》，其中，序号 2 第 2 项技术要求明确规定："颜色：组件整版电池颜色均匀一致，不允许电池片跳色"，第 3 项技术要求明确规定"电池裂纹（肉眼可见）、碎片不允许"。上述条款表示，申请人所提供的太阳能电池组件应符合颜色均匀，无裂纹、无碎片的质量标准，否则，应视为存在材质及工艺缺陷。《联合品牌协议》Warranty/Defective Products 条款约定："For warranty, free from defects in material workmanship: 5 years"。该条款表示，申请人承诺其销售给被申请人的产品在 5 年内不会出现材质与工艺缺陷。

此外，被申请人于 2010 年 5 月 5 日与申请人之间的邮件往来显示，申请人的销售经理再次通过邮件向被申请人发送了名称为"Limited Warranties for Photovoltaic Modules 2010"的质量保证。该质量保证也同样约定 "CSUN warrants its MODULES, including field replaceable DC connectors and cables, to be free from defects in materials and workmanship under normal application, installation, use and service conditions. If MODULES fail to conform to this warranty, for a period

Appellate Case: 15-1256    Document: 01019465886    Date Filed: 07/27/2015    Page: 32

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 33

ending 60 months from date of sale to the original customer(CUSTOMER) as shown in stamped packing list of CSUN, CSUN will, at its option, either repair, replacement and refund the purchase price as paid by CUSTOMER". 由此可见，申请人承诺且被申请人接受，申请人就其销售给被申请人的产品存在的材质或工艺缺陷，在 5 年内承担修理、更换及退款的质量保证责任。

2、被申请人向申请人采购的产品存在质量缺陷，被申请人向申请人多次要求承担质量保证责任未果。

涉案合同及订单下的产品出现质量缺陷。根据被申请人提供的缺陷组件照片显示，《销售合同》下型号为 SSTWB190-72M 的组件存在明显的颜色不匀的现象，不符合申请人承诺的组件质量标准。另据申请人交付货物时提供的 Flash Testing Report（S69020043F-2），可以确定缺陷组件的型号对应《销售合同》下申请人所交付的组件型号。可见，《销售合同》下提供的 SSTWB190-72M 的组件产品存在明显的、目测可见的质量缺陷。

而后，被申请人又聘请权威的第三方检测机构对申请人交付的其他型号的组件进行了更加详细的检测，根据第三方检测机构 Celestica 出具的检测报告显示，申请人向被申请人交付的 SSTWB250-60M 型号的组件上存在目测可见的颜色不匀的情况。根据进一步 EL 光学检测，在出现蜗牛痕的组件上发现了清晰的裂痕。最终检测报告的结论是，蜗牛痕与裂痕

Appellate Case: 15-1256   Document: 0101946586   Date Filed: 07/27/2015   Page: 34

之间存在直接的关联，存在蜗牛痕的组件在 EL 光学检测中必然会被发现存在裂痕。而在有些组件上即便没有蜗牛痕，在 EL 光学检测汇总也发现存在裂痕。

而根据申请人交付货物时提供的 Flash Testing Report S69020043-7A，S69020043-7B 及 S69020043F-1（分别对应 S69020043 合同下的 PO1578 和 PO1559 订单），可以确定本案涉案合同及订单下申请人交付的货物均是 SSTWB250-60M 型号的组件。

出现质量缺陷的产品型号涉及被申请人与申请人之间多个订单批次。2010 年 12 月 10 日，被申请人首次针对申请人提供的组件汇总存在的上述材质与工艺缺陷，通过电子邮件向申请人提出了质量异议，并将发生质量问题的组件型号及有关数据和照片等详尽信息随邮件发送至申请人。2010 年 12 月 14 日，申请人回复邮件确认其收到了与该质量异议有关的所有文件。在随后的沟通中，申请人的销售经理向被申请人承诺会为被申请人更换缺陷组件，并且建议被申请人"无论最终协商结果如何"，被申请人应"尽快"为其客户更换存在缺陷的组件。于是，被申请人为其客户更换了被投诉的缺陷组件，但却迟迟没有收到申请人承诺的替代品。之后，被申请人又继续收到了多个客户的质量投诉，声称申请人所交付的多个批次的产品均先后出现不同程度的上述质量缺陷，从现场拍摄的照片中可以清晰地看到太阳能组件上存在明显的颜色不

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 35

匀及裂痕。2011 年 4 月 28 日，被申请人向申请人送达了正式的质量投诉，截止当时为止，被申请人为其客户更换缺陷组件而遭受的实际损失已达 2,417,335 美元，为此，被申请人根据申请人作出的质量保证，向申请人提出了提供替代产品或抵扣价款的要求。而后，被申请人又分别于 2011 年 9 月 15 日及 2011 年 11 月 4 日，再次向申请人提出了质量投诉，其中附随了被申请人收到的多个客户相继向其提出的质量投诉，缺陷产品包括多个批次的相同型号的组件，以及同一批次中的不同型号的组件。

根据权威第三方检测机构的报告显示，上述质量缺陷只有正常安装在室外至少五个月后方才逐渐显现，因此不排除有更多已安装的组件产品会在未来被发现存在上述缺陷。截止 2011 年 4 月，根据被申请人对其几个客户已安装的组件系统进行的抽样检测，申请人交付的货物中出现颜色不均及裂痕的缺陷率已达到 65%。但时至今日，申请人对于上述质量投诉未采取任何的补救措施，怠于履行其在合同中约定的质量保证义务，申请人的行为已构成违约。鉴于申请人所交付的产品出现广泛的质量缺陷，且缺陷组件的规模有可能不断扩大，而申请人始终怠于履行约定的质保义务，被申请人有理由认为申请人的行为将构成对长期采购合同的根本违约。

3、被申请人有权按照申请人提供的质量保证要求申请人采取修理、更换或退款的救济措施，并有权按照《联合国国

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 36

际货物销售合同公约》（以下简称 "《公约》"）的规定要求申请人减少价款，提供替代品。

根据申请人的质量保证，被申请人有权要求申请人对缺陷产品进行更换或减低价款。根据双方订立的《联合品牌协议》及 CSUN 质量保证，在产品销售之日起的 60 个月内，对于申请人交付的产品所存在的材质和工艺缺陷，被申请人有权要求申请人修理、更换或退款。被申请人基于申请人的质量保证要求就未支付的合同价款进行抵扣，并非违约，而是行使合同约定的质量不符情况下的救济权利。而且，双方在销售合同中约定适用《公约》，根据《公约》第五十条的规定，如果货物不符合合同，不论价款是否已付，买方都可以减低价款。

被申请人拒付货款的行为不构成违约。《公约》第八十一条规定，一方当事人因其行为或不行为而使得另一方当事人不履行义务时，不得声称该另一方当事人不履行义务。被申请人提交的证据表明，本案争议的未付款订单下的产品存在明显的质量缺陷。根据申请人的质量保证，申请人应当对被申请人在质保期内提出的质量缺陷产品进行修理、更换或减少价款。然而，时至今日申请人既未按照质量保证对缺陷产品进行修理，也未按被申请人要求提供更换的替代品，因此使得被申请人不得不从尚未支付的货款中抵扣应当减少的价款。由于申请人不履行合同约定的质保义务，导致被申请人

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 37

无法履行支付货款的义务，申请人不应当声称被申请人不履行义务或构成违约。

被申请人由于申请人交付的产品不符遭受实际损失。由于申请人提交的产品普遍存在质量缺陷，被申请人将产品销售给其客户并安装使用后，相继收到多家客户的质量投诉。截止2011年4月28日为止，被申请人为其客户更换缺陷组件而遭受的实际损失已达2,417,335美元，远远超出了被申请人抵扣的未向申请人支付的货款。并且，被申请人收到的客户投诉还远不止于此。至2011年9月15日，又有多家客户针对从申请人处采购的产品提出了相同的质量缺陷。目前，被申请人因缺陷产品受损的金额还在继续扩大。对此，被申请人保留继续根据申请人作出的质量保证，要求申请人更换缺陷产品或退款的权利。

（三）申请人代理人于庭后提交的代理意见

申请人代理人亦于第一次开庭后提交了书面代理意见，其主要观点如下：

1、被申请人拒绝支付本案系争《销售合同》的全部货款，应承担相应的违约责任，赔偿申请人的所有损失。

《销售合同》约定申请人向被申请人出售太阳能电池组件，被申请人承担相应的付款责任。2010年9月至2010年11月间，被申请人在《销售合同》下向申请人采购金额分别为646,191美元和878,748美元的两批太阳能电池组件。申请

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 38

人在收到了被申请人汇出的 10%预付款后，于 2010 年 10 月 23 日和 2010 年 11 月 21 日分别向被申请人发送了其所采购的太阳能电池组件。两次发货所对应的申请人商业发票号为 S69020043-6 和 S69020043-7。

　　申请人已全部履行了《销售合同》下的发货义务，但被申请人至今仍未能履行其付款义务，总计拖欠货款 1,372,445.10 美元。被申请人于第一次开庭庭审过程中，除认为拖欠金额应为 1,371,525 美元外，对申请人的上述主张不持异议。此外，被申请人至今尚未提交任何证据证明其实际拖欠的金额为 1,371,525.00 美元。

　　被申请人的违约行为给申请人造成了以下损失：（1）《销售合同》所欠货款： 1,372,445.10 美元；（2）利息损失：暂计至 2013 年 3 月 7 日止，利息损失人民币 1,251,930 元；（3）汇率损失：逾期付款给申请人造成的汇率损失，暂计至 2013 年 3 月 7 日，汇率损失人民币 463,779 元。被申请人未能按照合同约定向申请人支付全款，申请人提交本仲裁申请书之日以及本案第一次庭审之日的汇率较货款支付截止日的中国银行的美元兑换人民币汇率均有大幅贬值，因而给申请人造成了汇率损失。根据《公约》第七十四条所确立的"完全赔偿原则"，被申请人应当赔偿申请人的以上汇率损失。（4）律师费：申请人与其律师签订的法律服务合同的付费方式为有条件的封顶报价，封顶价为人民币 25 万元，截至申请人律师最

Appellate Case: 15-1256 Document: 0101946586 Date Filed: 07/27/2015 Page: 39

后一份账单日 2013 年 9 月 10 日，申请人已收到律师账单总计金额人民币 257,710 元。申请人因此请求裁决被申请人承担申请人律师费共计人民币 250,000 元，如果本案申请人最终实际支付的金额超过 250,000 元，申请人保留请求仲裁庭按最终实际支付的金额，要求被申请人作出相应赔偿的权利。（5）仲裁费：申请人已支付本案仲裁费人民币 225,782 元。

2、被申请人在 2013 年 9 月 14 日提交的证据《索赔函》中向申请人作出的赔偿主张，没有事实和法律依据，不应得到仲裁庭的支持。

被申请人在其 2011 年 4 月 28 日的《索赔函》中，主张申请人向其交付的部分太阳能电池组件存在质量瑕疵。但是，被申请人在该函中只字未提其所声称的质量瑕疵究竟为何种瑕疵，没有证明瑕疵确实是在申请人所售出的太阳能电池组件上发现的，所谓的瑕疵会对被申请人产生损失以及这些瑕疵严重到已无法使用而必须进行更换的程度，亦未提交任何太阳能电池组件已实际更换的证明。从而可见，被申请人没有证明申请人提供的货物的瑕疵已构成《公约》第二十五条的根本违约从而有权行使退款的权利，没有提交证据表明所声称的瑕疵货物数量确为《索赔函》中所列出的数字，瑕疵货物的单价价值以及被申请人确有实际支付过任何更换太阳能电池组件的劳工成本。甚至被申请人未能证明所附的《质保书》是申请人向被申请人出具的、针对本案系争的《销售

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 40

合同》项下货物的质量保证，或是针对《索赔函》中所涵盖货物的质量保证。

3、被申请人的赔偿主张，不能作为抗辩或反请求在本案中提出。

本案中，被申请人实际上是在主张产品质量的相关责任，要求申请人承担相应法律责任从而抵销被申请人在本案中应当支付的价款。然而，被申请人的该等主张不能在本案中作为抗辩或者反请求提出，主要理由如下：

被申请人主张的质量问题，即使按照其主张也系发生在本案《销售合同》之外的其他合同项下纠纷，并非本案审理范围，不应在本案中以抗辩或者反请求的方式解决。因此，从程序上看，被申请人该等主张和相应事实不应在本案中予以审理，其抗辩不应得到审理，反请求亦不应得到受理。

被申请人因所谓质量问题提出的索赔主张，并非其对申请人一项已经确定的到期债权，而是需要通过审理予以确认的待定事项。因此，其即使属于本案系争订单项下争议，亦不符合《中华人民共和国合同法》（以下简称"《合同法》"）中有关抵销的规定，不能直接在本案中通过抵销以抗辩的方式提出。

参照《最高人民法院关于审理买卖合同纠纷案件适用法律问题的解释》（以下简称"《审理买卖合同司法解释》"）第四十四条的规定，出卖人履行交付义务后要求买受人支付价

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 41

款的，买受人以出卖人违约在先为由主张出卖人应当支付违约金、赔偿损失等的，应当提起反诉。本案中，被申请人显然不是在消极抗辩，而是在积极向申请人主张给付并进一步要求抵销。被申请人的积极权利主张必须通过反请求或者另行起诉的方式予以提出，而不能仅通过抗辩的方式作出。本案中，从实体层面上看，因被申请人据以主张权利之订单并非本案系争订单，不符合中国法律有关反请求的条件，因此其无法在本案中提出反请求；从程序角度来看，因本案在2013年 3 月立案受理后期间历经半年多的时间内，被申请人均未提起反请求，这已经超过了《仲裁规则》和中国法律规定的反请求提起的时限要求，因此不应予以受理。

仲裁庭也在第一次庭审时明确表示不再受理被申请人提出的反请求。此外，考虑到被申请人早在第一次开庭审理前已经取得授权，却没有积极主张权利，却在延期后第一次开庭前最后一天完全没有任何理由地提起管辖权异议，希望拖延本案审限，不排除其反复拖延本案审理之嫌。有鉴于此，不论从法律规定和仲裁实践角度出发，还是从仲裁效率和公平的原则出发，均不应受理被申请人就所谓质量问题提出的抗辩或者反请求。

基于以上事实和理由，申请人请求仲裁庭，支持申请人要求被申请人支付剩余货款和相关赔偿的主张，并要求被申请人就其索赔主张，依照所基于的具体合同另行提起诉讼或

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 42

仲裁。

（四）被申请人代理人第二次开庭后提交的补充代理意见

被申请人代理人在第二次开庭后又提交了补充代理意见，其主要观点如下：

1、关于申请人与被申请人之间业务合作及发生争议的事实。

2009年7月7日，双方签订《联合品牌协议》，同日，双方签订《S60100号销售合同》，确定了采购第一批光伏组件的型号和数量。2010年3月1日，双方签订《S69020036号销售合同》。2010年4月9日，双方签订《S69020042号销售合同》。2010年5月5日，申请人以邮件方式向被申请人发送质保书。2010年5月17日，双方签订本案《销售合同》。2010年6月17日，双方签订《S69020045号销售合同》。

2010年12月，被申请人收到客户投诉，被申请人向客户转卖的申请人生产的光伏组件存在质量问题。被申请人经现场检验，核实了光伏组件的缺陷情况，并于2010年12月10日以邮件方式向申请人提出质量异议，以邮件附件形式提供了与缺陷组件有关的数据及照片。双方经过沟通，2011年1月6日，申请人销售经理Sally Fan建议，无论最终协商结果如何，被申请人应尽快为被申请人的客户更换存在缺陷的组件。被申请人遂于2011年1月19日根据客户Mogonlia Energy的要求更换了存在工艺缺陷的组件。

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 43

2011 年 1 月 26 日，被申请人再次通过邮件向申请人提出质量异议，并附上缺陷组件的照片。2011 年 4 月 3－14 日，被申请人又通过邮件向申请人提出质量异议，并提供了抽样检测的结果，光伏组件缺陷率已达到 65%。

2011 年 4 月 19－28 日期间，申请人在被申请人的催促下，派出相关人员 Lester（王兴磊）赴美至被申请人处就光伏组件发生质量问题了解情况。在申请人现场查验之后，被申请人当即于 2011 年 4 月 28 日向申请人发出了正式的索赔函。但申请人却始终没有给出解决方案，被申请人之后又分别于 2011 年 9 月 15 日、2011 年 11 月 4 日先后多次向申请人提出质量异议，要求申请人按照质保书履行质保义务，替换存在缺陷的光伏组件，但始终未得到申请人有效回应。可见，被申请人一直在向申请人提出质量异议，要求申请人承担质保义务，并非有意拖欠货款。

2、本案《销售合同》是分批次交付合同中的某一个批次。

被申请人与申请人的业务合作始于《联合品牌协议》，通过该长期采购协议，双方确定了在光伏组件上使用联合标识的合作事宜以及今后三年的总采购量。并且，基于该《联合品牌协议》，双方陆续签订了一系列的销售合同，以确定每次采购光伏组件的具体型号和数量。

可见，《联合品牌协议》所确定的合作目的是通过之后一系列的销售合同的履行来实现的。因此，本案《销售合同》

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 44

并非一个单独的合同。申请人与被申请人自 2009 年 7 月 7 日起签订的所有的合同，包括本案《销售合同》，应被视为一个整体适用《公约》关于分批次交付合同的规定。

3、申请人对其销售给被申请人的光伏组件应当承担质量保证责任。

申请人在庭审时一再否认质保书的存在，并认为即便质保书存在，被申请人所主张的缺陷并不影响光伏组件的正常使用，所以光伏组件并不存在质量缺陷。对此，被申请人认为：首先，从申请人提供的证据以及国际贸易的商业惯例来看，质保书是客观存在的。被申请人与申请人存在长期买卖光伏组件的合同关系，鉴于光伏组件的产品特性，双方对于质保不可能没有约定。事实上，申请人代理人在 2013 年 1 月 24 日向被申请人发出的律师函中第三段曾提到："*Please note that the* ***general warranty issued by CEEG*** *does not cover incidentals such as your labor costs.*" 由此可见，申请人代理人对质保书存在的事实以及质保书的具体内容是心知肚明的。其次，申请人的质保书适用于其生产的所有型号的光伏组件。被申请人在庭审中曾提交过两份从申请人处获得的质保书，虽然这两份质保书的出具人分别为申请人 CEEG 和被申请人的母公司 CSUN，但两份质保书的主要内容是一致的，都承诺对于组件上产生的材质和工艺缺陷质保 5 年。此外，在双方签订的《联合品牌协议》中，申请人也承诺了与质保书一致

21

Appellate Case: 15-1256   Document: 0101946588   Date Filed: 07/27/2015   Page: 45

的质保范围和期限。申请人提供的质保书适用于其生产的所有型号的光伏组件产品。再者，光伏组件上出现裂纹及蜗牛痕的现象属于质保书对材质及工艺缺陷的质保范围。申请人提供的质保包含两个部分，其一是针对材质和工艺缺陷的质保，其二是针对功率输出的质保。被申请人提供的组件检验标准明确要求光伏组件电池表面颜色应当均匀一致，并且不得存在裂纹。而蜗牛痕及裂纹的出现正是属于一种材质及工艺缺陷。无论裂纹及蜗牛痕是否影响光伏组件的功率输出，根据申请人在质保书中的承诺，申请人也应该就材质及工艺缺陷履行质保义务。在产品发生质量问题时，申请人对于处理质量问题采取拖延回避的态度，显然是违约在先。最后，Celestica 检测报告具有权威性。Celestica 实验室是 TUV Rheinland 实验室授权的，为光伏组件提供测试认证服务的专业机构。而 TUV Rheinland 实验室正是申请人提供的质保书中确定的检测机构。因此，Celestica 实验室与 TUV Rheinland 实验室对光伏组件测试结果具有同样的权威性。

4、被申请人以存在质量缺陷为由要求申请人减少价款等救济的主张属于抗辩。根据中国最高人民法院《审理买卖合同司法解释》第四十四条"出卖人履行交付义务后诉请买受人支付价款，买受人以出卖人违约在先为由提出异议的，人民法院应当按照下列情况分别处理：（一）买受人拒绝支付违约金、拒绝赔偿损失或者主张出卖人应当采取减少价款等补救

Appellate Case: 15-1256   Document: 0101946886   Date Filed: 07/27/2015   Page: 46

措施的，属于提出抗辩；（二）买受人主张出卖人应支付违约金、赔偿损失或者要求解除合同的，应当提起反诉"的规定，被申请人在本案中基于申请人产品存在缺陷而要求减少价款等救济的主张，属于抗辩而非反请求。

5、被申请人不应就未支付货款承担违约责任。申请人不履行质保义务在先，导致被申请人抵扣未支付货款以弥补缺陷产品造成的损失，根据《公约》第八十条的规定，申请人不得主张被申请人不履行合同义务或违约。因此，被申请人对于申请人因被申请人未支付货款而遭受的利息损失、汇率损失不承担违约责任。

（五）申请人代理人第二次开庭后提交的补充代理意见

针对被申请人提交的补充代理意见，申请人亦提交了书面补充代理意见，其主要观点如下：

1、本案系争《销售合同》合同完全独立于《联合品牌协议》，两者之间并无任何关联性。首先，被申请人未能提供《联合品牌协议》的原件，申请人对《联合品牌协议》的真实性不予认可。其次，《联合品牌协议》与本案系争《销售合同》显然也无任何关联性。《联合品牌协议》和《销售合同》中均无任何内容相互提及或引述，无从推断两者之间存在任何关系。并且，《联合品牌协议》本身条款自相矛盾，且与《销售合同》的条款也多处存在冲突。本案双方在2010年的实际交易情况，包括交货的种类、数量和付款方式，也均非依据《联

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 47

合品牌协议》执行，例如，双方在《销售合同》下的实际付款方式为：发货前买方支付 10%预付款，90%尾款在货物离港 60 天内付清；而不是《联合品牌协议》中所规定的"20%预付款，80%尾款 10 天内付清"或"100%全款 3 个月内付清"中的任何一种方式。故本案与《联合品牌协议》无关，根本无法得出所谓《销售合同》是《联合品牌协议》中某一批次的结论。

2、被申请人所谓的两份《质保书》均不具有真实性，不能作为本案认定事实的依据。被申请人认为双方之间对于质保存在约定的主要依据即其向仲裁庭先后提交的两份《质保书》。然而，对于第一份《质保书》（即"Limited Warranty for PV Modules"），其上没有任何一方的签章或签字，来源不明；对于第二份《质保书》（即"Limited Warranty for Photovoltaic Modules 2010"），其上也没有申请人签章或签字，且出具人为 China Sunergy (Nanjing) Co., Ltd.，并非申请人，同样与本案无关。故申请人对两份所谓《质保书》的真实性均不予认可，被申请人依据该等《质保书》主张质量问题不应予以采信。

3、Celestica 检测报告不具有权威性，如被申请人认为质量不符合合同约定，完全可以申请司法鉴定。被申请人在其代理意见中提出 Celestica 实验室是 TUV Rheinland 实验室授权的权威机构，但其对此未提供任何证据予以证明。事实上，对于双方争议的产品质量问题，被申请人完全可以在仲裁程

序中申请司法鉴定，而非仅仅提供一份其自行委托的机构出具的检测报告。

　　4、本案仲裁的裁决范围应当仅限于申请人所主张的货款争议，如被申请人主张质量缺陷赔偿，应当提出反请求或另行诉讼。首先，被申请人依据《审理买卖合同司法解释》主张减少价款属于抗辩而非反请求。然而，该等依据属于最高人民法院作出的司法解释，应当仅适用于其下属各级人民法院审理诉讼案件，而不适用于本案仲裁。其次，被申请人主张质量问题系主要依据其作为证据提交的《质保书》，而恰恰根据该质保书本身第 5 条的约定，质保承诺人与购买者有任何争议，应提交中国南京市有管辖权的法院审理，故仲裁庭对本案双方目前对该质保书而引起的争议，不具有管辖权。被申请人应当另案向南京有管辖权的人民法院起诉。再次，本案中被申请人未提出任何反请求主张质量缺陷赔偿，如仲裁委对相关质量争议予以裁决，显然将属于典型的超裁。因此，本案仲裁应当仅限于申请人所主张的货款争议，而不应当涉及质量争议。当然，这也并不会影响被申请人的任何实质权益，如被申请人欲基于质量问题主张赔偿责任，其完全可以另行起诉以维护其合法权益。

## 二、仲裁庭意见

Appellate Case: 15-1256　　Document: 0101946 5886　　Date Filed: 07/27/2015　　Page: 48

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 49

（一）关于本案的法律适用

本案当事人签订的交易标的物为太阳能电池组件，交易跨越国境，涉争《销售合同》系国际货物销售合同；申请人的营业地位于中国，被申请人的营业地位于美国，双方当事人的营业地所属国均为《公约》的缔约国；《销售合同》第十五条约定："……准据法为《联合国国际货物销售公约》"；当事人均援引了中国法律的相关内容及法院的司法解释作为依据；所以，仲裁庭认为解决本案《销售合同》项下的争议应适用《公约》的规定，《公约》未规定的内容适用中国法律。

（二）关于涉争《销售合同》的效力

根据《公约》第四条规定："本公约只适用于销售合同的订立和卖方和买方因此种合同而产生的权利和义务。特别是：本公约除非另有明文规定，与以下事项无关：（a）合同的效力，或其任何条款的效力，或任何惯例的效力；……。"因此，关于涉争《销售合同》的效力问题，应适用中国法律作出判断。

仲裁庭注意到，本案《销售合同》分别有申请人加盖的公司公章和被申请人授权代表的签名，是双方当事人真实的意思表示，双方在仲裁过程中对合同的效力均不持异议，仲裁庭亦未发现合同内容存在与中国现行法律、行政法规关于合同效力的强制性规定相抵触而导致合同无效的情形。根据《合同法》第三十二条关于"当事人采用合同书形式订立合同

Appellate Case: 15-1256    Document: 01019465886    Date Filed: 07/27/2015    Page: 50

的，自双方当事人签字或者盖章时合同成立"以及该法第四十四条关于"依法成立的合同，自成立时生效"之规定，仲裁庭认为，本案涉争合同已依法成立并生效，对双方当事人均具有法律约束力，双方均应严格按照合同约定以及相关法律法规规定履行义务、主张权利和承担责任。

（三）仲裁庭查明的事实

仲裁庭核阅了双方当事人提交的证据材料，并听取了双方当事人关于《销售合同》履行情况的陈述，基于双方当事人的举证和质证意见，查明如下事实：

申请人与被申请人于 2010 年 5 月 14 日在上海签订了《销售合同》，合同约定申请人作为卖方向作为买方的被申请人出售太阳能电池组件。合同对货物运输、交货、货款支付、汇率风险、检验与索赔等均作了约定。

上述合同签订后，被申请人于 2010 年 10 月 8 日向申请人支付了 64,619.10 美元的货物预付款。申请人于 2010 年 10 月 23 日向被申请人运送了总价为 646,191.00 美元的太阳能电池组件。被申请人又于 2010 年 11 月 9 日向申请人支付了 87,874.80 美元的预付款。2010 年 11 月 21 日，申请人再向被申请人运送了总价为 878,748.00 美元的太阳能电池组件。

此后，被申请人并未根据《销售合同》第七条"货款支付：提单上所列离港日期后 60 天内回款"的约定向申请人支付上述两笔货物剩余 90% 的货款，至今尚欠申请人货款

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 51

1,372,445.10 美元未予偿还。

（三）本案争议焦点

基于上述事实及双方各自的观点，仲裁庭就本案争议焦点和仲裁庭的基本观点发表如下意见：

1、被申请人以货物质量缺陷为由要求申请人减少价款的答辩主张是否属于本案的审理范围，是否应另行提出诉请。

仲裁庭注意到，被申请人在《仲裁规则》规定的期限内未提出仲裁反请求，但其在答辩意见中指出申请人提交的货物存在质量瑕疵，进而提出应减少价款的答辩主张。

申请人对此认为，本案仲裁庭的审理范围应仅限于申请人所主张的货款争议，而不应涉及质量争议。被申请人有关基于质量缺陷而应予以赔偿的主张应当提出仲裁反请求或另行诉讼。被申请人则认为，被申请人以存在质量缺陷为由要求申请人减少价款等救济的主张属于抗辩而非反请求。

仲裁庭认为，对于被申请人以货物质量缺陷为由要求申请人减少价款主张的性质进行判断的前提是确定涉案《销售合同》的准据法就相关问题的规定。仲裁庭在前述意见中业已认定，涉案《销售合同》项下的争议解决应适用《公约》，《公约》未规定的事项应适用中国法律。仲裁庭注意到，《公约》对于国际销售合同中的买方有关货物质量的减价主张应是属于其行使抗辩权还是属于反请求的问题并没有作出规定；《合同法》对该问题也没有相关的规定；但当事人均援

28

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 52

引了中国最高人民法院《审理买卖合同司法解释》第四十四条规定："出卖人履行交付义务后诉请买受人支付价款，买受人以出卖人违约在先为由提出异议的，人民法院应当按照下列情况分别处理：（一）买受人拒绝支付违约金、拒绝赔偿损失或者主张出卖人应当采取减少价款等补救措施的，属于提出抗辩；（二）买受人主张出卖人应支付违约金、赔偿损失或者要求解除合同的，应当提起反诉"，该等规定可作为仲裁庭对本案相应问题考量的法律依据。本案现有材料表明，作为买方的被申请人主张基于货物质量瑕疵减少价款的主张应适用《审理买卖合同司法解释》第四十四条第（一）项的规定，以答辩方式提出即可，无须以反请求方式提出。

2、涉案《销售合同》项下申请人与被申请人在合同履行过程中相关违约责任的认定

从仲裁庭已经查明的事实来看，本案申请人在收到了被申请人分两批汇出的 10%预付款后，于合同规定的期限内向被申请人发送了《销售合同》项下的两批太阳能电池组件。申请人已履行了合同项下的发货义务，而被申请人至今尚未履行合同项下的付款义务。

但被申请人答辩称申请人的产品存在质量缺陷。根据申请人的质量保证以及《公约》的规定，被申请人有权要求申请人对缺陷产品进行更换或退款。申请人怠于履行质保义务，导致被申请人抵扣未支付货款以弥补缺陷产品造成的损失。

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 53

同时，由于申请人不履行约定的质保义务，导致被申请人无法履行支付货款的义务。申请人的行为构成对申请人与被申请人签订的《联合品牌协议》的根本违约。

仲裁庭对此注意到，被申请人称申请人与被申请人在双方签订的《联合品牌协议》中就质量标准和质保期达成合意，申请人向被申请人提供的质保书适用于其生产的所有型号的光伏组件产品，而根据被申请人聘请的第三方权威检测机构 Celestica 实验室对申请人交付的货物检测后出具的检验报告，申请人向被申请人交付的产品存在很多严重的质量问题。然而，申请人除了对被申请人提供的《联合品牌协议》和质保书的真实性及对 Celestica 检测报告的权威性均予以否定外，还指出《联合品牌协议》与本案系争《销售合同》并无任何关联性，其中有关条款不能适用于本案。

仲裁庭经对相关证据进行审查后认为，被申请人答辩所称申请人提交的货物存在严重质量问题的理由不能成立，理由如下：

第一，仲裁庭注意到，《销售合同》第 2 条第（6）款约定："用 LUMOS 和 CSUN 的联合商标和包装信息"，该条款提及的联合商标，应是被申请人主张的《联合品牌协议》中所涉的"商标"范畴。然而仲裁庭通过分别对于《销售合同》、《联合品牌协议》各自合同条款的分析，认为该两份合同在合同标的数量、交货和付款等重要条款上并不相同。上述两

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 54

份合同系各自独立的合同，各自约束不同的合同标的的权利和义务，无法得出被申请人辩称的《销售合同》为执行《联合品牌协议》项下的一个批次合同的结论。因此，被申请人援引的《联合品牌协议》项下有关质量保证和质保期的约定，对于本案涉争《销售合同》并无约束力。并且，仲裁庭获得管辖权的依据为双方当事人在《销售合同》中达成的仲裁条款，《联合品牌协议》并非本案的审理范围。

第二，被申请人主张依据其提交的《质保书》，申请人提供的《销售合同》项下的产品存在严重质量问题。仲裁庭注意到，被申请人提交了《质保书》作为证据，申请人对于该份证据的真实性不予认可，但申请人代理人曾于2013年1月24日致被申请人的函件中亦提及了质保书，在申请人未能提交反驳证据的前提下，申请人对该份《质保书》真实性异议的主张难以成立。仲裁庭审阅了《质保书》的内容，从被申请人提交的《质保书》的文字内容可见，其中承诺的质量保证5年的期限是针对消费者的，与被申请人在本案中要求减少价款的答辩主张无涉。此外，《质保书》还约定质保承诺人与购买者有任何争议应提交中国南京市有管辖权的法院审理，由此仲裁庭对涉及《质保书》而引起的争议不具有管辖权，如涉及《质保书》项下的争议，当事人可向有管辖权的人民法院另行寻求司法救济。

第三，双方签订的《销售合同》并未约定货物质量的检

验机构，依据现有证据查明的事实显示，被申请人在提请第三方检测机构 Celestica 实验室对申请人提供货物进行检测之前，未将检测机构等相关情况告知申请人或得到申请人的同意，而申请人提出该份检验报告所涉检样是否双方系争合同履行时的交付状态的异议，考虑到该份检验报告系在申请人提请仲裁后作出，距系争合同项下交货期已逾三年，仲裁庭难以仅凭该报告认定申请人交付的货物存在质量问题。

鉴于上述理由，仲裁庭对于被申请人辩称的申请人交付的货物存在严重质量问题的观点不予采信。仲裁庭根据现有的证据和查明的事实认为，本案申请人已履行了《销售合同》项下的发货义务，被申请人没有提供足够和合理的证据证明该履行行为存在过失和不当，而被申请人至今尚未履行合同项下的付款义务，已构成违约，应承担相应的违约责任。

（四）关于申请人的仲裁请求

1、关于要求被申请人向申请人支付两笔未付货款的仲裁请求

仲裁庭在前述意见中业已认定，在申请人已经履行《销售合同》项下交货义务的情况下，被申请人有义务向申请人支付全部货款。根据《公约》第六十二条"卖方可以要求买方支付价款、收取货物或履行他的其他义务，除非卖方已采取与此一要求相抵触的某种补救办法"的规定，对于申请人的该项仲裁请求仲裁庭予以支持。仲裁庭注意到就货款金额

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 56

而言，被申请人在答辩中提出应为 1,371,525 美元，该金额与申请人主张的剩余货款金额略有差异，但被申请人并未提交任何证据证明其有关货款金额的主张。仲裁庭通过对双方提交的证据材料的审查认定，被申请人所欠的货款应为 1,372,445.10 美元。

2、关于利息损失的仲裁请求

申请人请求裁决被申请人向申请人支付未付货款截止日到实际支付日的利息，暂计人民币 1,251,930 元（其中：第一笔货款的利息，从付款截止日的第二天 2010 年 12 月 23 日起暂计到 2013 年 3 月 7 日止，暂计人民币 543,454 元。第二笔货款的利息，从付款截止日的第二天 2011 年 1 月 21 日起暂计到 2013 年 3 月 7 日止，暂计人民币 708,476 元。以上总暂计利息人民币 1,251,930 元。请求计算至被申请人实际履行全部付款义务之日）。

被申请人拖欠货款已经构成违约，应对于其拖欠货款的行为承担违约责任，根据《公约》第七十八条："如果一方当事人没有支付价款或任何其他拖欠金额，另一方当事人有权对这些款额收取利息，但不妨碍要求按照第七十四条规定可以取得的损害赔偿"的规定，仲裁庭认为申请人要求被申请人支付利息损失的仲裁请求于法有据。

仲裁庭注意到，《销售合同》约定被申请人应当在货运提单上所列货物离港日起算的 60 天内付清货款，因此，鉴于两

批货物的发货日期分别为 2010 年 10 月 23 日和 2010 年 11 月 21 日,其货款支付截止日应分别为 2010 年 12 月 22 日和 2011 年 1 月 20 日。申请人主张第一笔货物利息起算日为付款截止日之次日 2010 年 12 月 23 日,第二笔货物利息起算日为 2011 年 1 月 21 日,仲裁庭对于该等起算时间予以采纳;然而,仲裁庭认为,申请人在第一项仲裁请求中已经明确两笔未付货款应以美元计价的情况下,却主张使用美元折换人民币的汇率、中国人民银行公布的人民币贷款利率来计算本项利息损失,该等利率主张存在错误,仲裁庭不予采纳,参考涉争《销售合同》履行期内的美元贷款情况,仲裁庭裁决以 2.53%的年利率计算上述两笔货款截止 2013 年 3 月 7 日止的利息,共计 74,991 美元。

综上,仲裁庭裁决被申请人应向申请人支付逾期付款利息 74,991 美元以及以 1,372,445.10 美元为本金,自 2013 年 3 月 8 日起算至实际付款日,以 2.53%年利率计算的逾期付款利息。

3、关于汇率损失的仲裁请求

申请人请求裁决被申请人向申请人赔偿逾期付款给申请人造成的汇率损失人民币 464,816 元(其中:第一笔货款的汇率损失为人民币 216,403 元,第二笔货款的汇率损失为人民币 248,413 元。请求计算至被申请人实际履行全部付款义务之日)。

Appellate Case: 15-1256   Document: 0101946588   Date Filed: 07/27/2015   Page: 57

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 58

仲裁庭注意到,《销售合同》第 9 条约定:"如果本合同项下的结算货币是美元或欧元,且买方未能按照本合同及时付款。因此而给卖方所造成的汇率风险损失由买方承担。即在买方实际的延迟付款时根据中国银行的官方美元或欧元对人民币的汇率,与买方根据本合同应付款时的官方汇率相比较,如美元或欧元对人民币有贬值,由此而给卖方造成的损失由买方承担",由此仲裁庭对于因被申请人逾期付款造成的申请人汇率损失的请求予以支持。根据仲裁庭前述认定,被申请人所欠第一笔货款金额为 581,571.90 美元,应于 2010 年 12 月 22 日前支付;第二笔货款金额为 790,873.20 美元,应于 2011 年 1 月 20 日前支付。仲裁庭经查中国银行美元对人民币汇率的相关数据,对于申请人汇率损失的计算方式予以认可,其应支付的汇率损失金额应为:(1)第一笔货款 581,571.90 美元,以裁决作出前一日中国银行公布的美元对人民币汇率与 2010 年 12 月 23 日的中行折算价 6.6466 之差计算的汇率损失人民币 287,878.09 元;(2)第二笔货款 790,873.20 美元,以裁决作出前一日中国银行公布的美元对人民币汇率与 2011 年 1 月 21 日的中行折算价 6.5886 元计算的汇率损失人民币 345,611.58 元。

4、关于律师费的仲裁请求

鉴于本案争议系由于被申请人违约行为而产生,考虑到申请人仲裁请求得到支持的程度,根据《仲裁规则》第四十

七条第（二）款"仲裁庭有权根据案件的具体情况在裁决书中裁定败诉方应当补偿胜诉方因办理案件而支出的合理的费用"的规定，被申请人应补偿申请人为本案而支出的律师费，仲裁庭裁决被申请人应补偿申请人律师费人民币 230,000 元。

5、关于本案仲裁费的承担。

考虑到申请人仲裁请求得到支持的程度以及引起本案争议的原因等因素，仲裁庭认为本案仲裁费由申请人承担 10%，被申请人承担 90%。

# 三、裁 决

仲裁庭裁决如下：

（一）被申请人应向申请人支付两笔未付货款共计 1,372,445.10 美元；

（二）被申请人应向申请人支付逾期付款利息 74,991 美元以及以 1,372,445.10 美元为本金，自 2013 年 3 月 8 日起算至实际付款日，以 2.53%年利率计算的逾期付款利息；

（三）被申请人应向申请人赔偿逾期付款造成的汇率损失人民币 633,489.67 元；

（四）被申请人应向申请人补偿为本案而支出的律师费人民币 230,000 元；

（五）本案仲裁费为人民币 225,782 元，由申请人承担

Appellate Case: 15-1256    Document: 01019465886    Date Filed: 07/27/2015    Page: 59

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 60

10%，即人民币 22,578.20 元，被申请人承担 90%，即人民币 203,203.80 元。鉴于申请人已全额预缴仲裁费，被申请人应支付申请人民币 203,203.80 元；

上述（一）、（二）、（三）、（四）、（五）项裁决所涉款项，被申请人应在裁决书生效之日起 15 日内一次性给付申请人。

本裁决为终局裁决，自作出之日起生效。

（此页无正文）

首席仲裁员：

仲　裁　员：

仲　裁　员：

二〇一四年六月三日于上海

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 62



上海国际经济贸易仲裁委员会(上海国际仲裁中心)
Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center)

Translation

NOTARIAL CERTIFICATE

(2014)H.D. Z.W.J.Z.No.2035

Applicant:

CEEG (Shanghai) Solar Science & Technology Co., Ltd.

Domicile: No. 5999, Guangfulin Rd., Songjiang District, Shanghai

Legal Representative: LU Tingxiu, male, Citizen ID No.: 321124196105293532

Entrusted Agent: ZHENG Lulu, female, Citizen ID No.: 342622198712111903

Notarized Matter: Arbitral Award

This is to certify that the foregoing document is a true copy of the original Arbitral Award issued to CEEG (Shanghai) Solar Science & Technology Co., Ltd. by Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center) on June 13, 2014 and the original copy is genuine.

YE Guojian (Seal)
Notary Public

The People's Republic of China
Shanghai Oriental Notary Public Office
(Seal)

October 9, 2014

# 公　　证　　书

(2014)沪东证外经字第 2036 号

申请人：中电电气（上海）太阳能科技有限公司
　　　　住所：上海市松江区广富林路五九九九号
　　　　法定代表人：陆廷秀，男，公民身份号码：
　　　　　　　　　　321124196105293532
　　　　委托代理人：郑露露，女，公民身份号码：
　　　　　　　　　　342622198712111903

　　公证事项：译文与原本相符
　　兹证明前面的英文译本内容与中电电气（上海）太
阳能科技有限公司的(2014)沪东证外经字第 2035 号公
证书中文原本相符。

中华人民共和国上海市东方公证处

公 证 员　

二〇一四年十月九日



认 字 第 14032231-1 号

兹证明前面文书上公证处的印
章和公证员    叶国建    的签名
（印章）属实。

中华人民共和国外交部（ 310 ）
2014 年 10 月 09 日   上海

3318159

Consulate General of the )
United States of America )          SS;
in Shanghai, China        )

I,                          Consul of the
United States of America at Shanghai, China duly
commissioned and qualified do hereby certify that
        Zhang, Ying          , whose true signature
subscribed above was on Oct. 9, 2014 the date
hereof, an officer of the Foreign Affairs Office
of the    Shanghai    People's Government,
duly commissioned and qualified, to whose official
acts full faith and credit are due. For the contents
of this document I assume no responsibility.

IN WITNESS WHEREOF I have hereonto set my hand
and affixed the seal of the United States Consulate
General at Shanghai, China, this    14th    day of
Oct., 2014.

American Consulate General
Shanghai China

PRESIDENTIAL COMMISSIONS DO NOT EXPIRE

Case 1:14-cv-03118-WYD-MEH   Document 39-2   Filed 07/27/15   USDC Colorado   Page 59 of 269

Appellate Case: 15-1256    Document: 01019465886    Date Filed: 07/...    Page...

EXHIBIT
B to

EXHIBIT
2

# Arbitral Award

Shanghai International Economic and Trade Arbitration Commission (Shanghai International

Arbitration Center)

# Shanghai International Economic and Trade Arbitration Commission

## (Shanghai International Arbitration Center)

## Arbitral Award

Applicant:  CEEG (Shanghai) Solar Science & Technology Co., Ltd.

Domicile:  Building 2, No. 68, Gangde Road, Xiaokunshan Town, Songjiang District, Shanghai Municipality

Attorneys:  Hu Mei, Lawyer of Beijing King & Wood Mallesons Law Firm Shanghai Branch

Yu Simin, Lawyer of Beijing King & Wood Mallesons Law Firm Shanghai Branch

Liu Qian, Lawyer of Beijing King & Wood Mallesons Law Firm Shanghai Branch


Respondent: LUMOS LLC

Domicile:  3550 Frontier Avenue, #C2, Boulder, United States

Attorneys:  Xiong Wei, Lawyer of Guangdong WANG JING & CO. Shanghai Branch

Gao Ya, Lawyer of Guangdong WANG JING & CO. Shanghai Branch


**Shanghai**

**June 13, 2014**



## Arbitral Award

[2014] H. M. Z. C. Zi. No. 138

In accordance with the arbitration clause set out in the *Sales Contract* No. S69020043, which Contract was signed by and between the Applicant CEEG (Shanghai) Solar Science & Technology Co., Ltd. (hereinafter referred to as "the Applicant") and the Respondent LUMOS LLC (hereinafter referred to as "the Respondent"), as well as the arbitration application submitted by the Applicant to the Commission on March 22, 2013, China International Economic and Trade Arbitration Commission Shanghai Branch (now renamed as "Shanghai International Economic and Trade Arbitration Commission", also known as "Shanghai International Arbitration Center", hereinafter referred to as "the Commission") accepted the case of dispute arbitration under the aforesaid *Sales Contract* on April 1, 2013 after the Applicant handled relevant formalities including prepayment for the arbitration cost. The number of the case is SG2013023.

*Arbitration Rules of China International Economic and Trade Arbitration Commission Shanghai Branch* (hereinafter referred to as *"the Arbitration Rules"*) implemented from May 1, 2012 applies to the arbitration procedure of this case.

The Secretariat of the Commission (hereinafter referred to as "the Secretariat") issued acceptance notice/arbitration notice, *Arbitration Rules* and *List of Arbitrators* to the Applicant and the Respondent on April 1, 2013, and also sent to the Respondent the arbitration application and attachments which were submitted by the Applicant.

In accordance with the stipulations set out in the *Arbitration Rules*, an arbitration tribunal composed of three arbitrators heard the case. The Applicant appointed Mr. Chen Gang as the Arbitrator. The Respondent failed to choose or entrust the Director of the Commission to designate an arbitrator within the term stipulated by the *Arbitration Rules*, and the Director of the Commission appointed Mr. Liu Ying as its arbitrator according to Item (I), Clause 22 of the *Arbitration Rules*. Whereas the Applicant and the Respondent failed to choose jointly or entrust the Director of the Commission to designate the Chief Arbitrator according to the stipulations set out in the *Arbitration Rules*, the Director appointed Ms. Liu Xiaohong as Chief Arbitrator according to the stipulations set out in in Item (IV), Clause 22 of the *Arbitration Rules*. The three arbitrators aforesaid all signed the *Arbitrator's Declaration*, and established the arbitration tribunal on May 27, 2013 to hear the case jointly. The arbitration tribunal decided to open a court session on June 27, 2013. The Secretariat sent the *Notice of Composition of Arbitration Tribunal* and the *Notice of Hearing* to the Applicant and the

Appellate Case: 15-1256   Document: 0101946586   Date Filed: 07/27/2015   Page: 68

Respondent on May 27, 2013.

The Respondent submitted an application for extension of hearing on June 20, 2013. The Secretariat forwarded the said document to the Applicant and the arbitration tribunal on June 21, 2013, and also requested the Applicant to make written comments. On June 24, 2013, the Applicant submitted the written comments on the aforesaid application made by the Respondent, and the Secretariat forwarded the said document to both the Applicant and the Respondent on the same day. After penal discussion, the arbitration tribunal approved the Respondent's application for extending the date of hearing and entrusted the Secretariat to inform both parties of such decision in writing on June 24, 2013.

The arbitration tribunal decided to extend the open session of the case until September 14, 2013, and the Secretariat sent the notice of extension of court hearing to both parties on July 29, 2013. Later, the arbitration tribunal decided to adjust the time of court session, i.e. in the morning of September 14, 2013, to the afternoon of the same day, and also entrusted the Secretariat to inform both parties of such matter in writing on August 5, 2013.

The Respondent submitted jurisdiction objection on September 11, 2013. The Secretariat forwarded such file to the Applicant and the arbitration tribunal on the same day, and also requested the Applicant to make written comments on the file. On September 12, 2013, the Applicant submitted the opinions on the aforesaid jurisdiction objection raised by the Respondent, and the Secretariat forwarded such file to both the Respondent and the arbitration tribunal on the same day.

On September 13, 2013, the Commission made "[2013] H. M. Z. Zi. No. 4801" *Resolution on Jurisdiction* to reject the Respondent's jurisdiction objection, and held that the arbitration procedure of the case shall be implemented continuously.

On September 14, 2013, the arbitration tribunal opened the court session to hear the case in the location of the Commission. The arbitration attorneys of both the Applicant and the Respondent appeared in the court for hearing. The two parties made presentations on facts and legal issues of the case, questioned the evidences, answered the questions raised by the arbitration tribunal, debated and gave final statement opinions. Before the hearing was finished, the arbitration tribunal arranged for the arbitration procedures after the session.

Attorneys of the Respondent submitted the attorneys' opinions and supplementary evidences on September 27, 2013. The Secretariat forwarded such materials to the Applicant and the tribunal on September 29, 2013, and also requested the Applicant to give written cross-examination opinions on

the supplementary evidences submitted by the Respondent.

The Applicant's attorneys submitted the attorneys' opinions and supplementary evidences on September 30, 2013. The Secretariat forwarded such materials to the Respondent and the tribunal on October 8, 2013, and also requested the Respondent to give written cross-examination opinions on the supplementary evidences submitted by the Applicant.

On October 14, 2013, the Applicant submitted the cross-examination opinions on the supplementary evidences submitted by the Respondent after the court hearing. The Secretariat forwarded such materials to the Respondent and the tribunal on October 15, 2013. The Respondent submitted written comments on cross-examination opinions mentioned above on October 22, 2013, and the Secretariat forwarded such documents to the Applicant and the tribunal on October 24, 2013.

The Respondent submitted a written document named *Request on Further Explanations on the Evidences of the Case* on October 28, 2013, requesting the arbitration tribunal to open a court session to hear the case again. The Secretariat forwarded such documents to the Applicant and the arbitration tribunal on October 29, 2013. On November 4, 2013, the Applicant submitted the comments on the preceding documents submitted by the Respondent. After penal discussion, the arbitration tribunal decided to open the second court session to hear the case on December 12, 2013, and also entrusted the Secretariat to send the notice of court session to both parties on November 13, 2013.

On December 12, 2013, the arbitration tribunal opened the court session for the second time to hear the case at the location of the Commission. The arbitration attorneys of both the Applicant and the Respondent appeared in the court for hearing. The two parties made further presentations on facts and legal issues of the case, carried out cross-examinations on the supplementary evidences, answered the questions raised by the arbitration tribunal, debated and gave final statement opinions. Before the hearing was finished, the arbitration tribunal arranged for the arbitration procedures after the session.

Attorneys of the Respondent submitted the supplementary attorneys' opinions on December 26, 2013. The Secretariat forwarded the file to the Applicant and the tribunal on December 27, 2013. Attorneys of the Applicant submitted the supplementary attorneys' opinions on January 28, 2014, and the Secretariat forwarded the file to the Respondent and the tribunal on February 7, 2014.

Upon application of the arbitration tribunal, the Secretary-general of the Commission, based on the stipulations set out in Item (III), Clause 43 of the *Arbitration Rules*, agreed to extend the term of judgment on the case to June 13, 2014.

Appellate Case: 15-1256   Document: 0101946588   Date Filed: 07/27/2015   Page: 71

All legal documents, notices and materials related with the case have been sent to the parties concerned in the case and the arbitration tribunal effectively according to the stipulations set out in Clause 60 of the *Arbitration Rules* by the Secretariat.

Now the case has been finalized. Based on verified facts and evidences as well as applicable laws, the arbitration tribunal has made the final judgment on the case. Facts of the case, opinions of the arbitration tribunal and the award are expatiated respectively as below:

## I.    Facts of the Case

(I)   Main opinions stated in the Arbitration Application and the items requested for arbitration by the Applicant

In May 2010, the Applicant and the Respondent executed the *Sales Contract* in question, stipulating that the Applicant shall sell solar battery modules to the Respondent. It is stipulated in Clause 7 of the *Sales Contract* that the Respondent shall pay off the money for the goods within 60 days from the departure date of goods as listed on the bill of lading.

On October 23, 2010, the Applicant delivered to the Respondent solar battery modules with the total price of USD646,191 according to the *Sales Contract*. On November 21, 2010, the Applicant delivered again to the Respondent solar battery modules valued USD878,748. After that, the Applicant provided relevant invoices, packing lists and bills of lading of these two batches of goods to the Respondent.

According to the stipulations set out in Clause 7 of the *Sales Contract*, the Respondent shall pay off the total price within 60 days from the departure date as listed on the bill of lading. Therefore, the deadlines for payment of the preceding two batches of goods shall be December 22, 2010 and January 20, 2011 respectively. On the aforesaid deadlines, the Respondent failed to pay the total price according to the stipulations set out in the *Sales Contract*, defaulting on its payment of USD1,372,445.10 in total, which is still overdue now.

In addition, according to the stipulations set out in Clause 9 of the *Sales Contract*, in case the Respondent fails to make full payment in time according to the Contract and thus causes exchange loss to the Applicant, the Respondent shall bear such loss, i.e. in case the exchange rate for USD to RMB of the People's Bank of China on the payment deadline is depreciated in comparison with that on the date when the Respondent actually makes the payment, the exchange loss caused therefrom shall be borne by the Respondent.

Therefore, the Applicant issued Lawyer's Letter to the Respondent on December 19, 2012 and January 24, 2013 respectively, requesting the Respondent to pay off the money overdue. However, by now the Respondent has neither paid off the money nor compensated any loss incurred to the Applicant. The arbitration requests submitted by the Applicant in the Arbitration Application are listed as follows:

1.   To request a judgment on the Respondent paying the two overdue payments for the goods, which are USD1,372,445.10 in total, to the Applicant (the total payment for the first batch of goods is USD646,191, minus the prepayment having been made by the Respondent, the Respondent is still defaulting on its payment of USD581,571.90; the total payment for the second batch is USD878,748, minus the prepayment made by the Respondent, the Respondent is defaulting on its payment of USD790,873.20), that is RMB8,611,407 in total (calculated according to the intermediate conversion price of RMB6.2745 for USD to RMB promulgated by the Bank of China on March 7, 2013);

2.   To request a judgment on the Respondent paying the interest of the overdue payment for the goods mentioned above from the deadline to the actual payment date, temporarily calculated as RMB1,251,930 (wherein the interest of the price of the first batch of goods, as calculated temporarily from the second day (December 23, 2010) following the payment deadline to March 7, 2013, amounts to RMB543,454; the interest of the price of the second batch of goods, as calculated temporarily from the second day (January 21, 2011) following the payment deadline to March 7, 2013, amounts to RMB708,476. The total amount of the interests mentioned above is RMB1,251,930; it is requested to calculate up to the date when the Respondent actually performs the obligation to make the total payment);

3.   To request a judgment on the Respondent compensating the Applicant RMB464,816 for exchange losses caused by overdue payment (wherein the exchange loss of the first payment for the goods is RMB216,403, and that of the second payment for the goods is RMB248,413; it is requested to calculate up to the date when the Respondent actually performs the obligation to make the total payment);

4.   To request a judgment on the Respondent bearing the lawyer's fee of the Applicant, which is in total RMB250,000 (this RMB250,000 is a temporarily calculated amount; in case the lawyer's fee actually paid exceeds RMB250,000, to request a judgment on the Respondent bearing the cost actually paid by the Applicant);

5.   To request a judgment on the Respondent bearing the arbitration cost of this case.

On the first court hearing, the Applicant made modification on the arbitration requests of Item 1 and Item 3 above: for Item 1, to request confirming that price should be calculated in USD; and for Item 3, the request was amended as: to request the judgment on the Respondent compensating the Applicant RMB463,799 for exchange losses caused by overdue payment of the Respondent to the Applicant. As of March 7, 2013, the initial day of exchange rate was moved one day compared to the previous one. The calculation days are December 22, 2010 and January 20, 2011 respectively. Exchange loss is calculated according to the actual payment date of the Respondent.

(II) Defense opinions given by the Respondent on the court hearing and the attorneys' opinions given after the first court hearing

The Respondent gave defense opinions orally in the court hearing, and submitted written attorney's opinions after the first court hearing. Its main opinions are listed as follows:

1.   The Respondent and the Applicant had long-term contract relationship and the two parties had reached agreement on quality standards and warranty period.

The Respondent and the Applicant had long-term contract relationship. On July 7, 2009, the Respondent and the Applicant signed a *Co-Branding Agreement* (referred to as "*Co-Branding Agreement*" hereinafter) for a duration of three years. The two parties stipulated the procurement volume of solar battery modules for each year. According to the stipulations set out in the *Co-Branding Agreement*, the two parties successively signed a series of sales contracts including the *Sales Contract* in question during the three years of effective duration of the contract, and determined model of assemble, quantity, price, time of payment and time of delivery of purchased modules of each batch. It is stipulated in the Purchase Order of the *Co-Branding Agreement*: "Before every contract year starts, parties need to sign on the purchase contract for that period. If during that contract year there are additional orders from buyer, parties may have additional purchase contracts. Both year and additional contracts are as the integral parts of the OEM agreement". Therefore, it can be seen that all sales contracts or orders concluded by and between both parties during the term of validity of the *Co-Branding Agreement* were integral part of the long-term procurement contract. Therefore, the Respondent and the Applicant had long-term and stable transaction relationship. The stipulations in the *Co-Branding Agreement* concerning quality assurance shall apply to products of all batches and models stipulated for procurement between the Respondent and the Applicant.

The two parties stipulated the quality standards and the quality assurance clauses. According to the *CSUN OEM Assembly Inspection Standards Q/CSUN. J27. 0002 V1.0* provided by the Applicant to the Respondent, it is specifically stipulated in the technical requirements of Item 2 No. 2: "color:

Appellate Case: 15-1256   Document: 0101945886   Date Filed: 07/27/2015   Page: 73

the whole battery of assembly shall have even color. Color-jumping on the battery is not allowed"; and technical requirements of Item 3 are "cracks (visually seeable) and debris on battery are not allowed". The aforesaid clauses indicates that the solar battery modules provided by the Applicant should comply with such quality standards as even colors, without cracks or debris, otherwise would be regarded as having defects in materials and workmanship. The clause of Warranty/Defective Products in the *Co-Branding Agreement* stipulates: "For warranty, free from defects in material workmanship: 5 years". The clause indicates that the Applicant guaranteed the products sold to the Respondent would be free from any defect in material or workmanship in 5 years.

In addition, the emails between the Respondent and the Applicant on May 5, 2010 showed that the sales manager of the Applicant sent a quality assurance named "Limited Warranties for Photovoltaic Modules 2010" to the Respondent again. This quality assurance also stipulated that "CSUN warrants its MODULES, including field replaceable DC connectors and cables, to be free from defects in materials and workmanship under normal application, installation, use and service conditions. If MODULES fail to conform to this warranty, for a period ending 60 months from date of sale to the original customer (CUSTOMER) as shown in stamped packing list of CSUN, CSUN will, at its option, either repair, replacement and refund the purchase price as paid by CUSTOMER". It can be seen that the Applicant guaranteed and the Respondent accepted that the Applicant would undertake the quality assurance responsibilities for repair, replacement and refund in 5 years for any defect in material or workmanship in products sold to the Respondent.

2.  The products purchased by the Respondent from the Application have quality defects. The Respondent requested many times the Applicant to bear quality assurance liabilities and obtained no result.

Products in the Contract and the orders in question have quality defects. According to the pictures of the defective modules provided by the Respondent, the modules of the model SSTWB190-72M under the *Sales Contract* have obvious uneven colors and are not in compliance with the quality standards of the modules guaranteed by the Applicant. In addition, according to the Flash Testing Report (S69020043F-2) provided by the Applicant when delivering the goods, it can be confirmed that the model of the defective modules corresponds to that delivered by the Applicant under the *Sales Contract*. Therefore, it can be seen that the products of SSTWB190-72M under the *Sales Contract* have obvious and visible quality defects.

Later, the Respondent engaged authoritative third party testing institution to carry out more detailed testing on the modules of other models delivered by the Applicant. According to the testing

Appellate Case: 15-1256   Document: 0101945886   Date Filed: 07/27/2015   Page: 74

report issued by the third party testing institution Celestica, the modules of the model SSTWB250-60M delivered to the Respondent by the Applicant have visible uneven colors. According to further EL optical testing, clear cracks were found on the modules with snail marks. The conclusion drawn in the final test report is that there are direct relationship between the snail marks and the cracks, and the modules with snail marks would certainly be found with cracks in EL optical testing. While some modules, even though no snail marks were found, have been found with cracks in the summary of EL optical testing.

According to Flash Testing Report S69020043-7A, S69020043-7B and S69020043F-1 (respectively corresponding to PO1578 and PO1559 orders under the contract for S69020043) provided by the Applicant at the time of delivery, it can be determined that the goods delivered by the Applicant under the contract and the orders in question are all modules of SSTWB250-60M.

Models of products with quality defects involved many orders and batches between the Respondent and the Applicant. On December 10, 2010, the Respondent raised quality objections to the Applicant for the first time through Email, aiming at aforesaid defects in materials and workmanship existing in the summary of modules provided, and sent detailed information including models, relevant data and pictures of the modules with quality problems to the Applicant along with the email. On December 14, 2010, the Applicant replied the email, confirming that it had received all the documents related with the quality objection. In the subsequent communications, the sales manager of the Applicant guaranteed to the Respondent to replace the defective modules for the latter, and suggested the Respondent that "no matter what the final negotiation result would be", the Respondent should replace the defective modules for its customers "as soon as possible". Therefore, the Respondent replaced the modules with defects complained by the customers, but failed to receive the substitutes guaranteed by the Applicant. Later, the Respondent received quality complaints from several customers more successively, claiming that several batches of products delivered by the Applicant had aforesaid quality defects of different levels. From the pictures taken on the site, it is clear that solar modules have obvious uneven colors and cracks. On April 28, 2011, the Respondent delivered formal quality complaint to the Applicant. As of that time, the actual loss encountered by the Respondent for replacing defective modules had reached USD2,417,335. Therefore, based on the quality warrants made by the Applicant, the Respondent raised the request for providing substitutes or discounting the price. Later on, the Respondent raised quality complaints to the Applicant again on September 15, 2011 and November 4, 2011 respectively, and attached complaints on quality raised by several customers in succession. Defective products included modules of same model in several batches as well as modules of different models in the same batch.

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 75

According to the report provided by the authoritative third party testing institution, the aforesaid quality defects only appear gradually in at least five months after being installed normally outdoors. Therefore, it cannot be excluded that the aforesaid defects would be found in the future in the modules that have been installed. As of April 2011, according to the sampling test carried out by the Respondent on the module systems installed by several customers, the defect rate of uneven colors and cracks in the goods delivered by the Applicant reached as high as 65%. However, up to now, the Applicant has not adopted any remedies for aforesaid quality complaints, idled in performing the quality assurance obligation stipulated in the Contract. The behavior of the Applicant has formed breach of Contract. Whereas the products delivered by the Applicant had wide quality defects, and the scale of defective modules might expand continuously, but the Applicant has neglected in performing the quality warrant obligations stipulated, the Respondent has reasons to consider that the behavior of the Applicant will structure fundamental breach of the long-term procurement contract.

3.   The Respondent is entitled to request the Applicant to adopt remedial measures including repair, replacement or refund according to the quality warrants provided by the latter, and be entitled to request the Applicant to offer discount and providing substitutes according to the *United Nations Convention on Contracts for the International Sale of Goods* (referred to as the "CISG" hereinafter).

According to the quality warrants provided by the Applicant, the Respondent is entitled to request the Applicant replacing the defective goods or giving discounts on the prices. Based on the *Co-Branding Agreement* and CSUN Quality Warrants concluded by both parties, within 60 months after the sale of products, for defects in materials and workmanship in the products delivered by the Applicant, the Respondent will be entitled to request the Applicant for repairing, replacement or refunding. The Respondent's deduction from the contract price not paid based on the requirements of quality warrants of the Applicant is not a breach of contract, but the exercise of right of remedy under the situation of quality not in compliance with that stipulated in the Contract. Moreover, the two parties have stipulated in the sales contracts to apply CISG. According to the stipulations set out in Clause 50 of CISG, in case the goods are not in compliance with contract, no matter whether the payment has been done or not, the Buyer can counteract the price.

The behavior of the Respondent refusing to pay does not form breach of contract. It is stipulated in Clause 81 of CISG that if one party fails to perform its obligations due to act or non-act of the other party, the latter shall not claim the opposite not performing obligations. The evidence submitted by the Respondent showed that the products under the purchase orders not paid under dispute of the case have prominent quality defects. According to the quality warrants from the Applicant, it shall

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 76

repair, replace or discount the products with quality defects raised during the quality warranty period. However, by now the Applicant has not repaired the defective products according to the quality warrants or provided substitutes upon the request of the Respondent. Therefore, the Respondent had to deduct the price to be reduced from the money payable for the goods. Because the Applicant failed to perform the quality warrant obligations stipulated in the Contract, which caused the Respondent not able to perform the obligation of paying for the goods, the Applicant should not allege that the Respondent failed to perform obligations or breached the Contract.

The Respondent has suffered actual losses due to incompliance of the products delivered by the Applicant. Because the products provided by the Applicant generally have defects in quality, after the Respondent sold the products to customers and installed and used, it received quality complaints from many customers. As of April 28, 2011, the actual loss suffered by the Respondent for replacing defective modules for its customers had reached USD2,417,335, far beyond the price counteracted by the Respondent from the money payable to the Applicant. Moreover, the complaints from the customers received by the Applicant are far more than these. Until September 15, 2011, many more customers put forward the same quality defects on the products purchased from the Applicants. At present, the amount of loss encountered by the Applicant due to defective products is still expanding. Therefore, the Respondent reserves the right to request the Applicant replacing defective products or refunding according to its quality warrants made.

(III) Attorneys' opinions submitted by the Attorney of the Applicant after appearing on court

Attorney of the Applicant also submitted written attorney's opinions after the first court hearing. The main opinions are as follows:

1.    The Respondent refused to pay total price for the goods under the *Sales Contract* involving dispute of the case, and should bear relevant liabilities for the breach of Contract, compensating all losses encountered by the Applicant.

It is stipulated in the *Sales Contract* that the Applicant will sell solar battery modules to the Respondent, and the latter shall undertake relevant payment responsibilities. From September to November 2010, the Respondent purchased two batches of solar battery modules of USD646,191 and USD878,748 respectively from the Applicant under the *Sales Contract*. After receiving 10% prepayment remitted from the Respondent, the Applicant delivered the two batches of solar battery modules purchased by the Respondent on October 23, 2010 and November 21, 2010 respectively. The commercial invoice numbers of the Applicant corresponding to the two deliveries are S69020043-6 and S69020043-7.

The Applicant has performed totally the obligation of delivery under the *Sales Contract*, but the Respondent has failed to perform its payment obligation until today, in total overdue USD1,372,445.10 for the goods. In the first court session, except considering the overdue amount should be USD1,371,525, the Respondent held no objection to the Applicant's assertion mentioned above. Moreover, the Respondent has not provided any evidence by now to provide that its actual overdue amount is USD1,371,525.00

The default behavior of the Respondent has caused the following losses to the Applicant: (1) Payment for the goods overdue under the *Sales Contract*: USD1,372,445.10; (2) Loss of interest: currently calculated until March 7, 2013, loss of interest is RMB1,251,930; (3) Exchange loss: exchange loss caused by overdue payment to the Applicant, currently calculated until March 7, 2013, is RMB463,779. The Respondent failed to pay the total amount to the Applicant according to the stipulations in the Contract. On the date that the Applicant submitted the Arbitration Application and the date of first court session of the case, the exchange rate dropped greatly compared to the exchange rate between USD and RMB promulgated by the Bank of China on the payment deadline for the goods, so exchange loss has been generated to the Applicant. According to the "complete compensation principle" established in Clause 74 of CISG, the Respondent should compensate aforesaid exchange loss encountered by the Applicant. (4) Lawyer's fee: the payment approach for the legal service contract signed by and between the Applicant and its lawyers is conditional fixed top price, which is RMB250,000. As of the last billing date of the lawyers of the Applicant, i.e. September 10, 2013, the Applicant had received a total of the lawyers' bills as much as RMB257,710. Therefore the Applicant requested a judgment on the Respondent bearing the lawyers' fee for the Applicant as much as RMB250,000 in total. If the actually paid amount by the Applicant for the case exceeds RMB250,000, the Applicant reserves the right to request the arbitration tribunal demanding the Respondent make relevant compensation according to the amount actually paid. (5) Arbitration cost: the Applicant has paid RMB225,782 arbitration cost for this case.

2.  The compensation assertion made by the Respondent against the Applicant in the submitted evidence *Claim Letter* on September 14, 2013 has no ground of facts and laws, which shall not be supported by the arbitration tribunal.

In the *Claim Letter* on April 28, 2011, the Respondent alleged that part of solar battery modules delivered by the Applicant had quality defects. However, the Respondent did not mention at all in the letter what kind of defects are those alleged. There is no evidence proving that the defects are found in the solar battery modules sold by the Applicant, and the Respondent failed to provide any

Appellate Case: 15-1256  Document: 01019465886  Date Filed: 07/27/2015  Page: 78

certificate to prove that so-called defects will cause loss to the Respondent as well as the severity of these defects is already on a level of not able to be used and must be replaced, or any certificate showing that these solar battery modules have been actually replaced. Therefore, it can be seen that the Respondent has not provided any evidence to prove that the defects in the goods provided by the Applicant have structured fundamental default against Clause 25 of CISG and thus the Respondent has right to request refund, and also the Respondent has not submitted any evidence proving that the quantity of the defective goods alleged are the number listed in the *Claim Letter*, unit value of defective goods as well as the labor cost actually paid by the Respondent for replacing any solar battery module. The Respondent cannot even prove that the attached *Quality Warrant* is the quality assurance for the goods issued by the Applicant to the Respondent, pertinent to the goods under the *Sales Contract* involving dispute of the case, or the quality assurance pertinent to the goods covered by the *Claim Letter*.

3.   The compensation assertion from the Respondent cannot be put forward in the case as demurrer or counterclaim.

In this case, the Respondent actually alleged relevant liabilities for quality of products, requesting the Applicant to bear relevant legal responsibilities so as to counteract the price payable by the Respondent in this case. However, such assertion of the Respondent should not be put forward in the case as demurrer or counterclaim. The main reasons are as follows:

Quality problems alleged by the Respondent, even according to its assertion, belong to disputes under other contracts apart from the *Sales Contract* of this case and do not fall into the hearing scope of the case; and they shall not be solved by means of demurrer or counterclaim in this case. Therefore, seen from procedure, such assertion and relevant facts from the Respondent should not be heard in this case, and the demurrer should not be accepted, nor the counterclaim.

The claim for compensation raised by the Respondent in terms of so-called quality issues is not pertinent to any of creditor's right due against the Applicant that has been recognized, but pending matter to be recognized through hearing. Therefore, even if it belongs to any dispute of orders under the case, it does not comply with regulations set out in the *Contract Law of the People's Republic of China* (referred to as "*the Contract Law*" hereinafter) in terms of counteraction, cannot be put forward by means of demurrer through counteraction in this case.

Referring to the stipulations set out in Clause 44 of the *Explanations of the Supreme People's Court on Applicable Laws for Hearing Cases Concerning Disputes in Sales Contracts* (referred to as "*Judicial Explanations on Hearing Sales Contracts*" hereinafter), if the Seller requests the Buyer to

pay after performing the oblgiation of delivery, while the Buyer alleges that the Seller shall pay penalty for breach of contract and compensation for loss, etc. with the assertion that the Seller first breaches the contract, counterclaim shall be filed. In this case, the Respondent is obviously not carrying out negative defense, but is actively alleging to the Applicant for payment and further request coutneraction. Positive claims of the Respondent must be put forward by means of counterclaim or prosecution else wise instead of by means of demurrer. In this case, seen from the object level, because the orders based on which the Respondent alleged for the rights are not the orders involved in the case and are not in compliance with conditions set out in China laws concerning counterclaims, it cannot put forward the counterclaim in this case. In terms of procedure, the Respondent has not raised counterclaims during the peirod over half year after the case was accepted for hearing in March 2013, which has exceeded the deadline on submission of counterclaims stipulated in the *Arbitration Rules* and Chenese laws, thus it should not be accepted.

The arbitration tribunal expressed clearly at the first court session that it would not accept the counterclaims raised by the Respondent. In addition, considering that the Respondent had obtained authorization before the opening of the first court session but failed to actively claim for rights, and the Respondent raised jurisdiction objection without any reason on the last day before the first court hearing after extension, expecting to delay the time limit for trial of this case. It cannot be excluded that it is suspected for delaying the trial of the case over and over. Therefore, no matter from the vision of legal regulations or arbitration practice, or from the principles of arbitration efficiency and justice, demurrer or counterclaim raised by the Respondent concerning so-called quality issues should not be accepted for trial.

Based on the aforesaid facts and reasons, the Applicant requests the arbitration tribunal to support the Applicant's claims against the Respondent for paying the balance of the goods and relevant compensations, and requests the Respondent filing litigation or arbitration else wise based on specific contracts.

(IV) Supplementary attorneys' opinions submitted by the Attorneys of the Respondent after the opening of the second court session

The Attorneys of the Respondent submitted supplementary attorneys' opinions after the opening of the second court session. Main opinions are as follows:

1. The fact concerning business cooperation and disputes between the Applicant and the Respondent.

Appellate Case: 15-1256   Document: 0019465886   Date Filed: 07/27/2015   Page: 80

On July 7, 2009, the two parties signed *Co-Branding Agreement*. On the same day, the two parties signed *Sales Contract No. S60100*, which specifies the models and the quantity of PV modules to be purchased. On March 1, 2010, the two parties signed *Sales Contract No. S69020036*. On April 9, 2010, the two parties signed *Sales Contract No. S69020042*. On May 5, 2010, the Applicant sent Quality Warranty to the Respondent through email. On May 17, 2010, the two parties signed the *Sales Contract* involved in this case. On June 17, 2010, the two parties signed *Sales Contract No. S69020045*.

In December 2010, the Respondent received complaints from the customer that the PV modules produced by the Applicant that had been sold by the Respondent to the customer had quality problems. Through field inspection, the Respondent verified the defects of the PV modules, and raised objection on quality to the Applicant through email on December 10, 2010, and provided data and pictures related with the defective modules by means of attachments to the email. Through communication between the two parties, on January 6, 2011, Sally Fan, the sales manager of the Applicant proposed that no matter what the result of negotiation would be, the Respondent should replace defective modules for its customers as soon as possible. The Respondent then replaced the modules with defects in workmanship according to the requirements of the customer Mongolia Energy on January 19, 2011.

On January 26, 2011, the Respondent raised again quality objection to the Applicant through email and attached the pictures of the defective modules. From April 3, 2011 to April 14, 2011, the Respondent raised quality objection to the Applicant through email again, and provided the result of sampling testing. The defect rate of PV modules had reached 65%.

From April 19, 2011 to April 28, 2011, as urged by the Respondent, the Applicant dispatched relevant staff Lester (Wang Xinglei) to the U. S. to learn the circumstances of quality problems of the PV modules at the Respondent's. After the Applicant carried out field inspection, the Respondent issued formal Claim Letter to the Applicant on April 28, 2011. However, the Applicant had never given a solution. The Respondent put forward quality objection many times to the Applicant on September 15, 2011 and November 4, 2011 successively, requesting the Applicant to perform the quality warrant obligations according to the Quality Warranty, and to replace the PV modules with defects, but it never received effective response from the Applicant. It can be seen that the Respondent has always been raising quality objection to the Applicant, requesting the latter to bear the obligation of quality warrants, instead of defaulting on payment deliberately.

2.    The *Sales Contract* of this case refers to a certain batch in the contracts of delivery in batches.

Appellate Case: 15-1256    Document: 0101946886    Date Filed: 07/27/2015    Page: 81

The business cooperation between the Respondent and the Applicant started from the *Co-Branding Agreement*, through which the two parties decided the cooperation matters of using joint logo on the PV modules as well as the total purchasing quantity in the subsequent three years. In addition, based on the *Co-Branding Agreement*, the two parties have signed successively a series of sales contracts to determine specific models and quantities of PV modules to be purchased every time.

It can be seen that the cooperation purpose determined in the *Co-Branding Agreement* is realized through the performance of a series sales contracts. Therefore, the *Sales Contract* in this case is not an independent contract. All the contracts signed by and between the Applicant and the Respondent from July 7, 2009, including the *Sales Contract* in this case shall be deemed as a whole part, subject to the regulations set out in CISG concerning the contracts of deliveries in batches.

3.    The Applicant shall bear quality assurance liabilities for the PV modules sold to the Respondent.

The Applicant denied over and over the existence of the Quality Warranty in court hearing, and considered that even it exists, the defects alleged by the Respondent would not affect the normal use of the PV modules, so the PV modules do not have quality defects. Therefore, the Respondent considers that: first of all, in terms of the evidences provided by the Applicant and the commercial conventions of international trade, the Quality Warranty exists objectively. The Respondent and the Applicant have long-term contract relationship for selling and buying PV modules. Whereas the characteristics of the products of PV modules, it is impossible that the two parties have no stipulations on quality warrant. In fact, it has been mentioned in the 3rd paragraph of the lawyer's letter sent by the Attorney of the Applicant to the Respondent on January 24, 2013: "*please note that the general warranty issued by CEEG does not cover incidentals such as your labor costs.*" Therefore, the Attorneys of the Applicant are well aware of the fact that the Quality Warranty exits and also the details of the Quality Warranty. Secondly, the Quality Warranty of the Applicant applies to the PV modules of all the models that it produces. The Respondent has submitted two copies of Quality Warranty obtained from the Applicant on open court session. Although the issuers of these two Quality Warranties are the Applicant CEEG and the parent company of the Respondent CSUN respectively, the main contents of these two documents are the same, guaranteeing a five-year warranty for defects in materials and workmanship generated from the modules. Moreover, in the *Co-Branding Agreement* signed by the two parties, the Applicant also guaranteed the scope and the term of quality warrants in consistency with the Quality Warranty. The Quality Warranty provided by the Applicant applies to the PV modules of all models that it produces. Besides, cracks and snail

marks appearing on the PV modules are within the scope of warrant for defects in materials and workmanship in the Quality Warranty. The Quality Warranty provided by the Applicant includes two parts: one is the warranty on defects in materials and workmanship and the other is that for power output. The inspection standards for modules provided by the Respondent specifically requests that the surface color of the PV module battery shall be even and consistent, and should not have any crack. The appearance of snail mark and crack is a type of defect in material and workmanship. No matter whether the crack or snail mark affects the power output of PV modules or not, according to the Applicant's commitments made in the Quality Warranty, the Applicant shall perform the quality assurance obligations for the defects in materials and workmanship. When quality problem occurred to the products, the Applicant adopted delay and avoiding attitude for handling the issues, which obviously formed breach of Contract. At last, the testing report from Celestica is authoritative. Celestica Lab is authorized by TUV Rheinland Laboratory, being a professional institution that provides test authentication services for PV modules, and TUV Rheinland Laboratory is the testing organization determined in the Quality Warranty provided by the Applicant. Therefore, the test result on PV modules carried out by Celestica Lab and TUV Rheinland Laboratory possess the same authority.

4.   The assertion of the Respondent for remedies, including requesting the Applicant to reduce the price with the reason of existence of quality defects, is a demurrer. According to stipulations set out in Clause 44 of *Judicial Explanations on Hearing Sales Contracts* promulgated by the Supreme People's Court of China, "in case the Seller requests the Buyer making payment after performing the delivery obligations, while the Buyer raises objection with the reason that the Seller has breached the contract first, the People's Court shall handle repsecitvely according to the following situations: (I) it is deemed as demurrer if the Buyer refuses to pay penalty for the breach or refuses to compensate for losses or argues that the Seller shall adopt remedial measures such as offering discounts; (II) in case the Buyer argues that the Seller shall pay penalty for the breach and compensate for loss, or requests cancellation of the Contract, it shall raise counterclaim", the assertion of the Respondent requesting a reduce of price due to the defects existing in the Applicant's products in this case is a demurrer instead of a counterclaim.

5.   The Respondent shall not bear any default liability for the payment not made for the goods. The Applicant failed to perform the obligation of quality warranty in the first place, which led to the Respondent's deducting from the payment not made for the goods in order to compensate for the losses caused by defective products. According to the stipulations set out in Clause 80 of CISG, the Applicant shall not argue that the Respondent has failed to perform the obligations set out in the

contract or has breached the contract. Therefore, the Respondent shall not bear any default liability due to interest loss and exchange loss caused by the Respondent's not paying for the goods.

(V) Supplementary attorneys' opinions submitted by the Attorneys of the Applicant after the opening of the second court session

Aiming at the supplementary attorneys' opinions submitted by the Respondent, the Applicant also submitted supplementary attorney's opinions in written form. Its main opinions are as follows:

(1) The *Sales Contract* in question is completely independent from the *Co-Branding Agreement*. There is no correlation between the two. First of all, the Respondent fails to provide the original copy of the *Co-Branding Agreement,* thus the Applicant does not recognize the authenticity of the *Co-Branding Agreement*. Secondly, the *Co-Branding Agreement* has no relation with the *Sales Contract* in question apparently. There is no mutual reference or quoting of any content in both, thus it cannot be concluded that these two documents have any relation. In addition, the clauses in the *Co-Branding Agreement* are self-contradictory, and they have many contradictions with the clauses in the *Sales Contract*. The actual transactions between the two parties in 2010, including types, quantities of deliveries and payment terms were not executed according to the *Co-Branding Agreement*. For example, the actual payment term under the *Sales Contract* between the two parties is: the Buyer shall make the prepayment of 10% before the delivery, and it shall pay off the 90% balance within 60 days following the departure of the goods; rather than either of that stipulated in the *Co-Branding Agreement* "20% as prepayment, and 80% balance to be paid off within 10 days" or "100% total amount to be paid off within 3 months". Therefore, this case has no relation with the *Co-Branding Agreement* and it cannot be concluded that the *Sales Contract* refers to a certain batch under the *Co-Branding Agreement*.

2.   The two copies of *Quality Warranty* mentioned by the Respondent are not authentic; they cannot be taken as the basis to confirm the facts of this case. The Respondent considers that the main basis for the stipulations on warranty of quality between two parties is these two *Quality Warranty* submitted to the arbitration tribunal successively. However, as for the first *Quality Warranty* (i.e. "Limited Warranty for PV Modules") on which there is no signature or seal affixed by either party, the source is not clear. As for the second *Quality Warranty* (i.e. "Limited Warranty for Photovoltaic Modules 2010"), there is no seal or signature affixed by the Applicant, and the issuer is China Sunergy (Nanjing) Co., Ltd., which is not the Applicant, thus it is not related to this case. Therefore, the Applicant does not recognize the authenticity of these two copies of so-called *Quality Warranty*. The assertion of the Respondent on quality issues based on such *Quality Warranty* shall not be

admitted.

3.   Testing report issued by Celestica is not authoritative. In case the Respondent considers that the quality does not comply with the stipulations set out in the Contract, it may apply for judicial authentication. The Respondent put forward in its Attorneys' opinions that Celestica Lab is an authority under the authorization of TUV Rheinland Laboratory, but did not provide any evidence. In fact, the Respondent can actually apply for judicial authentication on the quality issues of the projects in dispute between both parties instead of only providing a testing report issued by an organization entrusted by itself.

4.   The judgment scope of arbitration of this case shall only be restricted to the dispute over the payment for the goods argued by the Applicant. In case the Respondent argues for compensation for quality defects, it shall raise counterclaim or file a petition else wise. First of all, the assertion of the Respondent on reducing the price based on *Judicial Explanations on Hearing Sales Contracts* is a demurrer rather than a counterclaim. However, such basis belongs to the judicial explanations made by the Supreme Court of China, only applicable to the hearing of litigations of the People's Court on all subordinated levels, but not for the arbitration of this case. Secondly, the Respondent's argument for quality issues is mainly based on the *Quality Warranty* that it submitted as evidence, but it is stipulated exactly in Clause 5 of the Quality Warranty that in case any dispute arises between the quality warrantor and the buyer, it shall be submitted to the court having the jurisdiction in Nanjing City, China for trial. Therefore, the arbitration tribunal does not have jurisdiction over the dispute arising from the Quality Warranty between the two parties currently. The Respondent shall file a lawsuit to the People's Court having jurisdiction in Nanjing else wise. Thirdly, in this case the Respondent has not put forward any counterclaim arguing for compensation for quality defects. If the arbitration committee judges on relevant dispute over quality, it will be regarded as typical super-judgment. Therefore, the arbitration of the case shall only be limited to the dispute on the payment for the goods argued by the Applicant, and shall not involve quality dispute. Certainly, this will not affect any material rights and interests of the Respondent. If the Respondent intends to argue for the compensation liabilities based on quality issues, it may file a lawsuit else wise to protect its legal rights and interests.

## II.   Opinions of the Arbitration Tribunal

(I)   Law application in this case

The subject matters in the transaction signed by the parties of this case are PV modules. The transaction crosses borders, and the *Sales Contract* in question is an international goods sales

contract. The business premises of the Applicant are located in China, while those of the Respondent are in the USA. Both business premises are located in the members of CISG. It is stipulated in Clause 15 of the *Sales Contract*: "……proper law is the *United Nations Convention on Contracts for the International Sale of Goods*"; both parties quoted relevant contents in China laws and judicial explanations from the court as basis. Therefore, the arbitration tribunal considers that the stipulations set out in CISG shall apply to solve the disputes under the *Sales Contract* of the case, and the China laws shall apply to the issues that have not been covered in CISG.

(II) Effectiveness of the *Sales Contract* in question

According to the stipulations set out in Clause 4 of CISG: "CISG only applies to the conclusion of sales contract and rights and obligations generated by such contract between the seller and the buyer. In particular: unless otherwise specified, CISG has nothing to do with the following matters: (a) effectiveness of the contract or effectiveness of any clause or effectiveness of any convention; ……" Therefore, as for the effectiveness of the *Sales Contract* in question, China laws shall be applied to judgment.

The arbitration tribunal has noticed that the *Sales Contract* under this case has the official seal of the Applicant and signature of the authorized representative of the Respondent, being the true reflection of both parties' will. Neither party holds objection on the effectiveness of the contract during the arbitration process, and the arbitration tribunal has not found any conflicts between the contents of the Contract and the enforceable regulations in applicable laws and administrative laws of China concerning effectiveness of contracts and thus led to the result of invalid contract. According to stipulations set out in Clause 32 of the *Contract Law* concerning "if the parties adopt the form of contract to execute the contract, the contract will enter into force upon signatures or seals of both parties" as well as in Clause 44 of such law concerning "the contract established according to laws will enter into force at the time of effectiveness", the arbitration tribunal considers that the contract involving dispute under this case has been established and validated, having legal binding force on both parties. Both parties shall strictly follow the stipulations set out in the contract and relevant laws and regulations to perform obligations, argue for rights and bear responsibilities.

(III) Facts verified by the arbitration tribunal

The arbitration tribunal has reviewed the evidence materials submitted by both parties, and also heard the presentation made by both parties on performance of the *Sales Contract*. Based on opinions of proof and cross-examinations of both parties, the following facts have been verified:

The Applicant and the Respondent signed the *Sales Contract* in Shanghai on May 14, 2010. It is stipulated in the Contract that the Applicant (the Seller) will sell solar battery modules to the Respondent (the Buyer). The Contract has stipulated transportation of goods, delivery, payment, exchange rate risks, inspection and claim, etc.

After the aforesaid Contract was signed, the Respondent paid USD64,619.10 as the prepayment for the goods to the Applicant on October 8, 2010. The Applicant delivered solar battery modules with a total value of USD646,191.00 to the Respondent on October 23, 2010. The Respondent paid USD87,874.80 as prepayment to the Applicant on November 9, 2010, and the Applicant delivered solar battery modules with a total value of USD878,748.00 to the Respondent on November 21, 2010.

After that, the Respondent failed to pay the 90% outstanding for the two batches of goods above to the Applicant according to the stipulations set out in Clause 7 of the *Sales Contract:* "payment for the goods: payment collection within 60 days after the departure date as listed on the bill of lading". The Respondent still owes USD1,372,445.10 of the goods payment to the Applicant.

(III)  Focus of dispute of the case

Based on aforesaid facts and opinions of both parties, the arbitration tribunal hereby gives the following opinions on the focus of dispute of the case and the basic opinions of the arbitration tribunal:

1.   Whether the defense claim of the Respondent requesting the Applicant to reduce the price of the goods with the reason of quality defects in the goods is within the scope of trial of the case, and whether the pleading shall be proposed else wise.

The arbitration tribunal has noticed that the Respondent did not raise counterclaim on the arbitration during the period stipulated in the *Arbitration Rules*. However, it pointed out that the goods delivered by the Applicant have quality defects in the demurrer opinions, and further raised the defense claim on reducing the price.

The Applicant considers that the trial scope of the arbitration tribunal shall only be restricted to the dispute over the goods payment argued by the Applicant rather than to involve quality dispute. As for assertion on compensation based on quality defects, the Respondent shall raise arbitration counterclaim or file a lawsuit else wise. The Respondent holds that its claim for remedies including requesting the Applicant to reduce the price with the reason of quality defects is a demurrer instead of a counterclaim.

The arbitration tribunal considers that the precondition to make judgment on the nature of the Respondent's assertion on requesting the Applicant to reduce the price with the reason of quality defects in the goods is to determine the regulations of proper law of the *Sales Contract* under the case concerning relevant problems. It has been recognized in the preceding opinions by the arbitration tribunal that CISG shall apply to the settlement of disputes under the *Sales Contract* under the case, and Chinese laws shall apply to the matters not specified in CISG. The arbitration tribunal has also noticed that CISG has not stipulated that if the claim for discount by the buyer in international sales contract concerning quality of goods is its exercise of pleading right to counterclaim; and the *Contract Law* has not made relevant regulations on such problem. However, both parties have quoted the stipulations set out in Clause 44 of *Judicial Explanations on Hearing Sales Contracts* issued by the Supreme People's Court of China, "in case the Seller requests the Buyer to make payment after performing the delivery obligations, while the Buyer raises objection with the reason that the Seller has breached the contract in the first place, the People's Court shall handle according to the following situations respectively: (I) it is deemed as a demurrer if the Buyer refuses to pay penalty for the breach, refuses to compensate for losses or argues that the Seller shall adopt remedial measures such as offering discounts; (II) if the Buyer argues that the Seller shall pay penalty for the breach, compensate for loss or requests cancellation of the Contract, it shall raise counterclaim", such regulations can be legal bassif for considering relevant problems of the case by the arbitration tribunal. Current materials of the case have shown that the stipulations set out in Item (1) of Clause 44 of *Judicial Explanations on Hearing Sales Contracts* shall apply to the claim of the Respondent as the buyer to reduce the price based on the quality defects of the goods, to be raised by means of defense, not necessarily by means of counterclaim.

2.   Affirmation of relevant default liabilities of the Applicant and the Respondent under the *Sales Contract* in question during the performance of the Contract

It can be seen from the facts verified by the arbitration tribunal that after receiving the 10% prepayment remitted by the Respondent for each of the two batches, the Applicant of the case delivered two batches of solar battery modules under the *Sales Contract* to the Respondent within the period stipulated in the Contract. The Applicant has performed the obligation of delivery under the Contract, while the Respondent has not performed the obligation of payment under the Contract by now.

However, the Respondent alleges that the products from the Applicant have quality defects in its defense. According to the quality warranty of the Applicant and the stipulations in CISG, the

Respondent shall be entitled to request the Applicant to replace the defective products or to refund. The Applicant slighted in performing the quality warranty obligations, which led to the Respondent's deducting the money payable for the goods in order to compensate for the losses caused by the defective products. At the same time, because the Applicant failed to perform the stipulated obligations on quality warranty, it made the Respondent not able to perform the obligation of paying for the goods. The behavior of the Applicant has constituted material breach to the *Co-Branding Agreement* signed by and between the Applicant and the Respondent.

The arbitration tribunal has noticed that the Respondent alleged that the Applicant and the Respondent have reached agreement in the signed *Co-Branding Agreement* concerning quality standards and warranty period. The quality warranty provided by the Applicant to the Respondent applies to the PV modules of all models that produced by the Applicant. However according to the testing report issued by Celestica Lab, a third party authoritative testing organ hired by the Respondent after testing the goods delivered by the Applicant, the products delivered by the Applicant to the Respondent have a lot of serious quality problems. However, besides denying the authenticity of the *Co-Branding Agreement* and the *Quality Warranty* provided by the Respondent as well as the authority of the testing report issued by Celestica, the Applicant also pointed out that the *Co-Branding Agreement* has no relation with the *Sales Contract* in question under the case, and relevant clauses therein shall not apply to this case.

After inspecting relevant evidences, the arbitration tribunal decides that the reason that serious quality problems in the goods submitted by the Applicant as alleged by the Respondent in its defense cannot stand. The reasons are listed as follows:

Firstly, the arbitration tribunal has noticed that it is stipulated in Item (6), Clause 2 of the *Sales Contract*: "to use associated trademark and packaging information of LUMOS and CSUN". The associated trademark mentioned in this clause shall fall within the domain of "trademarks" involved in the *Co-Branding Agreement* which is argued by the Respondent. However, after analyzing the contract clauses in the *Sales Contract* and the *Co-Branding Agreement* respectively, the arbitration tribunal holds that the two contracts are not consistent in terms of such important clauses as quantity, delivery, payment of the contractual subject matters. The two contracts are independent, each binding rights and obligations of different contractual subject matters. It cannot be concluded that the *Sales Contract* refers to a contract for a certain batch under the *Co-Branding Agreement* which is claimed by the Respondent. Therefore, the stipulations concerning quality assurance and warranty period under the *Co-Branding Agreement* quoted by the Respondent have no binding force on the *Sales*

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 89

*Contract* in question under the case. Moreover, the basis of jurisdiction obtained by the arbitration tribunal is the arbitration clauses reached by the two parties in the *Sales Contract*. The *Co-Branding Agreement* do not fall within the scope of trial of this case.

Secondly, the Respondent alleged that according to the *Quality Warranty* that it submitted, the products under the *Sales Contract* by the Applicant have serious quality problems. The arbitration tribunal has noticed that the Respondent submitted the *Quality Warranty* as evidence, but the Applicant did not recognize the authenticity of such evidence. However, the Attorneys of the Applicant mentioned quality warranty in the letter to the Respondent on January 24, 2013. Under the precondition that the Applicant failed to submit rebuttal evidence, the Applicant's objection to the authenticity of such *Quality Warranty* cannot stand. The arbitration tribunal reviewed the contents in the *Quality Warranty*. It can be seen from the text of the *Quality Warranty* submitted by the Respondent that the 5-year quality warranty guaranteed therein is aiming at the consumers, not involved in the defense claim of the Respondent requesting discounting in the case. In addition, it has been stipulated in the *Quality Warranty* that any dispute between the quality warrantor and the buyer shall be submitted to the court having jurisdiction in Nanjing City, China for trial. Therefore, the arbitration tribunal does not have jurisdiction over the disputes arising from the *Quality Warranty*. For disputes under the *Quality Warranty*, the parties may seek for juridical remedy from the People's Court having the jurisdiction.

Thirdly, the *Sales Contract* signed by the two parties has not stipulated the testing organ for the quality of goods. According to the facts verified via current evidences, before engaging the third party testing organ Celestica Lab to carry out testing on the goods provided by the Applicant, the Respondent did not inform the Applicant of the relevant information of the testing organ nor acquire the consent of the Applicant, and the Applicant raised the objection that whether the test samples involved in the testing report were at the delivery status during the performance of the contract in question. Considering that the testing report was made after the Applicant requested for arbitration, already over three years from the delivery period under the Contract, it is difficult for the arbitration tribunal to judge that the goods delivered by the Applicant have quality problems simply on the basis of such report.

In consideration of the preceding reasons, the arbitration tribunal will not admit the opinions of the Respondent alleging that the goods delivered by the Applicant have serious quality problems. According to current evidences and the verified facts, the arbitration tribunal considers that the Applicant of the case has performed the obligation of delivering the goods under the *Sales Contract*.

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 90

The Respondent has not provided sufficient and reasonable evidence to prove that such performance has any fault or improperness, and the Respondent has not performed the payment obligation under the Contract, which has constituted breach of Contract, and shall bear relevant default liabilities.

(IV) About the Applicant's arbitration request

1.  Concerning the arbitration request on the Respondent to make the outstanding payment for the two batches of goods to the Applicant

The arbitration tribunal has already decided in the preceding opinions that under the situation that the Applicant has performed the obligation of delivering the goods under the *Sales Contract*, the Respondent is obliged to pay for all the goods to the Applicant. According to the stipulations set out in Clause 62 of CISG: "the seller may request the buyer to pay the price, collect goods or perform other obligations, unless the seller has adopted some remedial method contradictory to such request", the tribunal supports such arbitration request raised by the Applicant. The arbitration tribunal has noticed that as for the amount of the payment for the goods, the Respondent put forward in the defense that it should be USD1,371,525, which is slightly different from the outstanding payment for the goods argued by the Applicant. However, the Respondent has not submitted any evidence to support its claim on the amount of the payment for the goods. After reviewing and verifying the evidence materials submitted by both parties, the arbitration tribunal determined that the outstanding amount payable by the Respondent should be USD1,372,445.10.

2.  Arbitration request on the loss of interest

The Applicant requests the judgment on the Respondent to pay the interest of the money payable from the deadline to the actual payment date to the Applicant, temporarily calculated as RMB1,251,930 (wherein the interest of the price of the first batch of goods, from the second day of the payment deadline, i.e. December 23, 2010 to March 7, 2013, equals to RMB543,454, as calculated temporarily; the interest of the price of the second batch of goods, from the second day of the payment deadline, i.e. January 21, 2011 to March 7, 2013, equals to RMB708,476, as calculated temporarily. The total amount of the interests mentioned above is RMB1,251,930; it is requested to calculate up to the date when the Respondent actually performs the obligation of the total payment).

The Respondent's defaulting on the payment has constituted breach of Contract, and shall bear the default liabilities for its default. According to the stipulations set out in Clause 78 of CISG, "in case one party fails to pay the price or any other outstanding amount, the other party will be entitled to charge interest on such amount, but shall not obstruct the damage indemnification that can be

obtained according to the stipulations set out in Clause 74", the arbitration tribunal considers that the Applicant's arbitration request on the Respondent to pay interest loss has legal grounds.

The arbitration tribunal has also noticed that it is stipulated in the *Sales Contract* that the Respondent should pay off the money for the goods within 60 days from the departure date of goods as listed on the bill of lading. Therefore, whereas the delivery dates of the two batches of goods were October 23, 2010 and November 21, 2010 respectively, the payment deadlines should be December 22, 2010 and January 20, 2011 respectively. The Applicant claimed that the value date of interest of the first batch of goods is the second day of the payment deadline, i.e. December 23, 2010, and the value date of interest of the second batch of goods is January 21, 2011, the arbitration tribunal admits such value dates. However, the arbitration tribunal considers that in the first arbitration request that the Applicant has clarified that the two payments should be calculated in USD, it claimed to calculate the loss of interest according to the exchange rate of conversion between USD and RMB and the RMB loan interest rate issued by the People's Bank of China. Such claim on interest has mistakes, and the tribunal does not admit it. Referring to the conditions of loans in USD during the performance period of the *Sales Contract* in question, the arbitration tribunal judges to calculate the interest of the preceding two payments as of March 7, 2013 according to the annual interest rate of 2.53%, that is USD74,991 in total.

In general, the arbitration tribunal judges that the Respondent shall pay the interest for the overdue payment to the Applicant as much as USD74,991, along with the interest for the overdue payment calculated from March 8, 2013 to the actual payment date with the annual interest rate as 2.53% and the principal as USD1,372,445.10.

3.  Arbitration request concerning exchange loss

The Applicant requests the judgment on the Respondent to pay the exchange loss incurred to the Applicant due to overdue payment as much as RMB464,816 (wherein the exchange loss of the first payment for the goods is RMB216,403, and that of the second payment for the goods is RMB248,413; it is requested to calculate up to the date when the Respondent actually performs the obligation of the total payment ).

The arbitration tribunal noticed that it is stipulated in Clause 9 of the *Sales Contract*: in case the settlement currency under the Contract is USD or EUR, and the Buyer fails to pay in time according to the Contract, the exchange rate risk loss incurred to the Seller shall be borne by the Buyer. That is to say, in case the USD or EUR against RMB depreciates at the actual delayed payment time of the Buyer according to the official exchange rate for USD or EUR to RMB promulgated by the Bank of

Appellate Case: 15-1256    Document: 01019465886    Date Filed: 07/27/2015    Page: 92

China, compared with the official rates at the time when the payment should be made available by the Buyer according to the contract, the loss incurred thereby to the Seller shall be borne by the Buyer", therefore, the arbitration tribunal supports the request on the exchange loss incurred to the Applicant due to the overdue payment of the Respondent. According to the preceding recognition of the tribunal, the amount of first payment owed by the Respondent is USD581,571.90, which should be paid before December 22, 2010; the second payment is USD790,873.20, which should be paid before January 20, 2011. After consulting relevant data of exchange rates for USD to RMB from the Bank of China, the arbitration tribunal has recognized the calculation method for the Applicant's exchange loss. The amount of exchange loss to be paid shall be: (1) The first goods payment is USD581,571.90; calculated in accordance with the difference between the exchange rate for USD to RMB promulgated by the Bank of China one day before the judgment is made as well as the conversion price of Bank of China, i.e. 6.6466 on December 23, 2010, the exchange loss is RMB287,878.09; (2) The second payment for the goods is USD790,873.20; calculated in accordance with the difference between the exchange rate for USD to RMB promulgated by the Bank of China one day before the judgment is made as well as the conversion price of Bank of China, i.e. 6.5886 on January 21, 2011, the exchange loss is RMB345,611.58.

4.   About the arbitration request on the lawyer's fee

Whereas the dispute of the case arises from the Respondent's breach of contract, considering the support degree of the Applicant's request in the arbitration, according to the stipulations set out in Item (II) of Clause 47 of the *Arbitration Rules*, that "the arbitration tribunal has the right to judge in the award that the losing party shall compensate the winning party reasonable expenses generated in the winning party's handling the case according to the specific situation of the case", the Respondent shall compensate the Applicant the lawyer's fee paid by the Applicant for the case. The tribunal judges that the Respondent shall compensate the Applicant RMB230,000 as the lawyer's fee.

5.   About the undertaking of the arbitration cost in the case

Considering such factors as the support degree of the Applicant's request in the arbitration and the reasons that caused the disputes under the case, the arbitration tribunal judges that the Applicant shall bear 10% of the arbitration cost in the case, while the Respondent shall bear 90%.

### III. Award

The Award made by the arbitration tribunal is shown as follows:

(I)   The Respondent shall pay the Applicant two outstanding payments for the goods which is

USD1,372,445.10 in total;

(II) The Respondent shall pay the interest for the overdue payment to the Applicant as much as USD74,991, along with the interest for the overdue payment calculated from March 8, 2013 to the actual payment date with the annual interest rate as 2.53% and the principal as USD1,372,445.10.

(III) The Respondent shall pay the Applicant RMB633,489.67 as the exchange loss caused by the Respondent's overdue payment.

(IV) The Respondent shall compensate the Applicant RMB230,000 as the lawyer's fee paid by the Applicant for the case;

(V) The arbitration cost of the case is RMB225,782; the Applicant shall bear 10%, i.e. RMB22,578.20, and the Respondent shall bear 90%, i.e. RMB203,203.80. Whereas the Applicant has fully prepaid the arbitration cost, the Respondent shall pay the Applicant RMB203,203.80;

The payments involved in Item (I), (II), (III), (IV) and (V) of the Award shall be paid by the Respondent to the Applicant in a lump sum within 15 days from the date when the Award enters into force.

The Award is final and enters into force on the date of issuance.



(No text on this page)

Chief Arbitrator: Liu Xiaohong (Signature)

Arbitrator: Chen Gang (Signature)

Arbitrator: Liu Ying (Signature)

Shanghai, June 13, 2014

[With the seal of Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center)]



Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 95

Appellate Case: 15-1256   Document: 0101945886   Date Filed: 07/27/2015   Page: 96

# **SHIAC**

Shanghai International Economic and Trade Arbitration Commission (Shanghai International

Arbitration Center)



Translation

## NOTARIAL CERTIFICATE

(2014)H.D. Z.W.J.Z.No.2036

Applicant:

CEEG (Shanghai) Solar Science & Technology Co., Ltd.

Domicile: No. 5999, Guangfulin Rd., Songjiang District, Shanghai

Legal Representative: LU Tingxiu, male, Citizen ID No.: 321124196105293532

Entrusted Agent: ZHENG Lulu, female, Citizen ID No.: 342622198712111903

Notarized Matter: True and Faithful Translation

This is to certify that the foregoing English translation is true and faithful to the original (2014)H.D.Z.W.J.Z.No.2035 Chinese Notarial Certificate for CEEG (Shanghai) Solar Science & Technology Co., Ltd..

YE Guojian (Seal)
Notary Public

The People's Republic of China
Shanghai Oriental Notary Public Office
        (Seal)

October 9, 2014



认 字 第 14032231-1 号

兹证明前面文书上公证处的印
章和公证员　叶国建　的签名
（印章）属实。

中华人民共和国外交部（ 310 ）
2014 年 10 月 09 日　上海

3318159

Consulate General of the )
United States of America )          SS;
in Shanghai, China       )

I,                                                        Consul of the
United States of America at Shanghai, China, duly
commissioned and qualified do hereby certify that
_Zhang, Ying_            , whose true signature
subscribed above, was on _Oct. 9, 2014_ the date
hereof, an officer of the Foreign Affairs Office
of the _Shanghai_        People's Government,
duly commissioned and qualified, to whose official
acts full faith and credit are due. For the contents
of this document I assume no responsibility.

IN WITNESS WHEREOF I have hereonto set my hand
and affixed the seal of the United States Consulate
General at Shanghai, China, this   _14th_  day of
_Oct._, 2014.

Vice Consul of the
United States of America

American Consulate General
Shanghai China

PRESIDENTIAL COMMISSIONS DO NOT EXPIRE

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 92

**CONSULATE GENERAL OF THE**

**UNITED STATES OF AMERICA**

EXHIBIT
*C to*

EXHIBIT
*2*

PEOPLE'S REPUBLIC OF CHINA )
MUNICIPALITY OF SHANGHAI )
CONSULATE GENERAL OF THE )   SS
UNITED STATES OF AMERICA )

BEFORE ME, _____, VICE CONSUL OF THE
UNITED STATES OF AMERICA AT SHANGHAI, DULY COMMISSIONED AND QUALIFIED,
PERSONALLY APPEARED _____ *Bin Zhang* _____
WHO, BEING DULY SWORN, DEPOSES AND SAYS AS FOLLOWS:

*All the attached documents are true.*

_____
*Zhang Bin*
(SIGNATURE)

AND FURTHER THE DEPONENT SAITH NOT.

SUBSCRIBED AND SWORN TO BEFORE ME THIS ____ *14th* ____ DAY OF
___ *Oct.* ____, 201*4*

_____
(NOTARY PUBLIC)

PICTORIAL COMMISSIONS DO NOT EXPIRE

American Consulate General
Shanghai China

案件号码：

呈：中国国际经济贸易仲裁委员会上海分会


中电电气（上海）太阳能科技有限公司


与


LUMOS，LLC


《销售合同》争议仲裁案


------------------------------------


# 证据


------------------------------------


中电电气（上海）太阳能科技有限公司


**2013 年 3 月 21 日**



Page: 102

Date Filed: 07/27/2015

Document: 01019465886

Appellate Case: 15-1256

# SALE   CONTRACT 销售合同

No. 合同号：S69020043

Signed at (签订地)：Shanghai, China

**The Seller（卖方）：CEEG (Shanghai) Solar Science Technology Co., Ltd.**

Address(地址)：4H, Hongqiao Business Building, No. 2272, Hongqiao Rd, Shanghai, China

Tel（电话）：+86- 21-62376999-85

Fax（传真）：+86- 21-62377038

Contact Person(联系人)：Sally Fan

E-mail (邮箱)：sally.fan@ceeg.cn


**The Buyer(买方)：LUMOS**

Address(地址)：Colin T. Williams

　　　　　　3550 Frontier Avenue

　　　　　　Suite C-2

　　　　　　Boulder, Colorado 80301

Tel(电话)：303 449 2394

Fax(传真)：303 442 1829

Contact person (联系人)：Colin T. Williams

E-mail 邮箱：ctw@lumossolar.com

第 1 页 共 16 页

**1**

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 103



Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 104

**3**

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 105

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 106



Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 107



**C-1**

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 108



**7**

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 109



Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 110



Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 111



Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 112

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 113



Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 114



Page: 115

Date Filed: 07/27/2015

Document: 01019465886

Appellate Case: 15-1256



### 15. Arbitration 仲裁

Any dispute arising from or in connection with this Contract shall be settled through friendly negotiations. Failing that, then shall be submitted to China International Economic and Trade Arbitration Commission Shanghai Subcommission for arbitration which shall be conducted in accordance with the commission's arbitration rules in effect at the time of applying for arbitration. The arbitral award is final and binding upon both parties. The applicable law shall be the United Nations Convention on Contracts for the International Sale of Goods.

凡因本合同引起的或与本合同有关的任何争议，应通过友好协商解决。如未果，均应提交中国国际经济贸易仲裁委员会上海分会，按照申请仲裁时该会现行有效的仲裁规则进行仲裁。仲裁裁决是终局的，对双方均有约束力。准据法为《联合国国际货物销售公约》。



**14**

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 116



Page: 117       Date Filed: 07/27/2015       Document: 01019465886       Appellate Case: 15-1256

17.4 The Contract enters into effect after the last party's seal or signature. If the Contract is more than one page, the two paties shall seal on the perforation or seal or sign on each page. It is regarded as the signing of the Contract that each party may fax the signed or sealed Contract to the other party or may send the sacnned and signned or sealed Contract as the attachment to the email to the other party. Later, two paties exchange the orinignal paper Contract.

本合同自最后一方签字或盖章后生效。若合同超过一页，则要加盖骑缝章或在每一页上签字或盖章。一方签字或盖章后的本合同可以扫描件的形式作为电子邮件的附件或传真发送给对方，作为本合同的签订。以后双方再交换原始的纸质合同。

买方(The Buyer):                    卖方(The Seller):

*LumoS*

签字/盖章(Signature/Seal):     签字/盖章(Signature/Seal):

*Colin T. Williams*

时间（date）:                        时间（date）:
5/14/10                             第 16 页 共 16 页

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 118



**17**

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 119



Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 120

AS CARRIER

**19**

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 121

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 122

Appellate Case: 15-1256    Document: 01019465886    Date Filed: 07/27/2015    Page: 123



Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 124

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 125

出口货物报关单

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 126

25

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 127



Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   EXHIBIT

tabbies

3

# 公　证　书

## 中华人民共和国江苏省南京市南京公证处

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

**Civil Action No.**

CEEG (Shanghai) Solar Science Technology Co., Ltd.,

      Petitioner,

v.

Lumos Solar LLC fka. Lumos LLC,

      Respondent.

## DECLARATION OF TRANSLATOR

I, _Zhang Ying_, being of lawful age, hereby state and declare as follows:

1.     I am a translator at Nanjing College Translation Co., Ltd. ("Nanjing College Translation") in Nanjing, China.  The statements in this declaration are true to the best of my knowledge, information, and belief.

2.     I am approved by Nanjing College Translation to perform translations from Chinese to English.  I have worked at Nanjing College Translation for _____.

3.     Nanjing College Translation engaged me to conduct a translation of the arbitration award in *CEEG (Shanghai) Solar Science & Technology Co., Ltd. v. Lumos LLC* entered on June 13, 2014 by the China International Economic and Trade Arbitration Commission Shanghai Branch (now renamed as "Shanghai International Economic Trade Arbitration Commission," also known as "Shanghai International Arbitration Center") ("Arbitration Award").

4.     I have transcribed a true and accurate English translation of the Arbitration Award, attached hereto as **Exhibit A.**

5.       I declare under penalty of perjury under the laws of the United States of America

that, to the best of my knowledge, the foregoing is true and correct.

Executed this ____ day of _September 25_, 2014.

Subscribed and sworn before me this ____ day of _____, 2014, by _____.

Witness my hand and official seal.

My commission expires: _____

_____

Notary Public

# 公　证　书

(2014)宁南证经外字第1729号

　　申请人：南京学府翻译有限公司，住址：南京市建邺区云龙山路88号B幢1001室，法定代表人：王成兵。

　　委托代理人：张影，女，公民身份号码：372923198410105442。

　　公证事项：印鉴、签名

　　兹证明前面的南京学府翻译有限公司于二〇一四年九月二十五日出具的《译者声明》（英文本）原件上的南京学府翻译有限公司印鉴及其翻译人员张影的签名均属实。

中华人民共和国江苏省南京市南京公证处

公证员



二〇一四 年 九 月 二十五 日

59645988

# NOTARIAL CERTIFICATE

(2014)NNZ.JW.Zi,No.1729

Applicant: Nanjing College Translation Co., Ltd., Address: Apt. 1001, Building B, No. 88, Yunlongshan Road, Jianye District, Nanjing City, Legal Representative: Wang Chengbing.

Entrusted Agent: Zhang Ying, female, Citizen ID No. 372923198410105442.

Issue under notarization: seal and signature

This is to certify that both the seal of Nanjing College Translation Co., Ltd. and the signature of the translator Zhang Ying affixed to the foregoing original copy of the Declaration of Translator (the English copy) issued by Nanjing College Translation Co., Ltd. on September 25, 2014 are authentic.

Notary: Wang Ya(Signature)

Nanjing Notary Public Office

Nanjing City, Jiangsu Province

The People's Republic of China(Seal)

Sep.28, 2014

59645989

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 133

# 公　证　书

(2014)宁南证经外字第1730号

　　申请人：南京学府翻译有限公司，住址：南京市建邺区云龙山路88号B幢1001室，法定代表人：王成兵。

　　委托代理人：张影，女，公民身份号码：372923198410105442。

　　公证事项：译本内容与原本内容相符

　　兹证明前面的英文译本与(2014)宁南证经外字第1729号公证书中文原本内容相符。

中华人民共和国江苏省南京市南京公证处

公证员



二〇一四　年　九　月　二十　日

59645990

# NOTARIAL CERTIFICATE

(2014)NNZ.JW.Zi,No.1730

Applicant: Nanjing College Translation Co., Ltd., Address: Apt. 1001, Building B, No. 88, Yunlongshan Road, Jianye District, Nanjing City, Legal Representative: Wang Chengbing.

Entrusted Agent: Zhang Ying, female, Citizen ID No. 372923198410105442.

Issue under notarization: true and exact translation

This is to certify that the English translation of the Notarial Certificate (2014)NNZ.JW.Zi,No.1729 attached hereto is in conformity with the Chinese original.

Notary: Wang Ya(Signature)

Nanjing Notary Public Office

Nanjing City, Jiangsu Province

The People's Republic of China(Seal)

Sep.28, 2014

59645991

# Arbitral Award

Shanghai International Economic and Trade Arbitration Commission (Shanghai International

Arbitration Center)

# Shanghai International Economic and Trade Arbitration Commission

## (Shanghai International Arbitration Center)

## Arbitral Award

Applicant:   CEEG (Shanghai) Solar Science & Technology Co., Ltd.

Domicile:   Building 2, No. 68, Gangde Road, Xiaokunshan Town, Songjiang District, Shanghai Municipality

Attorneys:   Hu Mei, Lawyer of Beijing King & Wood Mallesons Law Firm Shanghai Branch

Yu Simin, Lawyer of Beijing King & Wood Mallesons Law Firm Shanghai Branch

Liu Qian, Lawyer of Beijing King & Wood Mallesons Law Firm Shanghai Branch


Respondent: LUMOS LLC

Domicile:   3550 Frontier Avenue, #C2, Boulder, United States

Attorneys:   Xiong Wei, Lawyer of Guangdong WANG JING & CO. Shanghai Branch

Gao Ya, Lawyer of Guangdong WANG JING & CO. Shanghai Branch

**Shanghai**

**June 13, 2014**



## Arbitral Award

[2014] H. M. Z. C. Zi. No. 138

In accordance with the arbitration clause set out in the *Sales Contract* No. S69020043, which Contract was signed by and between the Applicant CEEG (Shanghai) Solar Science & Technology Co., Ltd. (hereinafter referred to as "the Applicant") and the Respondent LUMOS LLC (hereinafter referred to as "the Respondent"), as well as the arbitration application submitted by the Applicant to the Commission on March 22, 2013, China International Economic and Trade Arbitration Commission Shanghai Branch (now renamed as "Shanghai International Economic and Trade Arbitration Commission", also known as "Shanghai International Arbitration Center", hereinafter referred to as "the Commission") accepted the case of dispute arbitration under the aforesaid *Sales Contract* on April 1, 2013 after the Applicant handled relevant formalities including prepayment for the arbitration cost. The number of the case is SG2013023.

*Arbitration Rules of China International Economic and Trade Arbitration Commission Shanghai Branch* (hereinafter referred to as "*the Arbitration Rules*") implemented from May 1, 2012 applies to the arbitration procedure of this case.

The Secretariat of the Commission (hereinafter referred to as "the Secretariat") issued acceptance notice/arbitration notice, *Arbitration Rules* and *List of Arbitrators* to the Applicant and the Respondent on April 1, 2013, and also sent to the Respondent the arbitration application and attachments which were submitted by the Applicant.

In accordance with the stipulations set out in the *Arbitration Rules*, an arbitration tribunal composed of three arbitrators heard the case. The Applicant appointed Mr. Chen Gang as the Arbitrator. The Respondent failed to choose or entrust the Director of the Commission to designate an arbitrator within the term stipulated by the *Arbitration Rules*, and the Director of the Commission appointed Mr. Liu Ying as its arbitrator according to Item (I), Clause 22 of the *Arbitration Rules*. Whereas the Applicant and the Respondent failed to choose jointly or entrust the Director of the Commission to designate the Chief Arbitrator according to the stipulations set out in the *Arbitration Rules*, the Director appointed Ms. Liu Xiaohong as Chief Arbitrator according to the stipulations set out in in Item (IV), Clause 22 of the *Arbitration Rules*. The three arbitrators aforesaid all signed the *Arbitrator's Declaration*, and established the arbitration tribunal on May 27, 2013 to hear the case jointly. The arbitration tribunal decided to open a court session on June 27, 2013. The Secretariat sent the *Notice of Composition of Arbitration Tribunal* and the *Notice of Hearing* to the Applicant and the

Respondent on May 27, 2013.

The Respondent submitted an application for extension of hearing on June 20, 2013. The Secretariat forwarded the said document to the Applicant and the arbitration tribunal on June 21, 2013, and also requested the Applicant to make written comments. On June 24, 2013, the Applicant submitted the written comments on the aforesaid application made by the Respondent, and the Secretariat forwarded the said document to both the Applicant and the Respondent on the same day. After penal discussion, the arbitration tribunal approved the Respondent's application for extending the date of hearing and entrusted the Secretariat to inform both parties of such decision in writing on June 24, 2013.

The arbitration tribunal decided to extend the open session of the case until September 14, 2013, and the Secretariat sent the notice of extension of court hearing to both parties on July 29, 2013. Later, the arbitration tribunal decided to adjust the time of court session, i.e. in the morning of September 14, 2013, to the afternoon of the same day, and also entrusted the Secretariat to inform both parties of such matter in writing on August 5, 2013.

The Respondent submitted jurisdiction objection on September 11, 2013. The Secretariat forwarded such file to the Applicant and the arbitration tribunal on the same day, and also requested the Applicant to make written comments on the file. On September 12, 2013, the Applicant submitted the opinions on the aforesaid jurisdiction objection raised by the Respondent, and the Secretariat forwarded such file to both the Respondent and the arbitration tribunal on the same day.

On September 13, 2013, the Commission made "[2013] H. M. Z. Zi. No. 4801" *Resolution on Jurisdiction* to reject the Respondent's jurisdiction objection, and held that the arbitration procedure of the case shall be implemented continuously.

On September 14, 2013, the arbitration tribunal opened the court session to hear the case in the location of the Commission. The arbitration attorneys of both the Applicant and the Respondent appeared in the court for hearing. The two parties made presentations on facts and legal issues of the case, questioned the evidences, answered the questions raised by the arbitration tribunal, debated and gave final statement opinions. Before the hearing was finished, the arbitration tribunal arranged for the arbitration procedures after the session.

Attorneys of the Respondent submitted the attorneys' opinions and supplementary evidences on September 27, 2013. The Secretariat forwarded such materials to the Applicant and the tribunal on September 29, 2013, and also requested the Applicant to give written cross-examination opinions on

the supplementary evidences submitted by the Respondent.

The Applicant's attorneys submitted the attorneys' opinions and supplementary evidences on September 30, 2013. The Secretariat forwarded such materials to the Respondent and the tribunal on October 8, 2013, and also requested the Respondent to give written cross-examination opinions on the supplementary evidences submitted by the Applicant.

On October 14, 2013, the Applicant submitted the cross-examination opinions on the supplementary evidences submitted by the Respondent after the court hearing. The Secretariat forwarded such materials to the Respondent and the tribunal on October 15, 2013. The Respondent submitted written comments on cross-examination opinions mentioned above on October 22, 2013, and the Secretariat forwarded such documents to the Applicant and the tribunal on October 24, 2013.

The Respondent submitted a written document named *Request on Further Explanations on the Evidences of the Case* on October 28, 2013, requesting the arbitration tribunal to open a court session to hear the case again. The Secretariat forwarded such documents to the Applicant and the arbitration tribunal on October 29, 2013. On November 4, 2013, the Applicant submitted the comments on the preceding documents submitted by the Respondent. After penal discussion, the arbitration tribunal decided to open the second court session to hear the case on December 12, 2013, and also entrusted the Secretariat to send the notice of court session to both parties on November 13, 2013.

On December 12, 2013, the arbitration tribunal opened the court session for the second time to hear the case at the location of the Commission. The arbitration attorneys of both the Applicant and the Respondent appeared in the court for hearing. The two parties made further presentations on facts and legal issues of the case, carried out cross-examinations on the supplementary evidences, answered the questions raised by the arbitration tribunal, debated and gave final statement opinions. Before the hearing was finished, the arbitration tribunal arranged for the arbitration procedures after the session.

Attorneys of the Respondent submitted the supplementary attorneys' opinions on December 26, 2013. The Secretariat forwarded the file to the Applicant and the tribunal on December 27, 2013. Attorneys of the Applicant submitted the supplementary attorneys' opinions on January 28, 2014, and the Secretariat forwarded the file to the Respondent and the tribunal on February 7, 2014.

Upon application of the arbitration tribunal, the Secretary-general of the Commission, based on the stipulations set out in Item (III), Clause 43 of the *Arbitration Rules*, agreed to extend the term of judgment on the case to June 13, 2014.

All legal documents, notices and materials related with the case have been sent to the parties concerned in the case and the arbitration tribunal effectively according to the stipulations set out in Clause 60 of the *Arbitration Rules* by the Secretariat.

Now the case has been finalized. Based on verified facts and evidences as well as applicable laws, the arbitration tribunal has made the final judgment on the case. Facts of the case, opinions of the arbitration tribunal and the award are expatiated respectively as below:

## I.   Facts of the Case

(I)   Main opinions stated in the Arbitration Application and the items requested for arbitration by the Applicant

In May 2010, the Applicant and the Respondent executed the *Sales Contract* in question, stipulating that the Applicant shall sell solar battery modules to the Respondent. It is stipulated in Clause 7 of the *Sales Contract* that the Respondent shall pay off the money for the goods within 60 days from the departure date of goods as listed on the bill of lading.

On October 23, 2010, the Applicant delivered to the Respondent solar battery modules with the total price of USD646,191 according to the *Sales Contract*. On November 21, 2010, the Applicant delivered again to the Respondent solar battery modules valued USD878,748. After that, the Applicant provided relevant invoices, packing lists and bills of lading of these two batches of goods to the Respondent.

According to the stipulations set out in Clause 7 of the *Sales Contract*, the Respondent shall pay off the total price within 60 days from the departure date as listed on the bill of lading. Therefore, the deadlines for payment of the preceding two batches of goods shall be December 22, 2010 and January 20, 2011 respectively. On the aforesaid deadlines, the Respondent failed to pay the total price according to the stipulations set out in the *Sales Contract*, defaulting on its payment of USD1,372,445.10 in total, which is still overdue now.

In addition, according to the stipulations set out in Clause 9 of the *Sales Contract*, in case the Respondent fails to make full payment in time according to the Contract and thus causes exchange loss to the Applicant, the Respondent shall bear such loss, i.e. in case the exchange rate for USD to RMB of the People's Bank of China on the payment deadline is depreciated in comparison with that on the date when the Respondent actually makes the payment, the exchange loss caused therefrom shall be borne by the Respondent.

Therefore, the Applicant issued Lawyer's Letter to the Respondent on December 19, 2012 and January 24, 2013 respectively, requesting the Respondent to pay off the money overdue. However, by now the Respondent has neither paid off the money nor compensated any loss incurred to the Applicant. The arbitration requests submitted by the Applicant in the Arbitration Application are listed as follows:

1.   To request a judgment on the Respondent paying the two overdue payments for the goods, which are USD1,372,445.10 in total, to the Applicant (the total payment for the first batch of goods is USD646,191, minus the prepayment having been made by the Respondent, the Respondent is still defaulting on its payment of USD581,571.90; the total payment for the second batch is USD878,748, minus the prepayment made by the Respondent, the Respondent is defaulting on its payment of USD790,873.20), that is RMB8,611,407 in total (calculated according to the intermediate conversion price of RMB6.2745 for USD to RMB promulgated by the Bank of China on March 7, 2013);

2.   To request a judgment on the Respondent paying the interest of the overdue payment for the goods mentioned above from the deadline to the actual payment date, temporarily calculated as RMB1,251,930 (wherein the interest of the price of the first batch of goods, as calculated temporarily from the second day (December 23, 2010) following the payment deadline to March 7, 2013, amounts to RMB543,454; the interest of the price of the second batch of goods, as calculated temporarily from the second day (January 21, 2011) following the payment deadline to March 7, 2013, amounts to RMB708,476. The total amount of the interests mentioned above is RMB1,251,930; it is requested to calculate up to the date when the Respondent actually performs the obligation to make the total payment);

3.   To request a judgment on the Respondent compensating the Applicant RMB464,816 for exchange losses caused by overdue payment (wherein the exchange loss of the first payment for the goods is RMB216,403, and that of the second payment for the goods is RMB248,413; it is requested to calculate up to the date when the Respondent actually performs the obligation to make the total payment);

4.   To request a judgment on the Respondent bearing the lawyer's fee of the Applicant, which is in total RMB250,000 (this RMB250,000 is a temporarily calculated amount; in case the lawyer's fee actually paid exceeds RMB250,000, to request a judgment on the Respondent bearing the cost actually paid by the Applicant);

5.   To request a judgment on the Respondent bearing the arbitration cost of this case.

On the first court hearing, the Applicant made modification on the arbitration requests of Item 1 and Item 3 above: for Item 1, to request confirming that price should be calculated in USD; and for Item 3, the request was amended as: to request the judgment on the Respondent compensating the Applicant RMB463,799 for exchange losses caused by overdue payment of the Respondent to the Applicant. As of March 7, 2013, the initial day of exchange rate was moved one day compared to the previous one. The calculation days are December 22, 2010 and January 20, 2011 respectively. Exchange loss is calculated according to the actual payment date of the Respondent.

(II) Defense opinions given by the Respondent on the court hearing and the attorneys' opinions given after the first court hearing

The Respondent gave defense opinions orally in the court hearing, and submitted written attorney's opinions after the first court hearing. Its main opinions are listed as follows:

1. The Respondent and the Applicant had long-term contract relationship and the two parties had reached agreement on quality standards and warranty period.

The Respondent and the Applicant had long-term contract relationship. On July 7, 2009, the Respondent and the Applicant signed a *Co-Branding Agreement* (referred to as "*Co-Branding Agreement*" hereinafter) for a duration of three years. The two parties stipulated the procurement volume of solar battery modules for each year. According to the stipulations set out in the *Co-Branding Agreement*, the two parties successively signed a series of sales contracts including the *Sales Contract* in question during the three years of effective duration of the contract, and determined model of assemble, quantity, price, time of payment and time of delivery of purchased modules of each batch. It is stipulated in the Purchase Order of the *Co-Branding Agreement*: "Before every contract year starts, parties need to sign on the purchase contract for that period. If during that contract year there are additional orders from buyer, parties may have additional purchase contracts. Both year and additional contracts are as the integral parts of the OEM agreement". Therefore, it can be seen that all sales contracts or orders concluded by and between both parties during the term of validity of the *Co-Branding Agreement* were integral part of the long-term procurement contract. Therefore, the Respondent and the Applicant had long-term and stable transaction relationship. The stipulations in the *Co-Branding Agreement* concerning quality assurance shall apply to products of all batches and models stipulated for procurement between the Respondent and the Applicant.

The two parties stipulated the quality standards and the quality assurance clauses. According to the *CSUN OEM Assembly Inspection Standards Q/CSUN. J27. 0002 V1.0* provided by the Applicant to the Respondent, it is specifically stipulated in the technical requirements of Item 2 No. 2: "color:

the whole battery of assembly shall have even color. Color-jumping on the battery is not allowed"; and technical requirements of Item 3 are "cracks (visually seeable) and debris on battery are not allowed". The aforesaid clauses indicates that the solar battery modules provided by the Applicant should comply with such quality standards as even colors, without cracks or debris, otherwise would be regarded as having defects in materials and workmanship. The clause of Warranty/Defective Products in the *Co-Branding Agreement* stipulates: "For warranty, free from defects in material workmanship: 5 years". The clause indicates that the Applicant guaranteed the products sold to the Respondent would be free from any defect in material or workmanship in 5 years.

In addition, the emails between the Respondent and the Applicant on May 5, 2010 showed that the sales manager of the Applicant sent a quality assurance named "Limited Warranties for Photovoltaic Modules 2010" to the Respondent again. This quality assurance also stipulated that "CSUN warrants its MODULES, including field replaceable DC connectors and cables, to be free from defects in materials and workmanship under normal application, installation, use and service conditions. If MODULES fail to conform to this warranty, for a period ending 60 months from date of sale to the original customer (CUSTOMER) as shown in stamped packing list of CSUN, CSUN will, at its option, either repair, replacement and refund the purchase price as paid by CUSTOMER". It can be seen that the Applicant guaranteed and the Respondent accepted that the Applicant would undertake the quality assurance responsibilities for repair, replacement and refund in 5 years for any defect in material or workmanship in products sold to the Respondent.

2. The products purchased by the Respondent from the Application have quality defects. The Respondent requested many times the Applicant to bear quality assurance liabilities and obtained no result.

Products in the Contract and the orders in question have quality defects. According to the pictures of the defective modules provided by the Respondent, the modules of the model SSTWB190-72M under the *Sales Contract* have obvious uneven colors and are not in compliance with the quality standards of the modules guaranteed by the Applicant. In addition, according to the Flash Testing Report (S69020043F-2) provided by the Applicant when delivering the goods, it can be confirmed that the model of the defective modules corresponds to that delivered by the Applicant under the *Sales Contract*. Therefore, it can be seen that the products of SSTWB190-72M under the *Sales Contract* have obvious and visible quality defects.

Later, the Respondent engaged authoritative third party testing institution to carry out more detailed testing on the modules of other models delivered by the Applicant. According to the testing

report issued by the third party testing institution Celestica, the modules of the model SSTWB250-60M delivered to the Respondent by the Applicant have visible uneven colors. According to further EL optical testing, clear cracks were found on the modules with snail marks. The conclusion drawn in the final test report is that there are direct relationship between the snail marks and the cracks, and the modules with snail marks would certainly be found with cracks in EL optical testing. While some modules, even though no snail marks were found, have been found with cracks in the summary of EL optical testing.

According to Flash Testing Report S69020043-7A, S69020043-7B and S69020043F-1 (respectively corresponding to PO1578 and PO1559 orders under the contract for S69020043) provided by the Applicant at the time of delivery, it can be determined that the goods delivered by the Applicant under the contract and the orders in question are all modules of SSTWB250-60M.

Models of products with quality defects involved many orders and batches between the Respondent and the Applicant. On December 10, 2010, the Respondent raised quality objections to the Applicant for the first time through Email, aiming at aforesaid defects in materials and workmanship existing in the summary of modules provided, and sent detailed information including models, relevant data and pictures of the modules with quality problems to the Applicant along with the email. On December 14, 2010, the Applicant replied the email, confirming that it had received all the documents related with the quality objection. In the subsequent communications, the sales manager of the Applicant guaranteed to the Respondent to replace the defective modules for the latter, and suggested the Respondent that "no matter what the final negotiation result would be", the Respondent should replace the defective modules for its customers "as soon as possible". Therefore, the Respondent replaced the modules with defects complained by the customers, but failed to receive the substitutes guaranteed by the Applicant. Later, the Respondent received quality complaints from several customers more successively, claiming that several batches of products delivered by the Applicant had aforesaid quality defects of different levels. From the pictures taken on the site, it is clear that solar modules have obvious uneven colors and cracks. On April 28, 2011, the Respondent delivered formal quality complaint to the Applicant. As of that time, the actual loss encountered by the Respondent for replacing defective modules had reached USD2,417,335. Therefore, based on the quality warrants made by the Applicant, the Respondent raised the request for providing substitutes or discounting the price. Later on, the Respondent raised quality complaints to the Applicant again on September 15, 2011 and November 4, 2011 respectively, and attached complaints on quality raised by several customers in succession. Defective products included modules of same model in several batches as well as modules of different models in the same batch.

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 144

According to the report provided by the authoritative third party testing institution, the aforesaid quality defects only appear gradually in at least five months after being installed normally outdoors. Therefore, it cannot be excluded that the aforesaid defects would be found in the future in the modules that have been installed. As of April 2011, according to the sampling test carried out by the Respondent on the module systems installed by several customers, the defect rate of uneven colors and cracks in the goods delivered by the Applicant reached as high as 65%. However, up to now, the Applicant has not adopted any remedies for aforesaid quality complaints, idled in performing the quality assurance obligation stipulated in the Contract. The behavior of the Applicant has formed breach of Contract. Whereas the products delivered by the Applicant had wide quality defects, and the scale of defective modules might expand continuously, but the Applicant has neglected in performing the quality warrant obligations stipulated, the Respondent has reasons to consider that the behavior of the Applicant will structure fundamental breach of the long-term procurement contract.

3. The Respondent is entitled to request the Applicant to adopt remedial measures including repair, replacement or refund according to the quality warrants provided by the latter, and be entitled to request the Applicant to offer discount and providing substitutes according to the *United Nations Convention on Contracts for the International Sale of Goods* (referred to as the "CISG" hereinafter).

According to the quality warrants provided by the Applicant, the Respondent is entitled to request the Applicant replacing the defective goods or giving discounts on the prices. Based on the *Co-Branding Agreement* and CSUN Quality Warrants concluded by both parties, within 60 months after the sale of products, for defects in materials and workmanship in the products delivered by the Applicant, the Respondent will be entitled to request the Applicant for repairing, replacement or refunding. The Respondent's deduction from the contract price not paid based on the requirements of quality warrants of the Applicant is not a breach of contract, but the exercise of right of remedy under the situation of quality not in compliance with that stipulated in the Contract. Moreover, the two parties have stipulated in the sales contracts to apply CISG. According to the stipulations set out in Clause 50 of CISG, in case the goods are not in compliance with contract, no matter whether the payment has been done or not, the Buyer can counteract the price.

The behavior of the Respondent refusing to pay does not form breach of contract. It is stipulated in Clause 81 of CISG that if one party fails to perform its obligations due to act or non-act of the other party, the latter shall not claim the opposite not performing obligations. The evidence submitted by the Respondent showed that the products under the purchase orders not paid under dispute of the case have prominent quality defects. According to the quality warrants from the Applicant, it shall

repair, replace or discount the products with quality defects raised during the quality warranty period. However, by now the Applicant has not repaired the defective products according to the quality warrants or provided substitutes upon the request of the Respondent. Therefore, the Respondent had to deduct the price to be reduced from the money payable for the goods. Because the Applicant failed to perform the quality warrant obligations stipulated in the Contract, which caused the Respondent not able to perform the obligation of paying for the goods, the Applicant should not allege that the Respondent failed to perform obligations or breached the Contract.

The Respondent has suffered actual losses due to incompliance of the products delivered by the Applicant. Because the products provided by the Applicant generally have defects in quality, after the Respondent sold the products to customers and installed and used, it received quality complaints from many customers. As of April 28, 2011, the actual loss suffered by the Respondent for replacing defective modules for its customers had reached USD2,417,335, far beyond the price counteracted by the Respondent from the money payable to the Applicant. Moreover, the complaints from the customers received by the Applicant are far more than these. Until September 15, 2011, many more customers put forward the same quality defects on the products purchased from the Applicants. At present, the amount of loss encountered by the Applicant due to defective products is still expanding. Therefore, the Respondent reserves the right to request the Applicant replacing defective products or refunding according to its quality warrants made.

(III) Attorneys' opinions submitted by the Attorney of the Applicant after appearing on court

Attorney of the Applicant also submitted written attorney's opinions after the first court hearing. The main opinions are as follows:

1.   The Respondent refused to pay total price for the goods under the *Sales Contract* involving dispute of the case, and should bear relevant liabilities for the breach of Contract, compensating all losses encountered by the Applicant.

It is stipulated in the *Sales Contract* that the Applicant will sell solar battery modules to the Respondent, and the latter shall undertake relevant payment responsibilities. From September to November 2010, the Respondent purchased two batches of solar battery modules of USD646,191 and USD878,748 respectively from the Applicant under the *Sales Contract*. After receiving 10% prepayment remitted from the Respondent, the Applicant delivered the two batches of solar battery modules purchased by the Respondent on October 23, 2010 and November 21, 2010 respectively. The commercial invoice numbers of the Applicant corresponding to the two deliveries are S69020043-6 and S69020043-7.

The Applicant has performed totally the obligation of delivery under the *Sales Contract*, but the Respondent has failed to perform its payment obligation until today, in total overdue USD1,372,445.10 for the goods. In the first court session, except considering the overdue amount should be USD1,371,525, the Respondent held no objection to the Applicant's assertion mentioned above. Moreover, the Respondent has not provided any evidence by now to provide that its actual overdue amount is USD1,371,525.00

The default behavior of the Respondent has caused the following losses to the Applicant: (1) Payment for the goods overdue under the *Sales Contract*: USD1,372,445.10; (2) Loss of interest: currently calculated until March 7, 2013, loss of interest is RMB1,251,930; (3) Exchange loss: exchange loss caused by overdue payment to the Applicant, currently calculated until March 7, 2013, is RMB463,779. The Respondent failed to pay the total amount to the Applicant according to the stipulations in the Contract. On the date that the Applicant submitted the Arbitration Application and the date of first court session of the case, the exchange rate dropped greatly compared to the exchange rate between USD and RMB promulgated by the Bank of China on the payment deadline for the goods, so exchange loss has been generated to the Applicant. According to the "complete compensation principle" established in Clause 74 of CISG, the Respondent should compensate aforesaid exchange loss encountered by the Applicant. (4) Lawyer's fee: the payment approach for the legal service contract signed by and between the Applicant and its lawyers is conditional fixed top price, which is RMB250,000. As of the last billing date of the lawyers of the Applicant, i.e. September 10, 2013, the Applicant had received a total of the lawyers' bills as much as RMB257,710. Therefore the Applicant requested a judgment on the Respondent bearing the lawyers' fee for the Applicant as much as RMB250,000 in total. If the actually paid amount by the Applicant for the case exceeds RMB250,000, the Applicant reserves the right to request the arbitration tribunal demanding the Respondent make relevant compensation according to the amount actually paid. (5) Arbitration cost: the Applicant has paid RMB225,782 arbitration cost for this case.

2.   The compensation assertion made by the Respondent against the Applicant in the submitted evidence *Claim Letter* on September 14, 2013 has no ground of facts and laws, which shall not be supported by the arbitration tribunal.

In the *Claim Letter* on April 28, 2011, the Respondent alleged that part of solar battery modules delivered by the Applicant had quality defects. However, the Respondent did not mention at all in the letter what kind of defects are those alleged. There is no evidence proving that the defects are found in the solar battery modules sold by the Applicant, and the Respondent failed to provide any

certificate to prove that so-called defects will cause loss to the Respondent as well as the severity of these defects is already on a level of not able to be used and must be replaced, or any certificate showing that these solar battery modules have been actually replaced. Therefore, it can be seen that the Respondent has not provided any evidence to prove that the defects in the goods provided by the Applicant have structured fundamental default against Clause 25 of CISG and thus the Respondent has right to request refund, and also the Respondent has not submitted any evidence proving that the quantity of the defective goods alleged are the number listed in the *Claim Letter*, unit value of defective goods as well as the labor cost actually paid by the Respondent for replacing any solar battery module. The Respondent cannot even prove that the attached *Quality Warrant* is the quality assurance for the goods issued by the Applicant to the Respondent, pertinent to the goods under the *Sales Contract* involving dispute of the case, or the quality assurance pertinent to the goods covered by the *Claim Letter*.

3.   The compensation assertion from the Respondent cannot be put forward in the case as demurrer or counterclaim.

In this case, the Respondent actually alleged relevant liabilities for quality of products, requesting the Applicant to bear relevant legal responsibilities so as to counteract the price payable by the Respondent in this case. However, such assertion of the Respondent should not be put forward in the case as demurrer or counterclaim. The main reasons are as follows:

Quality problems alleged by the Respondent, even according to its assertion, belong to disputes under other contracts apart from the *Sales Contract* of this case and do not fall into the hearing scope of the case; and they shall not be solved by means of demurrer or counterclaim in this case. Therefore, seen from procedure, such assertion and relevant facts from the Respondent should not be heard in this case, and the demurrer should not be accepted, nor the counterclaim.

The claim for compensation raised by the Respondent in terms of so-called quality issues is not pertinent to any of creditor's right due against the Applicant that has been recognized, but pending matter to be recognized through hearing. Therefore, even if it belongs to any dispute of orders under the case, it does not comply with regulations set out in the *Contract Law of the People's Republic of China* (referred to as "*the Contract Law*" hereinafter) in terms of counteraction, cannot be put forward by means of demurrer through counteraction in this case.

Referring to the stipulations set out in Clause 44 of the *Explanations of the Supreme People's Court on Applicable Laws for Hearing Cases Concerning Disputes in Sales Contracts* (referred to as "*Judicial Explanations on Hearing Sales Contracts*" hereainfter), if the Seller requests the Buyer to

pay after performing the oblgiation of delivery, while the Buyer alleges that the Seller shall pay penalty for breach of contract and compensation for loss, etc. with the assertion that the Seller first breaches the contract, counterclaim shall be filed. In this case, the Respondent is obviously not carrying out negative defense, but is actively alleging to the Applicant for payment and further request coutneraction. Positive claims of the Respondent must be put forward by means of counterclaim or prosecution else wise instead of by means of demurrer. In this case, seen from the object level, because the orders based on which the Respondent alleged for the rights are not the orders involved in the case and are not in compliance with conditions set out in China laws concerning counterclaims, it cannot put forward the counterclaim in this case. In terms of procedure, the Respondent has not raised counterclaims during the peirod over half year after the case was accepted for hearing in March 2013, which has exceeded the deadline on submission of counterclaims stipulated in the *Arbitration Rules* and Chenese laws, thus it should not be accepted.

The arbitration tribunal expressed clearly at the first court session that it would not accept the counterclaims raised by the Respondent. In addition, considering that the Respondent had obtained authorization before the opening of the first court session but failed to actively claim for rights, and the Respondent raised jurisdiction objection without any reason on the last day before the first court hearing after extension, expecting to delay the time limit for trial of this case. It cannot be excluded that it is suspected for delaying the trial of the case over and over. Therefore, no matter from the vision of legal regulations or arbitration practice, or from the principles of arbitration efficiency and justice, demurrer or counterclaim raised by the Respondent concerning so-called quality issues should not be accepted for trial.

Based on the aforesaid facts and reasons, the Applicant requests the arbitration tribunal to support the Applicant's claims against the Respondent for paying the balance of the goods and relevant compensations, and requests the Respondent filing litigation or arbitration else wise based on specific contracts.

(IV) Supplementary attorneys' opinions submitted by the Attorneys of the Respondent after the opening of the second court session

The Attorneys of the Respondent submitted supplementary attorneys' opinions after the opening of the second court session. Main opinions are as follows:

1. The fact concerning business cooperation and disputes between the Applicant and the Respondent.

On July 7, 2009, the two parties signed *Co-Branding Agreement*. On the same day, the two parties signed *Sales Contract No. S60100*, which specifies the models and the quantity of PV modules to be purchased. On March 1, 2010, the two parties signed *Sales Contract No. S69020036*. On April 9, 2010, the two parties signed *Sales Contract No. S69020042*. On May 5, 2010, the Applicant sent Quality Warranty to the Respondent through email. On May 17, 2010, the two parties signed the *Sales Contract* involved in this case. On June 17, 2010, the two parties signed *Sales Contract No. S69020045*.

In December 2010, the Respondent received complaints from the customer that the PV modules produced by the Applicant that had been sold by the Respondent to the customer had quality problems. Through field inspection, the Respondent verified the defects of the PV modules, and raised objection on quality to the Applicant through email on December 10, 2010, and provided data and pictures related with the defective modules by means of attachments to the email. Through communication between the two parties, on January 6, 2011, Sally Fan, the sales manager of the Applicant proposed that no matter what the result of negotiation would be, the Respondent should replace defective modules for its customers as soon as possible. The Respondent then replaced the modules with defects in workmanship according to the requirements of the customer Mongolia Energy on January 19, 2011.

On January 26, 2011, the Respondent raised again quality objection to the Applicant through email and attached the pictures of the defective modules. From April 3, 2011 to April 14, 2011, the Respondent raised quality objection to the Applicant through email again, and provided the result of sampling testing. The defect rate of PV modules had reached 65%.

From April 19, 2011 to April 28, 2011, as urged by the Respondent, the Applicant dispatched relevant staff Lester (Wang Xinglei) to the U. S. to learn the circumstances of quality problems of the PV modules at the Respondent's. After the Applicant carried out field inspection, the Respondent issued formal Claim Letter to the Applicant on April 28, 2011. However, the Applicant had never given a solution. The Respondent put forward quality objection many times to the Applicant on September 15, 2011 and November 4, 2011 successively, requesting the Applicant to perform the quality warrant obligations according to the Quality Warranty, and to replace the PV modules with defects, but it never received effective response from the Applicant. It can be seen that the Respondent has always been raising quality objection to the Applicant, requesting the latter to bear the obligation of quality warrants, instead of defaulting on payment deliberately.

2. The *Sales Contract* of this case refers to a certain batch in the contracts of delivery in batches.

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 150

The business cooperation between the Respondent and the Applicant started from the *Co-Branding Agreement*, through which the two parties decided the cooperation matters of using joint logo on the PV modules as well as the total purchasing quantity in the subsequent three years. In addition, based on the *Co-Branding Agreement*, the two parties have signed successively a series of sales contracts to determine specific models and quantities of PV modules to be purchased every time.

It can be seen that the cooperation purpose determined in the *Co-Branding Agreement* is realized through the performance of a series sales contracts. Therefore, the *Sales Contract* in this case is not an independent contract. All the contracts signed by and between the Applicant and the Respondent from July 7, 2009, including the *Sales Contract* in this case shall be deemed as a whole part, subject to the regulations set out in CISG concerning the contracts of deliveries in batches.

3. The Applicant shall bear quality assurance liabilities for the PV modules sold to the Respondent.

The Applicant denied over and over the existence of the Quality Warranty in court hearing, and considered that even it exists, the defects alleged by the Respondent would not affect the normal use of the PV modules, so the PV modules do not have quality defects. Therefore, the Respondent considers that: first of all, in terms of the evidences provided by the Applicant and the commercial conventions of international trade, the Quality Warranty exists objectively. The Respondent and the Applicant have long-term contract relationship for selling and buying PV modules. Whereas the characteristics of the products of PV modules, it is impossible that the two parties have no stipulations on quality warrant. In fact, it has been mentioned in the 3rd paragraph of the lawyer's letter sent by the Attorney of the Applicant to the Respondent on January 24, 2013: "*please note that the general warranty issued by CEEG does not cover incidentals such as your labor costs.*" Therefore, the Attorneys of the Applicant are well aware of the fact that the Quality Warranty exits and also the details of the Quality Warranty. Secondly, the Quality Warranty of the Applicant applies to the PV modules of all the models that it produces. The Respondent has submitted two copies of Quality Warranty obtained from the Applicant on open court session. Although the issuers of these two Quality Warranties are the Applicant CEEG and the parent company of the Respondent CSUN respectively, the main contents of these two documents are the same, guaranteeing a five-year warranty for defects in materials and workmanship generated from the modules. Moreover, in the *Co-Branding Agreement* signed by the two parties, the Applicant also guaranteed the scope and the term of quality warrants in consistency with the Quality Warranty. The Quality Warranty provided by the Applicant applies to the PV modules of all models that it produces. Besides, cracks and snail

Appellate Case: 15-1256 Document: 0101946586 Date Filed: 07/27/2015 Page: 151

marks appearing on the PV modules are within the scope of warrant for defects in materials and workmanship in the Quality Warranty. The Quality Warranty provided by the Applicant includes two parts: one is the warranty on defects in materials and workmanship and the other is that for power output. The inspection standards for modules provided by the Respondent specifically requests that the surface color of the PV module battery shall be even and consistent, and should not have any crack. The appearance of snail mark and crack is a type of defect in material and workmanship. No matter whether the crack or snail mark affects the power output of PV modules or not, according to the Applicant's commitments made in the Quality Warranty, the Applicant shall perform the quality assurance obligations for the defects in materials and workmanship. When quality problem occurred to the products, the Applicant adopted delay and avoiding attitude for handling the issues, which obviously formed breach of Contract. At last, the testing report from Celestica is authoritative. Celestica Lab is authorized by TUV Rheinland Laboratory, being a professional institution that provides test authentication services for PV modules, and TUV Rheinland Laboratory is the testing organization determined in the Quality Warranty provided by the Applicant. Therefore, the test result on PV modules carried out by Celestica Lab and TUV Rheinland Laboratory possess the same authority.

4. The assertion of the Respondent for remedies, including requesting the Applicant to reduce the price with the reason of existence of quality defects, is a demurrer. According to stipulations set out in Clause 44 of *Judicial Explanations on Hearing Sales Contracts* promulgated by the Supreme People's Court of China, "in case the Seller requests the Buyer making payment after performing the delivery obligations, while the Buyer raises objection with the reason that the Seller has breached the contract first, the People's Court shall handle repsectively according to the following situations: (I) it is deemed as demurrer if the Buyer refuses to pay penalty for the breach or refuses to compensate for losses or argues that the Seller shall adopt remedial measures such as offering discounts; (II) in case the Buyer argues that the Seller shall pay penalty for the breach and compensate for loss, or requests cancellation of the Contract, it shall raise counterclaim", the assertion of the Respondent requesting a reduce of price due to the defects existing in the Applicant's products in this case is a demurrer instead of a counterclaim.

5. The Respondent shall not bear any default liability for the payment not made for the goods. The Applicant failed to perform the obligation of quality warranty in the first place, which led to the Respondent's deducting from the payment not made for the goods in order to compensate for the losses caused by defective products. According to the stipulations set out in Clause 80 of CISG, the Applicant shall not argue that the Respondent has failed to perform the obligations set out in the

contract or has breached the contract. Therefore, the Respondent shall not bear any default liability due to interest loss and exchange loss caused by the Respondent's not paying for the goods.

(V) Supplementary attorneys' opinions submitted by the Attorneys of the Applicant after the opening of the second court session

Aiming at the supplementary attorneys' opinions submitted by the Respondent, the Applicant also submitted supplementary attorney's opinions in written form. Its main opinions are as follows:

(1) The *Sales Contract* in question is completely independent from the *Co-Branding Agreement*. There is no correlation between the two. First of all, the Respondent fails to provide the original copy of the *Co-Branding Agreement,* thus the Applicant does not recognize the authenticity of the *Co-Branding Agreement*. Secondly, the *Co-Branding Agreement* has no relation with the *Sales Contract* in question apparently. There is no mutual reference or quoting of any content in both, thus it cannot be concluded that these two documents have any relation. In addition, the clauses in the *Co-Branding Agreement* are self-contradictory, and they have many contradictions with the clauses in the *Sales Contract*. The actual transactions between the two parties in 2010, including types, quantities of deliveries and payment terms were not executed according to the *Co-Branding Agreement*. For example, the actual payment term under the *Sales Contract* between the two parties is: the Buyer shall make the prepayment of 10% before the delivery, and it shall pay off the 90% balance within 60 days following the departure of the goods; rather than either of that stipulated in the *Co-Branding Agreement* "20% as prepayment, and 80% balance to be paid off within 10 days" or "100% total amount to be paid off within 3 months". Therefore, this case has no relation with the *Co-Branding Agreement* and it cannot be concluded that the *Sales Contract* refers to a certain batch under the *Co-Branding Agreement*.

2.   The two copies of *Quality Warranty* mentioned by the Respondent are not authentic; they cannot be taken as the basis to confirm the facts of this case. The Respondent considers that the main basis for the stipulations on warranty of quality between two parties is these two *Quality Warranty* submitted to the arbitration tribunal successively. However, as for the first *Quality Warranty* (i.e. "Limited Warranty for PV Modules") on which there is no signature or seal affixed by either party, the source is not clear. As for the second *Quality Warranty* (i.e. "Limited Warranty for Photovoltaic Modules 2010"), there is no seal or signature affixed by the Applicant, and the issuer is China Sunergy (Nanjing) Co., Ltd., which is not the Applicant, thus it is not related to this case. Therefore, the Applicant does not recognize the authenticity of these two copies of so-called *Quality Warranty*. The assertion of the Respondent on quality issues based on such *Quality Warranty* shall not be

admitted.

3.   Testing report issued by Celestica is not authoritative. In case the Respondent considers that the quality does not comply with the stipulations set out in the Contract, it may apply for judicial authentication. The Respondent put forward in its Attorneys' opinions that Celestica Lab is an authority under the authorization of TUV Rheinland Laboratory, but did not provide any evidence. In fact, the Respondent can actually apply for judicial authentication on the quality issues of the projects in dispute between both parties instead of only providing a testing report issued by an organization entrusted by itself.

4.   The judgment scope of arbitration of this case shall only be restricted to the dispute over the payment for the goods argued by the Applicant. In case the Respondent argues for compensation for quality defects, it shall raise counterclaim or file a petition else wise. First of all, the assertion of the Respondent on reducing the price based on *Judicial Explanations on Hearing Sales Contracts* is a demurrer rather than a counterclaim. However, such basis belongs to the judicial explanations made by the Supreme Court of China, only applicable to the hearing of litigations of the People's Court on all subordinated levels, but not for the arbitration of this case. Secondly, the Respondent's argument for quality issues is mainly based on the *Quality Warranty* that it submitted as evidence, but it is stipulated exactly in Clause 5 of the Quality Warranty that in case any dispute arises between the quality warrantor and the buyer, it shall be submitted to the court having the jurisdiction in Nanjing City, China for trial. Therefore, the arbitration tribunal does not have jurisdiction over the dispute arising from the Quality Warranty between the two parties currently. The Respondent shall file a lawsuit to the People's Court having jurisdiction in Nanjing else wise. Thirdly, in this case the Respondent has not put forward any counterclaim arguing for compensation for quality defects. If the arbitration committee judges on relevant dispute over quality, it will be regarded as typical super-judgment. Therefore, the arbitration of the case shall only be limited to the dispute on the payment for the goods argued by the Applicant, and shall not involve quality dispute. Certainly, this will not affect any material rights and interests of the Respondent. If the Respondent intends to argue for the compensation liabilities based on quality issues, it may file a lawsuit else wise to protect its legal rights and interests.

## II.   Opinions of the Arbitration Tribunal

(I)   Law application in this case

The subject matters in the transaction signed by the parties of this case are PV modules. The transaction crosses borders, and the *Sales Contract* in question is an international goods sales

contract. The business premises of the Applicant are located in China, while those of the Respondent are in the USA. Both business premises are located in the members of CISG. It is stipulated in Clause 15 of the *Sales Contract*: "……proper law is the *United Nations Convention on Contracts for the International Sale of Goods*"; both parties quoted relevant contents in China laws and judicial explanations from the court as basis. Therefore, the arbitration tribunal considers that the stipulations set out in CISG shall apply to solve the disputes under the *Sales Contract* of the case, and the China laws shall apply to the issues that have not been covered in CISG.

(II) Effectiveness of the *Sales Contract* in question

According to the stipulations set out in Clause 4 of CISG: "CISG only applies to the conclusion of sales contract and rights and obligations generated by such contract between the seller and the buyer. In particular: unless otherwise specified, CISG has nothing to do with the following matters: (a) effectiveness of the contract or effectiveness of any clause or effectiveness of any convention; ……" Therefore, as for the effectiveness of the *Sales Contract* in question, China laws shall be applied to judgment.

The arbitration tribunal has noticed that the *Sales Contract* under this case has the official seal of the Applicant and signature of the authorized representative of the Respondent, being the true reflection of both parties' will. Neither party holds objection on the effectiveness of the contract during the arbitration process, and the arbitration tribunal has not found any conflicts between the contents of the Contract and the enforceable regulations in applicable laws and administrative laws of China concerning effectiveness of contracts and thus led to the result of invalid contract. According to stipulations set out in Clause 32 of the *Contract Law* concerning "if the parties adopt the form of contract to execute the contract, the contract will enter into force upon signatures or seals of both parties" as well as in Clause 44 of such law concerning "the contract established according to laws will enter into force at the time of effectiveness", the arbitration tribunal considers that the contract involving dispute under this case has been established and validated, having legal binding force on both parties. Both parties shall strictly follow the stipulations set out in the contract and relevant laws and regulations to perform obligations, argue for rights and bear responsibilities.

(III) Facts verified by the arbitration tribunal

The arbitration tribunal has reviewed the evidence materials submitted by both parties, and also heard the presentation made by both parties on performance of the *Sales Contract*. Based on opinions of proof and cross-examinations of both parties, the following facts have been verified:

The Applicant and the Respondent signed the *Sales Contract* in Shanghai on May 14, 2010. It is stipulated in the Contract that the Applicant (the Seller) will sell solar battery modules to the Respondent (the Buyer). The Contract has stipulated transportation of goods, delivery, payment, exchange rate risks, inspection and claim, etc.

After the aforesaid Contract was signed, the Respondent paid USD64,619.10 as the prepayment for the goods to the Applicant on October 8, 2010. The Applicant delivered solar battery modules with a total value of USD646,191.00 to the Respondent on October 23, 2010. The Respondent paid USD87,874.80 as prepayment to the Applicant on November 9, 2010, and the Applicant delivered solar battery modules with a total value of USD878,748.00 to the Respondent on November 21, 2010.

After that, the Respondent failed to pay the 90% outstanding for the two batches of goods above to the Applicant according to the stipulations set out in Clause 7 of the *Sales Contract:* "payment for the goods: payment collection within 60 days after the departure date as listed on the bill of lading". The Respondent still owes USD1,372,445.10 of the goods payment to the Applicant.

(III)  Focus of dispute of the case

Based on aforesaid facts and opinions of both parties, the arbitration tribunal hereby gives the following opinions on the focus of dispute of the case and the basic opinions of the arbitration tribunal:

1.    Whether the defense claim of the Respondent requesting the Applicant to reduce the price of the goods with the reason of quality defects in the goods is within the scope of trial of the case, and whether the pleading shall be proposed else wise.

The arbitration tribunal has noticed that the Respondent did not raise counterclaim on the arbitration during the period stipulated in the *Arbitration Rules*. However, it pointed out that the goods delivered by the Applicant have quality defects in the demurrer opinions, and further raised the defense claim on reducing the price.

The Applicant considers that the trial scope of the arbitration tribunal shall only be restricted to the dispute over the goods payment argued by the Applicant rather than to involve quality dispute. As for assertion on compensation based on quality defects, the Respondent shall raise arbitration counterclaim or file a lawsuit else wise. The Respondent holds that its claim for remedies including requesting the Applicant to reduce the price with the reason of quality defects is a demurrer instead of a counterclaim.

The arbitration tribunal considers that the precondition to make judgment on the nature of the Respondent's assertion on requesting the Applicant to reduce the price with the reason of quality defects in the goods is to determine the regulations of proper law of the *Sales Contract* under the case concerning relevant problems. It has been recognized in the preceding opinions by the arbitration tribunal that CISG shall apply to the settlement of disputes under the *Sales Contract* under the case, and Chinese laws shall apply to the matters not specified in CISG. The arbitration tribunal has also noticed that CISG has not stipulated that if the claim for discount by the buyer in international sales contract concerning quality of goods is its exercise of pleading right to counterclaim; and the *Contract Law* has not made relevant regulations on such problem. However, both parties have quoted the stipulations set out in Clause 44 of *Judicial Explanations on Hearing Sales Contracts* issued by the Supreme People's Court of China, "in case the Seller requests the Buyer to make payment after performing the delivery obligations, while the Buyer raises objection with the reason that the Seller has breached the contract in the first place, the People's Court shall handle according to the following situations respectively: (I) it is deemed as a demurrer if the Buyer refuses to pay penalty for the breach, refuses to compensate for losses or argues that the Seller shall adopt remedial measures such as offering discounts; (II) if the Buyer argues that the Seller shall pay penalty for the breach, compensate for loss or requests cancellation of the Contract, it shall raise counterclaim", such regulations can be legal bassif for considering relevant problems of the case by the arbitration tribunal. Current materials of the case have shown that the stipulations set out in Item (1) of Clause 44 of *Judicial Explanations on Hearing Sales Contracts* shall apply to the claim of the Respondent as the buyer to reduce the price based on the quality defects of the goods, to be raised by means of defense, not necessarily by means of counterclaim.

2.   Affirmation of relevant default liabilities of the Applicant and the Respondent under the *Sales Contract* in question during the performance of the Contract

It can be seen from the facts verified by the arbitration tribunal that after receiving the 10% prepayment remitted by the Respondent for each of the two batches, the Applicant of the case delivered two batches of solar battery modules under the *Sales Contract* to the Respondent within the period stipulated in the Contract. The Applicant has performed the obligation of delivery under the Contract, while the Respondent has not performed the obligation of payment under the Contract by now.

However, the Respondent alleges that the products from the Applicant have quality defects in its defense. According to the quality warranty of the Applicant and the stipulations in CISG, the

Respondent shall be entitled to request the Applicant to replace the defective products or to refund. The Applicant slighted in performing the quality warranty obligations, which led to the Respondent's deducting the money payable for the goods in order to compensate for the losses caused by the defective products. At the same time, because the Applicant failed to perform the stipulated obligations on quality warranty, it made the Respondent not able to perform the obligation of paying for the goods. The behavior of the Applicant has constituted material breach to the *Co-Branding Agreement* signed by and between the Applicant and the Respondent.

The arbitration tribunal has noticed that the Respondent alleged that the Applicant and the Respondent have reached agreement in the signed *Co-Branding Agreement* concerning quality standards and warranty period. The quality warranty provided by the Applicant to the Respondent applies to the PV modules of all models that produced by the Applicant. However according to the testing report issued by Celestica Lab, a third party authoritative testing organ hired by the Respondent after testing the goods delivered by the Applicant, the products delivered by the Applicant to the Respondent have a lot of serious quality problems. However, besides denying the authenticity of the *Co-Branding Agreement* and the *Quality Warranty* provided by the Respondent as well as the authority of the testing report issued by Celestica, the Applicant also pointed out that the *Co-Branding Agreement* has no relation with the *Sales Contract* in question under the case, and relevant clauses therein shall not apply to this case.

After inspecting relevant evidences, the arbitration tribunal decides that the reason that serious quality problems in the goods submitted by the Applicant as alleged by the Respondent in its defense cannot stand. The reasons are listed as follows:

Firstly, the arbitration tribunal has noticed that it is stipulated in Item (6), Clause 2 of the *Sales Contract*: "to use associated trademark and packaging information of LUMOS and CSUN". The associated trademark mentioned in this clause shall fall within the domain of "trademarks" involved in the *Co-Branding Agreement* which is argued by the Respondent. However, after analyzing the contract clauses in the *Sales Contract* and the *Co-Branding Agreement* respectively, the arbitration tribunal holds that the two contracts are not consistent in terms of such important clauses as quantity, delivery, payment of the contractual subject matters. The two contracts are independent, each binding rights and obligations of different contractual subject matters. It cannot be concluded that the *Sales Contract* refers to a contract for a certain batch under the *Co-Branding Agreement*, which is claimed by the Respondent. Therefore, the stipulations concerning quality assurance and warranty period under the *Co-Branding Agreement* quoted by the Respondent have no binding force on the *Sales*

*Contract* in question under the case. Moreover, the basis of jurisdiction obtained by the arbitration tribunal is the arbitration clauses reached by the two parties in the *Sales Contract*. The *Co-Branding Agreement* do not fall within the scope of trial of this case.

Secondly, the Respondent alleged that according to the *Quality Warranty* that it submitted, the products under the *Sales Contract* by the Applicant have serious quality problems. The arbitration tribunal has noticed that the Respondent submitted the *Quality Warranty* as evidence, but the Applicant did not recognize the authenticity of such evidence. However, the Attorneys of the Applicant mentioned quality warranty in the letter to the Respondent on January 24, 2013. Under the precondition that the Applicant failed to submit rebuttal evidence, the Applicant's objection to the authenticity of such *Quality Warranty* cannot stand. The arbitration tribunal reviewed the contents in the *Quality Warranty*. It can be seen from the text of the *Quality Warranty* submitted by the Respondent that the 5-year quality warranty guaranteed therein is aiming at the consumers, not involved in the defense claim of the Respondent requesting discounting in the case. In addition, it has been stipulated in the *Quality Warranty* that any dispute between the quality warrantor and the buyer shall be submitted to the court having jurisdiction in Nanjing City, China for trial. Therefore, the arbitration tribunal does not have jurisdiction over the disputes arising from the *Quality Warranty*. For disputes under the *Quality Warranty*, the parties may seek for juridical remedy from the People's Court having the jurisdiction.

Thirdly, the *Sales Contract* signed by the two parties has not stipulated the testing organ for the quality of goods. According to the facts verified via current evidences, before engaging the third party testing organ Celestica Lab to carry out testing on the goods provided by the Applicant, the Respondent did not inform the Applicant of the relevant information of the testing organ nor acquire the consent of the Applicant, and the Applicant raised the objection that whether the test samples involved in the testing report were at the delivery status during the performance of the contract in question. Considering that the testing report was made after the Applicant requested for arbitration, already over three years from the delivery period under the Contract, it is difficult for the arbitration tribunal to judge that the goods delivered by the Applicant have quality problems simply on the basis of such report.

In consideration of the preceding reasons, the arbitration tribunal will not admit the opinions of the Respondent alleging that the goods delivered by the Applicant have serious quality problems. According to current evidences and the verified facts, the arbitration tribunal considers that the Applicant of the case has performed the obligation of delivering the goods under the *Sales Contract*.

The Respondent has not provided sufficient and reasonable evidence to prove that such performance has any fault or improperness, and the Respondent has not performed the payment obligation under the Contract, which has constituted breach of Contract, and shall bear relevant default liabilities.

(IV)  About the Applicant's arbitration request

1.  Concerning the arbitration request on the Respondent to make the outstanding payment for the two batches of goods to the Applicant

The arbitration tribunal has already decided in the preceding opinions that under the situation that the Applicant has performed the obligation of delivering the goods under the *Sales Contract*, the Respondent is obliged to pay for all the goods to the Applicant. According to the stipulations set out in Clause 62 of CISG: "the seller may request the buyer to pay the price, collect goods or perform other obligations, unless the seller has adopted some remedial method contradictory to such request", the tribunal supports such arbitration request raised by the Applicant. The arbitration tribunal has noticed that as for the amount of the payment for the goods, the Respondent put forward in the defense that it should be USD1,371,525, which is slightly different from the outstanding payment for the goods argued by the Applicant. However, the Respondent has not submitted any evidence to support its claim on the amount of the payment for the goods. After reviewing and verifying the evidence materials submitted by both parties, the arbitration tribunal determined that the outstanding amount payable by the Respondent should be USD1,372,445.10.

2.  Arbitration request on the loss of interest

The Applicant requests the judgment on the Respondent to pay the interest of the money payable from the deadline to the actual payment date to the Applicant, temporarily calculated as RMB1,251,930 (wherein the interest of the price of the first batch of goods, from the second day of the payment deadline, i.e. December 23, 2010 to March 7, 2013, equals to RMB543,454, as calculated temporarily; the interest of the price of the second batch of goods, from the second day of the payment deadline, i.e. January 21, 2011 to March 7, 2013, equals to RMB708,476, as calculated temporarily. The total amount of the interests mentioned above is RMB1,251,930; it is requested to calculate up to the date when the Respondent actually performs the obligation of the total payment).

The Respondent's defaulting on the payment has constituted breach of Contract, and shall bear the default liabilities for its default. According to the stipulations set out in Clause 78 of CISG, "in case one party fails to pay the price or any other outstanding amount, the other party will be entitled to charge interest on such amount, but shall not obstruct the damage indemnification that can be

obtained according to the stipulations set out in Clause 74", the arbitration tribunal considers that the Applicant's arbitration request on the Respondent to pay interest loss has legal grounds.

The arbitration tribunal has also noticed that it is stipulated in the *Sales Contract* that the Respondent should pay off the money for the goods within 60 days from the departure date of goods as listed on the bill of lading. Therefore, whereas the delivery dates of the two batches of goods were October 23, 2010 and November 21, 2010 respectively, the payment deadlines should be December 22, 2010 and January 20, 2011 respectively. The Applicant claimed that the value date of interest of the first batch of goods is the second day of the payment deadline, i.e. December 23, 2010, and the value date of interest of the second batch of goods is January 21, 2011, the arbitration tribunal admits such value dates. However, the arbitration tribunal considers that in the first arbitration request that the Applicant has clarified that the two payments should be calculated in USD, it claimed to calculate the loss of interest according to the exchange rate of conversion between USD and RMB and the RMB loan interest rate issued by the People's Bank of China. Such claim on interest has mistakes, and the tribunal does not admit it. Referring to the conditions of loans in USD during the performance period of the *Sales Contract* in question, the arbitration tribunal judges to calculate the interest of the preceding two payments as of March 7, 2013 according to the annual interest rate of 2.53%, that is USD74,991 in total.

In general, the arbitration tribunal judges that the Respondent shall pay the interest for the overdue payment to the Applicant as much as USD74,991, along with the interest for the overdue payment calculated from March 8, 2013 to the actual payment date with the annual interest rate as 2.53% and the principal as USD1,372,445.10.

3.   Arbitration request concerning exchange loss

The Applicant requests the judgment on the Respondent to pay the exchange loss incurred to the Applicant due to overdue payment as much as RMB464,816 (wherein the exchange loss of the first payment for the goods is RMB216,403, and that of the second payment for the goods is RMB248,413; it is requested to calculate up to the date when the Respondent actually performs the obligation of the total payment ).

The arbitration tribunal noticed that it is stipulated in Clause 9 of the *Sales Contract*: in case the settlement currency under the Contract is USD or EUR, and the Buyer fails to pay in time according to the Contract, the exchange rate risk loss incurred to the Seller shall be borne by the Buyer. That is to say, in case the USD or EUR against RMB depreciates at the actual delayed payment time of the Buyer according to the official exchange rate for USD or EUR to RMB promulgated by the Bank of

China, compared with the official rates at the time when the payment should be made available by the Buyer according to the contract, the loss incurred thereby to the Seller shall be borne by the Buyer", therefore, the arbitration tribunal supports the request on the exchange loss incurred to the Applicant due to the overdue payment of the Respondent. According to the preceding recognition of the tribunal, the amount of first payment owed by the Respondent is USD581,571.90, which should be paid before December 22, 2010; the second payment is USD790,873.20, which should be paid before January 20, 2011. After consulting relevant data of exchange rates for USD to RMB from the Bank of China, the arbitration tribunal has recognized the calculation method for the Applicant's exchange loss. The amount of exchange loss to be paid shall be: (1) The first goods payment is USD581,571.90; calculated in accordance with the difference between the exchange rate for USD to RMB promulgated by the Bank of China one day before the judgment is made as well as the conversion price of Bank of China, i.e. 6.6466 on December 23, 2010, the exchange loss is RMB287,878.09; (2) The second payment for the goods is USD790,873.20; calculated in accordance with the difference between the exchange rate for USD to RMB promulgated by the Bank of China one day before the judgment is made as well as the conversion price of Bank of China, i.e. 6.5886 on January 21, 2011, the exchange loss is RMB345,611.58.

4.   About the arbitration request on the lawyer's fee

Whereas the dispute of the case arises from the Respondent's breach of contract, considering the support degree of the Applicant's request in the arbitration, according to the stipulations set out in Item (II) of Clause 47 of the *Arbitration Rules*, that "the arbitration tribunal has the right to judge in the award that the losing party shall compensate the winning party reasonable expenses generated in the winning party's handling the case according to the specific situation of the case", the Respondent shall compensate the Applicant the lawyer's fee paid by the Applicant for the case. The tribunal judges that the Respondent shall compensate the Applicant RMB230,000 as the lawyer's fee.

5.   About the undertaking of the arbitration cost in the case

Considering such factors as the support degree of the Applicant's request in the arbitration and the reasons that caused the disputes under the case, the arbitration tribunal judges that the Applicant shall bear 10% of the arbitration cost in the case, while the Respondent shall bear 90%.

### III. Award

The Award made by the arbitration tribunal is shown as follows:

(I)   The Respondent shall pay the Applicant two outstanding payments for the goods, which is

USD1,372,445.10 in total;

(II) The Respondent shall pay the interest for the overdue payment to the Applicant as much as USD74,991, along with the interest for the overdue payment calculated from March 8, 2013 to the actual payment date with the annual interest rate as 2.53% and the principal as USD1,372,445.10.

(III) The Respondent shall pay the Applicant RMB633,489.67 as the exchange loss caused by the Respondent's overdue payment.

(IV) The Respondent shall compensate the Applicant RMB230,000 as the lawyer's fee paid by the Applicant for the case;

(V) The arbitration cost of the case is RMB225,782; the Applicant shall bear 10%, i.e. RMB22,578.20, and the Respondent shall bear 90%, i.e. RMB203,203.80. Whereas the Applicant has fully prepaid the arbitration cost, the Respondent shall pay the Applicant RMB203,203.80;

The payments involved in Item (I), (II), (III), (IV) and (V) of the Award shall be paid by the Respondent to the Applicant in a lump sum within 15 days from the date when the Award enters into force.

The Award is final and enters into force on the date of issuance.



(No text on this page)

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 164

Chief Arbitrator: Liu Xiaohong (Signature)

Arbitrator: Chen Gang (Signature)

Arbitrator: Liu Ying (Signature)

Shanghai, June 13, 2014

[With the seal of Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center)]



Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 165

# **SHIAC**

Shanghai International Economic and Trade Arbitration Commission (Shanghai International

Arbitration Center)

Translation

## NOTARIAL CERTIFICATE

(2014)H.D. Z.W.J.Z.No.2035

Applicant:

CEEG (Shanghai) Solar Science & Technology Co., Ltd.

Domicile: No. 5999, Guangfulin Rd., Songjiang District, Shanghai

Legal Representative: LU Tingxiu, male, Citizen ID No.: 321124196105293532

Entrusted Agent: ZHENG Lulu, female, Citizen ID No.: 342622198712111903

Notarized Matter: Arbitral Award

This is to certify that the foregoing document is a true copy of the original Arbitral Award issued to CEEG (Shanghai) Solar Science & Technology Co., Ltd. by Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center) on June 13, 2014 and the original copy is genuine.

YE Guojian (Seal)
Notary Public

The People's Republic of China
Shanghai Oriental Notary Public Office
        (Seal)

October 9, 2014

# 公　　证　　书

（2014）沪东证外经字第 2036 号

申请人：中电电气（上海）太阳能科技有限公司
　　　　住所：上海市松江区广富林路五九九九号
　　　　法定代表人：陆廷秀，男，公民身份号码：
　　　　　　　　　321124196105293532
　　　　委托代理人：郑露露，女，公民身份号码：
　　　　　　　　　342622198712111903

　　公证事项：译文与原本相符

　　兹证明前面的英文译本内容与中电电气（上海）太
阳能科技有限公司的(2014)沪东证外经字第 2035 号公
证书中文原本相符。

中华人民共和国上海市东方公证处

公　证　员　

二〇一四年十月九日

Translation

## NOTARIAL CERTIFICATE

(2014)H.D. Z.W.J.Z.No.2036

Applicant:

CEEG (Shanghai) Solar Science & Technology Co., Ltd.

Domicile: No. 5999, Guangfulin Rd., Songjiang District, Shanghai

Legal Representative: LU Tingxiu, male, Citizen ID No.: 321124196105293532

Entrusted Agent: ZHENG Lulu, female, Citizen ID No.: 342622198712111903

Notarized Matter: True and Faithful Translation

This is to certify that the foregoing English translation is true and faithful to the original (2014)H.D.Z.W.J.Z.No.2035 Chinese Notarial Certificate for CEEG (Shanghai) Solar Science & Technology Co., Ltd..

YE Guojian (Seal)
Notary Public

The People's Republic of China
Shanghai Oriental Notary Public Office
(Seal)

October 9, 2014



认 字 第 14032231-1 号

兹证明前面文书上公证处的印
章和公证员　叶国建　的签名
（印章）属实。

中华人民共和国外交部（310）
2014 年 10 月 09 日　上海

3318159

Consulate General of the )
United States of America ) SS:
in Shanghai, China )

I, Consul of the
United States of America at Shanghai, China duly
commissioned and qualified do hereby certify that
Zhang, Ying , whose true signature
subscribed above was on Oct. 9, 2014 the date
hereof, an officer of the foreign Affairs Office
of the Shanghai People's Government,
duly commissioned and qualified, to whose official
acts full faith and credit are due. For the contents
of this document I assume no responsibility.

IN WITNESS WHEREOF I have hereunto set my hand
and affixed the seal of the United States Consulate
General at Shanghai, China, this 14th day of
Oct., 2014.

Vice Consul of the
United States of America

American Consulate General
Shanghai China

PRESIDENTIAL COMMISSIONS DO NOT EXPIRE

JS 44 (Rev. )

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
CEEG (Shanghai) Solar Science & Technology Co., Ltd.

**DEFENDANTS**
LUMOS, LLC now knows as LUMOS SOLAR LLC

**(b)** County of Residence of First Listed Plaintiff China
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Boulder County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John S. Lutz, #; Courtney P. Hirsekorn #
Fairfield and Woods, 1801 California Street, Suite 2600, Denver, CO 80202
(303) 830-2400

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☒ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | | Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district *(specify)* | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
9 U.S.C. Section 201 et seq.

Brief description of cause:                ☐ AP Docket
Confirmation and enforcement of an international arbitration award

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 1,620,882.04 plus interest

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

DATE
November 19, 2014

SIGNATURE OF ATTORNEY OF RECORD
John S. Lutz

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows.

**I.**    **(a) Plaintiffs-Defendants.**   Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b) County of Residence.**   For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c) Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment noting, noting in this section "(see attachment)".

**II.**    **Jurisdiction.**   The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.    Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

 United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.**    **Residence (citizenship) of Principal Parties.**   This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**    **Nature of Suit**.  Place an "X" in the appropriate box.   If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.   If the cause fits more than on e nature of suit, select the most definitive.

**V.**    **Origin**.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**    **Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.    **Do not cite jurisdictional statutes unless diversity**.

| | | |
|---|---|---|
| | **Example:** | **U.S. Civil Statute: 47 USC 553** |
| | **Brief Description:** | **Unauthorized reception of cable service** |
| | **Or:** | **"AP Docket"** |

**VII.**    **Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No.

CEEG (Shanghai) Solar Science & Technology Co., Ltd.,

     Petitioner,

v.

LUMOS LLC, now known as LUMOS SOLAR LLC

     Respondent.

---

## [PROPOSED] ORDER GRANTING PETITION TO CONFIRM ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

---

Petitioner CEEG (Shanghai) Solar Science & Technology Co., Ltd. ("CEEG") filed a Petition to Confirm Arbitration Award and for Entry of Judgment.  Petitioner seeks confirmation of the June 13, 2014 award (the "Award") issued by the China International Economic and Trade Arbitration Commission Shanghai Branch (now renamed as "Shanghai International Economic and Trade Arbitration Commission," also known as the "Shanghai International Arbitration Center" (referred to hereinafter as the "Commission").  Having considered the Petition, the documents filed in support of and in opposition to the Petition, and the applicable law, the Court **ORDERS** as follows:

    1.    The Petition to Confirm Arbitration Award and for Entry of Judgment is **GRANTED**.

    2.    The Award is hereby **CONFIRMED**.

3.      The clerk is hereby **DIRECTED** to enter judgment in favor of Petitioner CEEG

confirming the Award and requiring Respondent LUMOS LLC, now known as

LUMOS SOLAR LLC, to pay the following amounts in conformity with the

Award and controlling law:

a.      $1,372,445.10 for two outstanding payments for goods;

b.      $74,991.00 in interest for the overdue payment, along with the interest for

the overdue payment calculated from March 8, 2013 to the actual payment

date with the annual interest rate at 2.53%;

c.      $103,006.25 in costs due to changes in foreign currency exchange rates

(converted from RMB633,489.67 based on the currency exchange rate as

of September 29, 2014);

d.      $37,398.40 in attorneys' fees (converted from RMB230,000 based on the

currency exchange rate as of September 29, 2014); and

e.      $33,041.29 in arbitration costs (converted from RMB203,203.80 based on

the currency exchange rate as of September 29, 2014).

**IT IS SO ORDERED**.


Dated: _____, 2014

_____
Judge of the United States District Court
District of Colorado

# UNITED STATES DISTRICT COURT

# DISTRICT OF COLORADO

Civil Action No. 1:14-cv-3118-WYD-MEH

CEEG (Shanghai) Solar Science & Technology Co., Ltd.,

     Petitioner,

v.

LUMOS LLC, now known as LUMOS SOLAR LLC,

     Respondent.

---

## RESPONDENT'S MOTION TO DISMISS PETITION TO CONFIRM ARBITRATION AWARD AND OPPOSITION TO PETITIONER'S MOTION FOR ENTRY OF JUDGMENT

---

     Respondent LUMOS LLC, now known as LUMOS SOLAR LLC ("LUMOS"), files this Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Motion for Entry of Judgment ("Petition") submitted by CEEG (Shanghai) Solar Science & Technology Co., Ltd. ("CEEG").

## I.    INTRODUCTION

     Federal policy favors the enforcement of private agreements to arbitrate.  However, that policy does not require a court to validate and enforce an award arising from an arbitration proceeding that does not comply with  the terms of the arbitration agreement between the parties. *Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 843-44 (9th Cir. 2010) (concluding that arbitration was not conducted in accordance with parties' arbitration clause and reversing district court's confirmation of arbitral award); *Encyclopaedia Universalis S.A. v. Encyclopaedia*

*Britannica, Inc.*, 403 F.3d 85, 91-92 (2005) (affirming district court's refusal to confirm arbitral award on grounds that appointment of third arbitrator did not comply with terms of parties' arbitration agreement).   The award Petitioner is asking this court to confirm, and thereby validate, is just such a case.   CEEG failed to comply with the terms of the arbitration agreement between the parties in at least two ways: (1) CEEG refused to engage in "friendly negotiations" prior to initiating the arbitration as mandated by the governing arbitration clause, and (2) the notice of arbitration sent to LUMOS was written entirely in Chinese, contrary to the requirements of the agreement between the parties and the parties' prior dealings.   These violations of the express terms of the relevant agreements resulted in a lost opportunity for the parties to resolve their differences without incurring the time and expense of an arbitration proceeding and in LUMOS being deprived of basic due process.

The only notice of the arbitration served on LUMOS was in Chinese.   LUMOS is not familiar with the Chinese language, a fact of which CEEG was well aware.   It was for that reason that the master agreement between the parties expressly required that documentation, notices, judicial proceedings, and <u>arbitration</u> between the parties be conducted in English.   LUMOS never agreed to the service of any notices—much less legal notices—in Chinese.   Further, all communications between the parties and their counsel prior to the Notice of Arbitration had been entirely in English.   As a result of the Notice being served in Chinese, LUMOS was required to find a suitable person to translate and explain the contents of the arbitration notice to LUMOS, and then identify and engage counsel to advise LUMOS regarding the arbitration procedures contained in the Notice, consider and explain the claims made by CEEG, and prepare the LUMOS defense.   While LUMOS was diligently seeking the assistance it needed, CEEG proceeded to work with CIETAC to appoint the entire arbitration panel with no input from

LUMOS whatsoever. LUMOS was therefore deprived of the opportunity to appoint an arbitrator (and to consult with CEEG to appoint the chief arbitrator) to the three-person tribunal that rendered the award. Despite the parties' earlier agreement to English as the choice of language in their dealings, the arbitration also was conducted in Chinese.

Accordingly, CEEG cannot show that LUMOS received notice reasonably calculated to apprise LUMOS of the pendency of the arbitration or that the arbitration itself was conducted in accordance with the agreement of the parties, and the Court should further refuse to enforce the arbitration award on those grounds.

In further support of this Opposition, LUMOS would respectfully show the Court the following:

## II.   FACTUAL BACKGROUND

Founded in 2007, in Boulder, Colorado, by a group of local installers of solar energy products, LUMOS is dedicated to providing high-value solar energy products and quality, cost effective solar technology solutions to meet America's ever-increasing energy demands. Franklin Decl., ¶ 3.   CEEG is a Chinese company based in Shanghai that develops solar panel products. *Id.* at ¶ 4.   CEEG is a wholly owned subsidiary of China Sunergy Co. Ltd. ("CSUN"), a specialized solar cell and module manufacturer. *Id.*   CEEG and LUMOS entered into a Co-Branding Agreement, effective June 29, 2009, and a series of subsequent sales contracts pursuant to which LUMOS contracted to buy and CEEG contracted to sell certain solar technology. *Id.* at ¶¶ 4-5. [1]

The Co-Branding Agreement operated as a master agreement governing transactions between CEEG and LUMOS, and provided that a series of individual sales contracts with some

---

[1] A short summary of the underlying background facts of the original dispute is set forth here to provide the Court with context and because many of these facts have bearing on LUMOS' asserted defenses regarding failure to engage in friendly negotiations and failure to comply with the parties' arbitration agreement.

additional terms would be entered into between the parties going forward. *See, e.g., id.* at ¶ 5, Ex. A at 3 ("The price to be paid by LUMOS to CEEGSST for the Product refers to individual contracts.") & 6 ("Even when this Agreement is terminated, cancelled or expires, any individual contract according to this Agreement of which the fulfillment date is beyond the termination, cancellation, or expiration date shall survive this Agreement until the date of its final fulfillment."). Under the Co-Branding Agreement, CEEG warranted that all goods delivered would "conform in respect of quality, specification and packaging, with the stipulations in each contract, relying datasheets of the goods and all other specifications between the two parties in written form." *Id.* at ¶ 5, Ex. A at 4 ("Warranty/Defective Products"). CEEG sent LUMOS an Inspection Standard for Modules that provided, in relevant part, that the "whole solar cell panel should have uniform color; different color solar cell can not exist in the same panel." *Id.* at ¶ 6, Ex. B.

> The Co-Branding Agreement contains an arbitration clause, which provides:

> All disputes in connection with this agreement or the execution thereof ***shall be settled through good faith negotiations***. In case no settlement can be reached, the case may then be submitted for arbitration to the China International Economic and Trade Arbitration Commission Shanghai Commission in accordance with its arbitration rules. The arbitration shall take place in Shanghai and the decision of the Commission shall be final and binding upon both parties; neither party shall seek recourse to a law court or other authorities to appeal the decision. The arbitration fee shall be borne by the losing party.

*Id.* at ¶ 5, Ex. A at 6 (emphasis added). This is a classic broad form arbitration clause, which brings into its purview any dispute related to the Co-Branding Agreement. The parties' Co-Branding Agreement also included a "Choice of Language" clause, which provided:

> The Parties hereby acknowledge and agree that they have mutually required that this Agreement ***and all documentation, notices, judicial proceedings, and dispute resolution and arbitration entered into, given, instituted pursuant to, or relating to, this Agreement be drawn upon in the English language***. Any translations of this Agreement or its attachments that are provided are done solely

for the convenience of Seller and, in all cases, the English language version of such documents shall govern.

*Id*. at ¶ 5, Ex. A at 1 (emphasis added).  The initial term of the Co-Branding Agreement was three years from the Effective Date (*i.e.*, June 28, 2012).  *Id*.

Pursuant to the Co-Branding Agreement, LUMOS and CEEG entered into a number of subsequent sales contracts, including the sales contract at issue in this dispute, which the parties entered into on May 17, 2010 ("Sales Contract").  The terms of the Sales Contract supplemented, but did not conflict with, the terms of the Co-Branding Agreement.  The arbitration clause in the Sales Contract provides:

> Any dispute arising from or in connection with this Contract **shall be settled through friendly negotiations**.  Failing that, then shall be submitted to China International Economic and Trade Arbitration Commission Shanghai Subcommission for arbitration which shall be conducted in accordance with the commission's arbitration rules in effect at the time of applying for arbitration. The arbitral award is final and binding upon both parties.  The applicable law shall be in the United Nations Convention on Contracts for the International Sale of Goods.

Pet., Ex. 2 (Qian Decl.), Ex. C at § 15 (emphasis added).[2]  Accordingly, read together, the relevant arbitration clauses (i.e., "the arbitration agreement") required that LUMOS and CEEG make a good faith effort to settle any disputes related to the Co-Branding Agreement <u>and</u> the Sales Contract through friendly negotiations as a precondition to instituting arbitration.

LUMOS received one shipment of solar battery modules from CEEG per the Sales Contract on October 23, 2010, and a second shipment on November 21, 2010.  Franklin Decl., ¶ 7.  On or before December 10, 2010, LUMOS provided notice to CEEG and CSUN that LUMOS was filing a claim for defective modules (due to discoloration, streaking, burning, and cracking of the cells), and noted in correspondence with Sally Fan, a sales manager for CSUN/CEEG, that

---

[2] The Sales Contract contains a confidentiality provision and, accordingly, was filed as a restricted document; however, the parties have agreed that the arbitration clause in the Sales Contract is not confidential and it previously has been set forth in the pleadings in this case without restriction.  Pet., Ex. 2 (Qian Decl.), Ex. C at § 15.

this was a "very urgent matter."  *Id.* at ¶ 8, Ex. C.  In a follow-up e-mail, dated December 23, 2010, LUMOS' President and Chief Executive Officer Scott Franklin wrote to Ms. Fan that LUMOS would not make any payments on the Sales Contract until LUMOS had a clear understanding as to how LUMOS' warranty claim would be handled.  *Id.* at ¶ 9, Ex. D.  On January 6, 2011, Ms. Fan wrote to Mr. Franklin, advising him:

> Scott, I think LUMOS may replace defective panels right away and please keep all defective panels replaced in your warehouse.  Basically there is no problem for replacing.  The issue is, right now, Stephen and Doctor Zhao are not in China.  We have to wait until next Monday at least to have their signature.  Replacing panels definitely need to be done ASAP, no matter what is final settlement.

*Id.* at ¶ 10, Ex. E.  LUMOS subsequently replaced the defective modules with non-defective modules in LUMOS' inventory, but never received the promised substitutes from CEEG or CSUN.  *Id.* at ¶ 10.  Mr. Franklin sent another follow-up e-mail to LUMOS' contacts at CEEG and CSUN on January 26, 2011, noting the lack of "any response or input from any senior management, engineering support, or quality control" at CEEG and CSUN regarding LUMOS' claim for defective modules.  *Id.* at ¶ 11, Ex. F.

On April 28, 2011, Mr. Franklin sent a formal letter to Thomas Liu of CSUN, further outlining LUMOS' workmanship warranty claim and providing additional supporting documentation.  *Id.* at ¶ 12, Ex. G.  In May 2011, Xinglei ("Lester") Wang of CSUN performed on-site inspections of the defective modules and confirmed to LUMOS that the modules he inspected were defective.  *Id.* at ¶ 13.

On October 30, 2011, Mr. Franklin sent an e-mail to Willis He, the Chief Executive Officer of CSUN USA, noting the need to come to a resolution on the warranty issue.  *Id.* at ¶ 14, Ex. H.  In response, copying David Shieh, Mr. He wrote:

> Scott, I owe an update.  We had an internal discussion last week regarding Lumos.  David has been travelling in US after SPI and he has the data disc and

> will drive a few meetings to address the issue.  I have raised your concern about workmanship instead of performance.  We will look into it.  David, please have it prioritized and organize meeting internally.

*Id*.  However, despite Mr. He's representations, LUMOS heard nothing further from CEEG or CSUN regarding its warranty claim until December 19, 2012.  *Id*. at ¶ 14.

After more than a year of silence regarding the warranty issue, on December 19, 2012, counsel for CEEG sent a letter to LUMOS demanding payment.  *Id*. at ¶ 15.  Mr. Franklin sent a response, on December 22, 2012, noting that LUMOS had been withholding payment pending resolution of the warranty issue.  *Id*. at ¶ 15, Ex. I.  On January 24, 2013, CEEG's counsel, M.M. Utterback and Simin Yu of King & Wood Mallesons, sent a second demand letter by e-mail to Mr. Franklin, wherein they stated:

> We hereby request that you immediately pay CEEG in full the past due principal amount of US$1,372, 445.10.  ***Failure to pay or make arrangement to pay before January 31, 2013 will result in our proceeding to file a claim on behalf of CEEG with CIETAC***.

*Id*. at ¶ 16, Ex. J (emphasis added).   However, the parties' arbitration agreement requires that CEEG and LUMOS make a good faith effort to settle dispute through friendly negotiations as a precondition to instituting arbitration.  Pet., Ex. 2 (Qian Decl.), Ex. C at § 15; Franklin Decl., ¶ 5, Ex. A at 6 (emphasis added).

Accordingly, later the same day, Mr. Franklin sent a response by e-mail on behalf of LUMOS, wherein he noted CEEG's failure to engage in "friendly negotiations" as required by the parties' arbitration agreement.  Franklin Decl., ¶ 17, Ex. K.  Three months later, in April 2013, LUMOS received a document written in Chinese.  *Id*. at ¶ 18, Ex. L.  On May 7, 2013, in a further attempt to engage CEEG in "friendly negotiations" per the Sales Contract, Mr. Franklin sent Ms. Utterback an e-mail containing an offer for settlement of the dispute and forwarding the document written in Chinese that LUMOS had received, noting "We do not speak Chinese nor

can we read the attached document." *Id*. at ¶ 19, Ex. M.  Later that evening, Ms. Utterback replied:

> Please note that the letter you received was from CIETAC, the arbitration institution to which Lumos agreed in its sales contracts with CEEG (Shanghai) Solar Science Technology Co., Ltd.  The contractual arbitration clause did not specify a language for the arbitration and the CIETAC default language is Chinese.[3]   Your company has been sued in arbitration in China.  I recommend you seek counsel and avoid the risk of an adverse award for failure to defend your company in the arbitration.

*Id.*  Ms. Utterback further noted that she would discuss LUMOS' settlement offer with her client.

*Id.*  Significantly, Ms. Utterback failed to mention that, under the CIETAC rules, a very short, 15-day clock now was running for LUMOS' participation in the selection of the arbitral tribunal.  Furthermore, despite her representation that she would discuss LUMOS' settlement offer with CEEG, Ms. Utterback did not send any response from CEEG to LUMOS' proposal until LUMOS sent a follow-up inquiry on May 19, 2013, at which time Ms. Utterback replied that CEEG had rejected the proposal.  *Id*. at ¶ 20 & Ex. M.   CEEG did not provide a counter-proposal.  *Id.*

During this time, LUMOS also worked to find a suitable person to translate and explain the contents of the arbitration notice and to engage the appropriate counsel to prepare its defense.  *Id*. at ¶ 21.  On June 20, 2013, Mr. Franklin sent a letter to CIETAC, explaining LUMOS' difficulties in translating CIETAC's correspondence and requesting additional time to prepare its defense and to explore settlement with CEEG.  *Id*. at ¶ 21, Ex. N.  Although CIETAC agreed to an extension of the first hearing date for the arbitration, CEEG did not engage in any informal settlement negotiations with LUMOS.  *Id*. at ¶ 21.

---

[3]  The Co-Branding Agreement—the master agreement between the parties—contained a choice of language provision specifying English, which expressly applied to any arbitration between the parties relating to the agreement.  Franklin Decl., ¶ 5, Ex. A at 1.  The dispute here clearly relates to the Co-Branding Agreement, as it concerns a Sales Contract entered into by the parties pursuant to the Co-Branding Agreement.

Furthermore, LUMOS was unable to appoint an arbitrator (or to consult with CEEG on the appointment of the chief arbitrator) to the three-person tribunal. *Id.* at ¶ 22. The CIETAC rules provide that, unless otherwise agreed by the parties, the arbitral tribunal shall be composed of three arbitrators. CIETAC Arbitration Rules, Art. 23 ("Number of Arbitrators"), § 2 (May 1, 2012). Under the rules, within 15 days from the date of receipt of the Notice of Arbitration, the Claimant and the Respondent are to each nominate, or entrust the Chairman of CIETAC to appoint, an arbitrator, failing which the arbitrator shall be appointed by the Chairman of CIETAC. *Id.* at Art. 25 ("Three-Arbitrator Tribunal"), § 1. Within that same 15-day time period, the parties are to jointly nominate, or entrust the Chairman of CIETAC to appoint, the third arbitrator, who will act as the presiding arbitrator on the tribunal. *Id.* at § 2. Here, because the arbitration notice was written only in Chinese, the 15-day deadline had elapsed by the time LUMOS had been alerted to the significance of the notice and was able to have the arbitration notice translated into English and to engage appropriate counsel. Franklin Decl., ¶ 22. Accordingly, although CEEG was able to appoint an arbitrator to the tribunal, LUMOS was not able to do so.

LUMOS filed an objection to the jurisdiction of the arbitral tribunal and specifically noted that LUMOS did not accept the constitution of the arbitral tribunal appointed by the Commission and reserved the right to move to vacate the arbitral award on the grounds that included the composition of the arbitral tribunal. *Id.* at ¶ 22. LUMOS' objection to jurisdiction was rejected by the arbitration tribunal on September 13, 2013. The panel subsequently issued the award that CEEG now seeks to enforce in Colorado.

## III.   GOVERNING LAW

The United States and China both are signatories to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention"). "The New York Convention provides a carefully structured framework for the review and enforcement of international arbitral awards." *First Investment Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 748 (5th Cir. 2012). The Convention includes seven potential grounds upon which a court may refuse to recognize and enforce a foreign arbitration award, including:

- The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

- The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties.

NEW YORK CONVENTION, art. V(1)(b) & (d); *see also Polimaster Ltd.*, 623 F.3d at 836 (9th Cir. 2010) ("The New York Convention enumerates seven defenses to the recognition or enforcement of an arbitral award."). The Convention "recognizes the central role of the parties in fashioning the arbitration procedure, and provides sanctions for failure to adhere to the agreed procedures" and, accordingly, courts cannot simply "overlook agreed-upon arbitral procedures in favor of the *enforcement* of an arbitration award." *Polimaster Ltd.*, 623 F.3d at 841 (internal quotations omitted) (emphasis in original). Furthermore, a party's participation in an arbitration proceeding does not preclude that party from subsequently challenging enforcement of an award under the Convention. *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 377 F.3d 1164, 1171 (11th Cir. 2004) (noting that contrary holding would place party objecting to arbitration in "untenable position").

Here, because CEEG not only failed but refused to enter into "friendly negotiations" prior to filing the claims in arbitration, because LUMOS was not given proper notice of the arbitration

proceedings, and because the arbitral procedure was not conducted in accordance with the agreement of the parties, the Court should refuse to enforce the international arbitral award at issue.

## IV.   ARGUMENT AND AUTHORITIES

### A.   CEEG did not make a good faith effort to settle dispute through "friendly negotiations," as required by the Sales Contract.

To determine whether the arbitral procedure was conducted in accordance with the agreement of the parties, a court looks to the language of the parties' arbitration agreement. *Polimaster Ltd.*, 623 F.3d at 836.  As noted by the Second Circuit Court of Appeals, in affirming a district court's refusal to enforce a foreign arbitration award where the tribunal failed to comply with requirements of the parties' arbitration clause, "While we acknowledge that there is a strong public policy in favor of international arbitration, we have never held that courts must overlook agreed-upon arbitral procedures in deference to that policy … the federal policy is simply to ensure the enforceability, ***according to their terms***, of private agreements to arbitrate." *Encyclopaedia Universalis S.A.*, 403 F.3d at 91 (2005) (emphasis in original) (quoting from *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989)) (internal quotations and citations omitted).

Here, the terms of the arbitration clause in the Sales Contract clearly provide that entering into "friendly negotiations" for the settlement of a dispute is a condition precedent to instituting arbitration.  The Co-Branding Agreement also contains an arbitration clause which, although worded slightly differently, is nearly identical in substance and provides:   "All disputes in connection with this agreement or the execution thereof shall be settled through good faith negotiations."  Franklin Decl., ¶ 5, Ex. A at 6.  Read together, as they should be here because the agreements operated jointly to govern the transaction at issue, the Co-Branding Agreement's

arbitration clause and the Sales Contract's arbitration clause show that the parties intended that "friendly negotiations" would be negotiations conducted in good faith.   The obligation to negotiate in good faith generally prevents one party from "renouncing the deal, abandoning negotiations, or insisting on conditions that do not conform to the preliminary agreement."   *Cf. A/S Apothekernes Laboratorium for Specialpreaeparater v. I.M.C. Chem. Grp., Inc.*, 873 F.2d 155, 158 (7th Cir. 1988) (enforcing obligation to negotiate in good faith imposed by letter of intent).   Here, CEEG not only abandoned negotiations in order to institute arbitration—CEEG never even engaged in such negotiations.

In LUMOS' response to the January 24, 2013 demand letter sent by CEEG's counsel, Mr. Franklin specifically cited CEEG's failure to engage in "friendly negotiations" as required by the Sales Contract.   Franklin Decl., ¶ 17, Ex. K.   However, CEEG did not take any action to rectify this deficiency prior to instituting arbitration.   In his subsequent June 20, 2013 letter to CIETAC, Mr. Franklin noted that LUMOS was seeking an extension on the first arbitral hearing, in part, to discuss settlement with CEEG; however, although the extension was granted, no informal settlement negotiations took place.   *Id.* at ¶ 21, Ex. N.

Accordingly, CEEG failed to comply with a condition precedent to instituting arbitration and the Court should refuse to enforce the arbitration award on that basis.

### B.   LUMOS did not receive proper notice of the arbitration proceedings, and the arbitration was not conducted in accordance with the parties' agreement.

CEEG and CIETAC failed to provide notice of the arbitration to LUMOS in English, which deprived LUMOS of the opportunity to appoint one arbitrator to the three-person tribunal and to consult with CEEG on the appointment of the chief arbitrator.   The notice of arbitration sent to LUMOS was in Chinese and no English translation was provided for reference.   Franklin Decl., ¶¶ 18-19 & Ex. L.   LUMOS does not have any knowledge of the Chinese language and

never agreed to service of process or any other notification in Chinese. *Id.* at ¶ 18. All previous correspondence between the parties had been in English. *Id.* In fact, the Co-Branding Agreement—the master agreement between CEEG and LUMOS—includes a "choice of language" provision that designates <u>English</u> as the language to be used in all documentation and in any related arbitration. *Id.* at ¶ 5, Ex. A at 1 ("Choice of Language"). Nevertheless, CEEG's counsel did not send notice to LUMOS in English regarding the submission and grant of CEEG's application for arbitration. *Id.* at ¶ 18. When LUMOS sent an inquiry to CEEG's counsel regarding the notice, Ms. Utterback claimed that there was no choice of language between the parties related to arbitration (completely disregarding the "Choice of Language" clause in the Co-Branding Agreement) and that, therefore, CIETAC's default rules, which provided that the arbitration be conducted in Chinese, applied. *Id.* at ¶ 19, Ex. M.

In a very similar case, a district court refused to enforce an arbitration award obtained in China, finding that, because the United States-based respondent was <u>not</u> notified of the arbitration in English, the respondent did not receive due process. *Qingdao Free Trade Zone Genius Int'l Trading Co., Ltd. v. P & S Int'l, Inc.*, No. 08-1292-HU, 2009 WL 2997184, at *4-5 (D. Or. Sept. 16, 2009).[4] The court rejected the petitioner's arguments that respondent received sufficient notice because it was aware of the dispute, previously had agreed to arbitrate in China under the rules of the Chinese commission, and had received copies of the commission's rules and the list of arbitrators in English, concluding:

---

[4] The Article V(1)(b) defense under the Convention permits courts in the United States to apply our standards of due process when evaluating whether a party was unable to present its case. *E.g., Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145-46 (2nd Cir. 1992) (affirming district court's refusal to enforce arbitration award where party received conflicting instructions from tribunal regarding proper presentation of its evidence, resulting in disallowance of certain claims by tribunal). Accordingly, if the party objecting to enforcement of the award, "was denied the opportunity to be heard in a meaningful time or in a meaningful manner, enforcement of the Award should be refused pursuant to Article V(1)(b)." *Id.* at 146. Here, because the lack of proper notice denied LUMOS of its opportunity to appoint one arbitrator and to consult in the selection of the chief arbitrator, LUMOS was denied the opportunity to be heard at "a meaningful time" in the arbitration.

> While these circumstances could lead to the inference that [respondent] knew it had agreed to arbitrate disputes with [petitioner] in China, and had reason to suspect that arbitration proceedings in China might be brought against [respondent] by [petitioner], they do not generate the inference that [respondent] had actual knowledge that [petitioner] had commenced an arbitration proceeding, to take place on a particular date in a particular place.  Nor does the contract [with respondent] contain a provision under which [respondent] agreed to service of process in Chinese.

*Id*. at *4.  The facts of this case present an even stronger basis for refusing enforcement of the arbitral award as there was, in fact, a governing choice of language provision between the parties that specified that any notices be provided in English (and that the arbitration itself should be conducted in English).

By the time that LUMOS was able to find a suitable person to translate and explain the contents of CIETAC's notice to LUMOS, the company had already missed a significant deadline in the arbitration.  Specifically, the CIETAC Arbitration Rules provide parties only <u>15 days</u> following a respondent's receipt of the Notice of Arbitration to select their arbitrators.  CIETAC Arbitration Rules, Art. 23 Art. 25, §§ 1-2.  Here, a three-arbitrator tribunal tried the case.  Docket 2-4 (Arbitral Award) at 3.  CEEG appointed one arbitrator and, because LUMOS was not able to provide its selections within the 15-day deadline, the Director of the Commission selected the other two arbitrators on the tribunal.  *Id*.  Accordingly, failure to provide notice to LUMOS in English deprived LUMOS of its ability to participate in selection of the tribunal.

The Convention expressly recognizes the significant impact that a party's participation in the selection of the arbitration panel has on its opportunity to be heard by providing that failure to give proper notice of the appointment of an arbitrator constitutes grounds for refusing to enforce a foreign arbitration award.  NEW YORK CONVENTION, art. V(1)(b); *see also, e.g.*, *Encyclopaedia Universalis S.A.*, 403 F.3d at 91 (noting that Article V of the New York Convention "itself suggests the importance of arbitral composition" and affirming district court's

14

refusal to confirm arbitral award where appointment of third arbitrator was "premature"). Furthermore, the arbitration itself was conducted in Chinese—not in English, as provided by the Co-Branding Agreement—and so was not conducted in accordance with the agreement of the parties.

Accordingly, the Court should further refuse to enforce the arbitration award on these grounds.

## V.   CONCLUSION

For the reasons set forth above, Respondent LUMOS respectfully requests that the Court deny Petitioner CEEG's Petition to Confirm Arbitration Award and for Entry of Judgment. Respectfully submitted this 7th day of January, 2015.

s/ Meghan Paulk Ingle
James R. Nelson
Texas State Bar No. 14899800
jr.nelson@dlapiper.com
**DLA PIPER US LLP**
1717 Main Street, Suite 4600
Dallas, Texas 75201
(214) 743-4500 (telephone)
(972) 813-6261 (facsimile)

Meghan Paulk Ingle
Texas State Bar No. 24036821
meghan.ingle@dlapiper.com
**DLA PIPER US LLP**
401 Congress Avenue, Suite 2500
Austin, TX 78701-3799
(512) 457-7000 (telephone)
(512) 457-7001 (facsimile)

***ATTORNEYS FOR RESPONDENT LUMOS LLC now known as LUMOS SOLAR LLC***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 7, 2015, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule D.C.COLO.LR 5.1(d).


/s/ Meghan Paulk Ingle
Meghan Paulk Ingle

# UNITED STATES DISTRICT COURT

# DISTRICT OF COLORADO

Civil Action No. 1:14-cv-3118-WYD-MEH

CEEG (Shanghai) Solar Science & Technology Co., Ltd.,

      Petitioner,

v.

LUMOS LLC, now known as LUMOS SOLAR LLC,

      Respondent.

_____

**DECLARATION OF SCOTT FRANKLIN IN SUPPORT OF RESPONDENT'S MOTION TO DISMISS PETITION TO CONFIRM ARBITRATION AWARD AND OPPOSITION TO PETITIONER'S MOTION FOR ENTRY OF JUDGEMENT**

_____

I, Scott Franklin, declare as follows:

1.     My name is Scott Franklin. I am over eighteen (18) years of age and am legally competent to make this Declaration, which is true and correct and is based on my personal knowledge.

2.     I am the President and Chief Executive Officer at Lumos Solar LLC (formerly known as Lumos LLC) ("LUMOS"). I have been employed full time by LUMOS since 2007. I have personal knowledge of the facts contained herein and, if called as a witness, could and would competently testify thereto.

3.     LUMOS was founded in Boulder, Colorado, in 2007, by a group of local installers of solar energy products. LUMOS is dedicated to providing high-value solar energy products

1

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 191

and quality, cost effective solar technology solutions to meet America's ever-increasing energy demands.

4.     LUMOS entered into a Co-Branding Agreement with CEEG (Shanghai) Solar Science & Technology Co., Ltd. ("CEEG"), a Chinese company based in Shanghai that develops solar panel products.  It is my understanding that CEEG is a wholly owned subsidiary of China Sunergy Co. Ltd. ("CSUN"), a specialized solar cell and module manufacturer.  LUMOS had regular dealings with employees of CEEG and CSUN related to transactions conducted under the Co-Branding Agreement.

5.     The Co-Branding Agreement had an effective date of June 29, 2009.  In the Co-Branding Agreement, LUMOS contracted to buy and CEEG contracted to sell certain solar technology.  A true and correct copy of the Co-Branding Agreement is attached hereto as **Exhibit A** and incorporated herein by reference.

6.     Pursuant to their business arrangement, CEEG sent LUMOS an Inspection Standard for Modules.  A true and correct copy of the Inspection Standard for Modules that LUMOS received from CEEG is attached hereto as **Exhibit B** and incorporated herein by reference.

7.     Under the terms of the Co-Branding Agreement, LUMOS and CEEG were to enter into individual sales contracts for each order.  On May 17, 2010, LUMOS and CEEG entered into the sales contract at issue in this dispute ("Sales Contract").  LUMOS received one shipment of solar battery modules from CEEG per the Sales Contract on October 23, 2010, and a second shipment on November 21, 2010.  In its inspection of the modules, LUMOS discovered that modules in at least two containers were defective due to discoloration, streaking, burning, and cracking of the cells.

8.     On or before December 10, 2010, LUMOS provided notice to CEEG and CSUN that modules delivered were defective and that LUMOS was filing a warranty claim for the defective modules.  A true and correct copy of this correspondence is attached hereto as **Exhibit C** and incorporated herein by reference.

9.     On December 23, 2010, I wrote a follow-up e-mail to Sally Fan, a sales manager for CSUN/CEEG, providing notice that LUMOS would not make any payments on the Sales Contract until LUMOS had a clear understanding as to how its warranty claim for the defective modules would be handled.  A true and correct copy of this e-mail is attached hereto as **Exhibit D** and incorporated herein by reference.

10.    On January 6, 2011, Ms. Fan wrote to back to me advising that LUMOS should replace the defective modules with other non-defective modules in LUMOS' inventory right away and noting that there would be "no problem" with replacing them.  A true and correct copy of this e-mail is attached hereto as **Exhibit E** and incorporated herein by reference.  LUMOS subsequently replaced the defective modules with non-defective modules from its inventory, but never received the promised substitutes from CEEG or CSUN.

11.    On January 26, 2011, I sent another follow-up e-mail to LUMOS' contacts at CEEG and CSUN (Ms. Fan, Stephen Cai, Thomas Liu, and Xinglei ("Lester") Wang)  noting the lack of any response or input from any senior management, engineering support, or quality control at CEEG and CSUN regarding LUMOS' warranty claim for defective modules.  A true and correct copy of this e-mail is attached hereto as **Exhibit F** and incorporated herein by reference.

12.    Subsequently, on April 28, 2011, I sent a formal letter to Thomas Liu of CSUN further outlining LUMOS' workmanship warranty claim and providing additional supporting

documentation.  A true and correct copy of this letter is attached hereto as **Exhibit G** and incorporated herein by reference.

13.     In May 2011, Xinglei ("Lester") Wang of CSUN performed on-site inspections of the defective modules and confirmed to LUMOS that the modules he inspected were defective.

14.     On October 30, 2011, I sent an e-mail to Willis He, the Chief Executive Officer of CSUN USA, noting that we needed to come to a resolution on the warranty issue.  Mr. He replied to me that they would "look into it," but LUMOS heard nothing further from CEEG or CSUN regarding LUMOS' warranty claim until December 19, 2012  A true and correct copy of my correspondence with Mr. He is attached hereto as **Exhibit H.**

15.     On December 19, 2012, counsel for CEEG sent a correspondence to LUMOS demanding payment on amounts due related to the shipments of defective modules.  I sent a response on December 22, 2012, noting that LUMOS had been withholding payment pending resolution of the warranty issue.  A true and correct copy of my e-mail to CEEG's counsel, sent on behalf of LUMOS, is attached hereto as **Exhibit I** and incorporated herein by reference.

16.     On January 24, 2013, CEEG's counsel sent a second demand letter to LUMOS, threatening to institute arbitration if LUMOS did not send full payment for the defective modules to CEEG by January 31, 2013.  A true and correct copy of this letter is attached hereto as **Exhibit J.**

17.     Later that same day, I sent a response to CEEG's counsel on behalf of LUMOS expressly noting CEEG's failure to engage in "friendly negotiations" as required by the arbitration agreement.  It was my understanding that "friendly negotiations" required that both parties make a good faith effort to resolve the dispute through business discussions before

instituting any arbitration related to the Sales Contract or the Co-Branding Agreement.  A true and correct copy of this letter is attached hereto as **Exhibit K.**

18.     In April 2013, LUMOS received a document written in Chinese, with no English translation provided.  A true and correct copy of this letter is attached hereto as **Exhibit L.**  I do not have any knowledge of the Chinese language and am not aware of any LUMOS employee who has such knowledge.  LUMOS never agreed to service of process or any other notification in Chinese.  All previous communications between LUMOS and CEEG had been in English.

19.     On May 7, 2013, in a further attempt to engage CEEG in "friendly negotiations" as required by the arbitration agreement, I sent Ms. Utterback an e-mail on behalf of LUMOS containing an offer for settlement of the dispute.  I attached a copy of the document that we had received written in Chinese and noted, "We do not speak Chinese nor can we read the attached document."  Later that evening, Ms. Utterback sent me an e-mail, where she wrote, in part:

> Please note that the letter you received was from CIETAC, the arbitration institution to which Lumos agreed in its sales contracts with CEEG (Shanghai) Solar Science Technology Co., Ltd.  The contractual arbitration clause did not specify a language for the arbitration and the CIETAC default language is Chinese.  Your company has been sued in arbitration in China.  I recommend you seek counsel and avoid the risk of an adverse award for failure to defend your company in the arbitration.

Ms. Utterback also noted that she would discuss LUMOS' settlement offer with her client.  She did not mention that CIETAC rules provide only 15 days after the receipt of an arbitration notice to participate in selection of the arbitral tribunal.  A true and correct copy of this correspondence is attached hereto as **Exhibit M.**

20.     On May 19, 2013, having received no further response from Ms. Utterback, I sent her a follow-up e-mail inquiring as to CEEG's response to LUMOS' settlement proposal.  Ms.

Utterback sent me a reply e-mail noting that CEEG did not accept LUMOS' offer and that any settlement would require payment for the modules.  *See* **Exhibit M.**

21.     During this time, LUMOS also worked to find a suitable person to translate and explain the contents of the document received that was written in Chinese and to engage the appropriate counsel to prepare its defense.   On June 20, 2013, I sent a letter to CIETAC, explaining LUMOS' difficulties in translating CIETAC's correspondence and requesting additional time to prepare its defense and to explore settlement with CEEG.  A true and correct copy of this correspondence is attached hereto as **Exhibit N.**   Although CIETAC agreed to an extension of the first hearing date for the arbitration, CEEG did not engage in any settlement negotiations with LUMOS.

22.     Because the arbitration notice was written only in Chinese, CIETAC's 15-day deadline to participate in the appointment of arbitrators had passed by the time LUMOS had been alerted to the meaning of the notice and was able to have it translated into English and to engage appropriate counsel.   Therefore, LUMOS was unable to appoint an arbitrator (or to consult with CEEG on the appointment of the chief arbitrator) to the three-person tribunal that rendered the arbitration award at issue.   LUMOS filed an objection to the jurisdiction of the arbitral tribunal and specifically noted that LUMOS did not accept the constitution of the arbitral tribunal appointed by the Commission and reserved the right to move to vacate the arbitral award on the grounds that included the composition of the arbitral tribunal.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7th day of January, 2015 in Boulder, Colorado.


  s/ Scott Franklin
Scott Franklin

# EXHIBIT A

 

## CO-BRANDING AGREEMENT
## BETWEEN LUMOS AND CEEGSST

This Agreement is made and entered into as of 29 June 2009 ("Effective Date") by and between CEEG (SHANGHAI) SOLAR SCIENCE TECHNOLOGY CO., LTD. ("CEEGSST") located at 4H, Hongqiao Business Building, No.2272, Hongqiao Rd, Shanghai, China and LUMOS ("LUMOS") located at 2406 30th St, Boulder, Colorado 80301。
本协议自 2009 年 6 月 12 号生效。

WHEREAS, CEEGSST has developed SOLAR PANEL Products ("Products") and LUMOS wishes to purchase Products and sell them under LUMOS and CEEGSST brand. CEEGSST and LUMOS, therefore, desire to enter into an Co-branding agreement (the "Agreement") for the SOLAR PANEL Products.

In consideration of the mutual promises and covenants of the parties hereto and other valuable consideration, the parties hereby agree with each other as follows:

### _TERM_

This Agreement shall be effective as of the Effective Date and shall continue in effect for an initial term of three (3) year. Thereafter, it will renew in three (3) year increments unless terminated pursuant to the provisions herein.
此协议有效期为 3 年。



### _CHOICE OF LANGUAGE_

The Parties hereby acknowledge and agree that they have mutually required that this Agreement and all documentation, notices, judicial proceedings, and dispute resolution and arbitration entered into, given, instituted pursuant to, or relating to, this Agreement be drawn up in the English language. Any translations of this Agreement or its attachments that are provided are done solely for the convenience of Seller and, in all cases, the English language version of such documents shall govern.
英语作为协议语言

### _PURCHASE ORDERS_

a) Over the three (3) year term, LUMOS agrees to order a minimum of 9MW from CEEGSST with the following delivery schedule:
   - Year 1: 2MW, approximately 13 containers shipped over a 12 month period
   - Year 2: 3MW, approximately 20 containers shipped over a 12 month period
   - Year 3: 4MW, approximately 26 containers shipped over a 12 month period
   在三年有效期内 LUMOS 将向 CEEGSST 采购至少 9MW 的组件。
   - 第一年: 2MW, 在 12 个月内共采购大约 13 个集装箱
   - 第二年: 3MW, 在 12 个月内共采购大约 20 个集装箱
   - 第三年: 4MW, 在 12 个月内共采购大约 26 个集装箱

1





Before every contract year starts, parties need to sign on the purchase contract for that period. If during that contract year there are additional orders from buyer, parties may have additional purchase contracts. Both year and additional contracts are as the integral parts of the OEM agreement.
每一个合同年开始前，双方需要签署采购合同。如果在该合同年期间买方要求增加订单，双方可签署附加合同。合同年合同和附加合同与 OEM 协议构成总的协议。

b) CEEGSST shall deliver Products to LUMOS pursuant to a written Order accepted and acknowledged by CEEGSST in accordance with the requested Delivery schedule.
CEEGSST 应当根据 LUMOS 书面合同中的发货时间表发货。

c) Any Order given by LUMOS will be deemed accepted by CEEGSST unless it is rejected by CEEGSST within Five (5) working days after CEEGSST receives it. Each Order shall constitute an individual contract for the transaction of Products Ordered. CEEGSST shall provide a written acknowledgement for each Order showing acknowledged Delivery dates, quantities and pricing.
如果 CEEGSST 在收到 LUMOS 订单后五个工作日内没有拒绝订单，则表示 CEEGSST 接受 LUMOS 的订单。每一次的订单应该形成单独的合同。CEEGSST 应当在每一个合同中规定发货时间，货物数量和价格。

### DELIVERY TERMS

Delivery terms shall be FOB Shanghai. Lead time refers to individual contracts.
运输条款为 FOB 上海。订货至交货的时间参见合同。

### PACKAGING

All goods shall be packed in a way, which prevents damages from dampness, rust, moisture, erosion and shock. Packaging shall be adequate for ocean transport. The Seller shall be liable for any damages and loss of the Contract Goods caused by inadequate or improper packaging according to this clause. If the damage is caused by forwarder's improper handling, or by any other factor out of the seller's control, the above mentioned shall not apply.
包装符合海运要求。

All packaging materials and methods shall be CEEGSST's standard commercial materials or methods. If LUMOS requests any special packaging materials or methods, the additional cost thereof shall be paid by LUMOS. If LUMOS and CEEGSST agree that the standard packaging is inadequate, then CEEGSST will implement improved packaging at no extra cost to LUMOS.
包装按照 CEEGSST 的标准包装方式。

### LABELING

Labeling shall be designed in accordance with the specifications of LUMOS.
标签应按 LUMOS 要求

### PAYMENT

2




a) All payment for the Products shall be made in U.S. Dollars.

以美金付款

b) CEEGSST will offer the following payment terms to LUMOS:

ⅰ. Payment of 20% deposit via T/T upon acknowledgement of order from CEEG, and the balance to be paid via T/T upon reciept of copy of B/L within 10 days.

ⅱ. Payment of 100% balance via T/T for up to two (2) 40 feet containers of modules net 90 from delivery date shown on the B/L. Orders surpassing two (2) containers will execute payment ⅰ.

本协议会设置两个付款条件如下：

ⅰ. 20%T/T预付款，剩下80%T/T在见到提单复印件后10天内付清

ⅱ. 两个40尺货柜组件可执行提单上所列日期后3个月内回款. 超过两个集装箱的组件执行付款条件一。

c) LUMOS shall be responsible for the payment of all taxes, tax levies, or tax assessments and bank charges occurring outside of China and CEEG SST shall be responsible for the payment of all taxes, tax levies, or tax assessments and bank charges occurring within China.

LUMOS 负责中国以外的税费和银行费用。CEEGSST 负责中国境内的税费和银行费用。

**PRICES**

a) The price to be paid by LUMOS to CEEGSST for the Product refers to individual contracts. Parties agree to negotiate a new price each quarter. If the market datum from a third-party institute or association shows that the price change in the US spot market is over +/- 3%, parties agree to adjust prices for orders for the remainder of that quarter

价格参见合同，在某个季度如果有机构的市场数据显示在美国的现货市场价格有超过3%的市场波动，协议双方需要调整该季度的剩余合同价格。

1) For the initial 2MW of orders during the first contract year, and based on the payment terms, prices will be as follows:

ⅰ. For payment term ⅰ LUMOS will pay CEEGSST $2.10/watt for white back sheet

For payment term ⅰ LUMOS will pay CEEGSST $2.16/watt for black back sheet

For payment term ⅰ LUMOS will pay CEEGSST $2.16/watt for clear back sheet

ⅱ. For payment term ⅱ LUMOS will pay CEEGSST $2.20/watt for white back sheet

For payment term ⅱ LUMOS will pay CEEGSST $2.26/watt for black back sheet

For payment term ⅱ LUMOS will pay CEEGSST $2.26/watt for clear back sheet

建立在上述两个付款条款的基础上，对于第一合同年的两兆瓦订单，付款方式如下：

ⅰ. 对于白色背板的组件，LUMOS 需要向 CEEGSST 支付$2.10/watt。

对于黑色背板的组件，LUMOS 需要向 CEEGSST 支付$2.16/watt。

对于透明背板的组件，LUMOS 需要向 CEEGSST 支付$2.16/watt。

ⅱ. 对于白色背板的组件，LUMOS 需要向 CEEGSST 支付$2.20/watt。

对于黑色背板的组件，LUMOS 需要向 CEEGSST 支付$2.26/watt

对于透明背板的组件，LUMOS 需要向 CEEGSST 支付$2.26/watt

3

**CEEG® SST**



b) CEEGSST will engage in ongoing cost reduction efforts, and where practicable, CEEGSST will pass price reductions on to LUMOS.

CEEGSST 应致力于不断降低成本的努力，并且将降低的成本传递给对 LUMOS 的报价。

c) It is further understood that Seller will grant Buyer Most Favored Nation ("MFN") status with respect to pricing. As part of granting Buyer MFN status, Seller agrees to sell its Products to Buyer on terms that are equivalent to or more favorable than terms offered to any other customer, with respect to price, trademark and volume commitments. Should Seller sell to a third party on terms more favorable than those granted to Buyer, Seller shall notify Buyer and grant the identical terms to Buyer.

LUMOS 应当享受 CEEGSST 的"最惠买方"（含义同国与国间的"最惠国"）的待遇。

### TRADEMARK

All Products purchased by LUMOS from CEEGSST under this Agreement shall be used, leased, rented, licensed or sold by LUMOS only under trademarks and/or trade names of LUMOS&CEEGSST

LUMOS 从 CEEGSST 购买的所有此协议下货物的支配权归 LUMOS 所有，并且用 LUMOS 和 CEEGSST 的商标

### WARRANTY/DEFECTIVE PRODUCTS

The Seller warrants that all goods delivered conform in respect of quality, specification and packaging, with the stipulations in each contract, relying datasheets of the goods and all other specifications between the two parties in written form.

卖方担保所有货运到买方处的货物符合合同的规定

The warranty period shall be
- For power performance of more than 90% of nominal power: 10 years
- For power performance of more than 80% of nominal power: 25 years
- For product warranty, free from defects in material & workmanship: 5 years

The above warranty period begins from the date when the goods reach the port of destination.

质保要求为 CEEGSST 标准质保。

### CLAIMS

Any claims resulting from visual inspection of cargo in which it is determined the cargo has arrived in irregular cargo conditions or upon opening and/or discharging the container the internal container and cargo conditional are irregular, must be made by the buyer to the seller before the cargo is discharged from the container. Also, the insurance company should be notified by the buyer, pictures should be taken depicting the irregularity and the container number, product order number, bill of lading number, and product lot number should all be recorded. The buyer should cease discharging the container until the seller notifies them in writing that product discharge can continue. If the buyer does not follow this procedure, the seller or the insurance company may not honor a claim.

经买方检查认为货物不符要求，买方应当在货物被从集装箱中取出来之前，向卖方提出声明。并且买方应通知保险公司，并为不符产品拍照。买方只有在卖方书面通知的前提下才可以继续拆卸集装箱。

4





Within 30 days after the arrival of the goods at destination, should the specification or quality be found not in conformity with the stipulations of the Contract except those claims for which the insurance company or the Carriers are liable, the Buyers shall, on the strength of the Inspection Certificate issued by China Commodity Inspection Bureau, have the right to claim for replacement with goods or for compensation. And all the expenses (such as insurance premium, storage and loading and unloading charges etc.) shall be borne by the Sellers. The certificate so issued shall be accepted as the base of a claim. The Sellers, in accordance with the Buyer's claim shall be responsible for the immediate elimination of the defect(s), if the Sellers fail to answer the Buyers within one month after receipt of the aforesaid claim, the claim shall be reckoned as having been accepted by the Sellers.

货物到达目的地后的 30 天内，买方如果发现产品不符合同要求，并且这些不符点不是保险公司或货运人的责任，那么买方在获得中国商检局的检测证明后可以要求卖方替换产品或索要赔偿。所有由此引起的费用由卖方负责。

CEEGSST has the right to claim compensation for any period of this contract that LUMOS hasn't met its agreed purchase volume under the terms of this agreement. The compensation for this claim will be calculated as the average price times quantities unordered in that year.

如果 LUMOS 没有按照此协议在每一合同年内购买规定数量的货物，CEEGSST 有权索要赔偿。赔偿价格为当年未购买货物的平均价格。

LUMOS has the right to claim compensation for any period of this contract that CEEGSST hasn't fulfilled its agreed delivery volume under the terms of this agreement. The compensation for this claim will be calculated as the average price times quantities undelivered in that year.

如果 CEEGSST 在每一合同年内没有送达规定数量的货物。LUMOS 有权要求赔偿。赔偿价格为当年未送达货物的平均价格。

### *TERMINATION*

Neither party may cancel this agreement without the other party's consent. In the event of termination without consent of the other party, the terminating party shall bear the whole loss of the non-terminating party.

任何一方不得单独中断此协议。

Either party may terminate this Agreement, effective upon written notice to the other, if any one of the following events occur: (i) the other files a voluntary petition in bankruptcy; (ii) the other is adjudicated bankrupt; (iii) the other makes an assignment for the benefit of its creditors; (iv) a court assumes jurisdiction of the assets of the other under a federal bankruptcy or reorganization act; (v) a trustee or receiver is appointed by a court for all or a substantial portion of the assets of the other; (vi) there is a substantial change in the financial conditions of the other; or (vii) the other is unable to pay its debts as they become due.

在下述情况下，一方允许在有效地书面通知另一方的前提下终止协议。自愿申请破产，法庭判决破产，债付债权人，法院清算，法院托管，经济状况巨变，没有能力清偿债务。

Either party may terminate this Agreement upon written notice if the other party breaches this Agreement and fails to correct the breach within thirty (30) days following the receipt of a written notice specifying the breach.

一方违约并在收到另一方书面通知 30 天内没有修正违约行为，则无过错方在发出书面通知后有权终止此协议。

5

 

If parties enter into Joint Venture to complete final module assembly in United States to market, sell and distribute modules this agreement may be terminated without prejudice.

如果双方今后在美国成立组件组装的合资公司，此代加工协议终止，取而代之的为合资公司的协议.

### *FORCE MAJEURE*

Neither LUMOS nor CEEGSST shall be liable to the other for delays in the performance of this Agreement if such delay is caused by strike, riots, wars, government regulations, acts of God, fire, flood, or other causes beyond its control; provided, however, if any such delay by CEEGSST continues sixty (60) days or more, then LUMOS shall have the option, exercisable by written notice to cancel this Agreement without charge or liability.

不可抗力导致的违约，双方均无责。

### *SURVIVAL*

Even when this Agreement is terminated, cancelled or expires, any individual contract according to this Agreement of which the fulfillment date is beyond the termination, cancellation or expiration date shall survive this Agreement until the date of its final fulfillment.

即使本协议终止，取消或到期，任何与此协议相关的未到期合同仍继续执行。

### *DISPUTE RESOLUTION*

All disputes in connection with this agreement or the execution thereof shall be settled through good faith negotiations. In case no settlement can be reached, the case may then be submitted for arbitration to the China International Economic and Trade Arbitration Commission Shanghai Commission in accordance with its arbitration rules. The arbitration shall take place in Shanghai and the decision of the Commission shall be final and binding upon both parties; neither party shall seek recourse to a law court or other authorities to appeal the decision. The arbitration fee shall be borne by the losing party.

协议双方应本着协商的原则处理纠纷。如果协商无效，最终的裁定权归中国国际贸经委上海委员会。

IN WITNESS WHEREOF, this Agreement has been executed by duly authorized representatives of both parties hereto as of the date first written above.

CEEGSST

Signature:

Name:

Title:

Date:

LUMOS

Signature:

Name: SCOTT FRANKLIN

Title: PRESIDENT / CEO

Date: 7/7/09

6





**Exhibit**

**Product Codes**

SSTWS185

SSTWB185

SSTBS180

SSTBB180

SSTCS180

SSTCB180

**Classification**

*TPT-3 types*

W: White

B: Black

C: Clear

*Frame-2 types*

S: Silver

B: Black

*Watts*

185W

180W

7

**EXHIBIT B**

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 205

# Inspection Standard for Modules



CSUN OEM 组件检验标准
Q/CSUN.J27.0002 V1.0

| No. | Item | Technical Requirement |
|-----|------|----------------------|
| 1 | Back sheet | 1. It is allowed that there are a little small wrinkles and small bulges caused by ribbon on the back sheet; small dent is allowed, dent area≤100mm², depth≤1mm，n≤3(n means number of the dent). <br> 2. Invisible from the front ,bend mark length≤50mm and dose not extend to the edge of the glass. <br> 3. Bulge caused by soldering belt or ribbon which is not obvious is allowed. Keen-edged bulge, stretchy and touchable bubble is not allowed. <br> 4.Ribbon and interconnector are invisible or slightly visible, Which situation can not get worse. <br> 5. Bulge (Height≤0.2mm) cannot be denseness. <br>　　 Bulge (Height ＞0.2mm, n≤5 per panel) is allowed. <br> 6. No scratch, delamination, mend. |
| 2 | Solar cell | 1.　Modules adopt A class solar cell. <br> Single crystalline silicon Solar cell and poly crystalline silicon solar cell are not allowed to exist in the same solar panel; <br> Solar cell with different specification or different figure(finger number is included)existing in the same module is not allowed; <br> Smooth and textured solar cell mixed is not allowed in the same panel. <br> 2. Color: whole solar cell panel should have uniform color; different color solar cell can not exist in the same panel. <br><br> Photo 1   uniform color panel |



CSUN OEM 组件检验标准
Q/CSUN.J27.0002 V1.0

| No. | Item | Technical Requirement |
|-----|------|----------------------|
| 2 | Solar cell | 3. Cells crack(visible by naked eyes), Cells broken(visible by naked eyes) is not allowed<br><br>4. V type gap and pinhole are not allowed (see photo 2).  Photo 2<br><br>a．chipping along cell edge is allowed(length≤2mm，width≤0.8mm，depth≤1/2 cell height (see photo 3)，n =1/piece, n≤3 per panel)  Photo 3<br><br>b. U type gap is allowed(length≤1.5mm，depth≤0.8mm(see photo 4),n=1/piece, n≤3 per panel).  Photo 4<br><br>c. Chipping is allowed (length≤2mm, depth≤1mm (see photo 5), n=1/piece, n≤ 1/panel).<br><br>The gap, chipping mentioned above cannot across the bus bar and finger.<br><br>Total number allowed ≤ 5 per panel.<br><br>4. Soldering tin on the cells and searing-iron trace are allowed(length≤5mm, n≤2 per cell)  Photo 5<br><br>6. Stain by soldering flux is not allowed on the surface of the solar cell. |
| 3 | Figure Array | 1. Figure array is aligned well. The string connector and the cell connector are straight.<br><br>2. 1mm≤distance between cell≤3 mm；<br><br>3. 2mm≤distance between cell serial≤4mm；<br><br>4. 2 mm≤distance between string connector and cell≤5mm；<br><br>5. Distance between the active component and glass edge≥11mm；<br><br>6. Deviation between interconnector and bus bar（Bus bar can be seen）≤0.3 mm 。 |
| 4 | Front bubble | 1. Consecutive bubble and consecutive channel bubble between frame and solar cell are not allowed<br><br>2. Bubble on the solar cell，area≤3mm$^2$,n= 1；<br><br>Bubble, Not on the solar cell，area≤1mm$^2$，n≤5 个；or area≤5mm$^2$，n≤1,<br><br>The bubbles which may be conjoint or obviously draw near each other are not allowed. |



CSUN OEM 组件检验标准
Q/CSUN.J27.0002 V1.0

| 5 | Foreign matter | 1. A lot of conductive foreign matters and hair are not allowed.<br><br>2. A little foreign matters are allowed(area≤5mm ²,n≤3).<br><br>3. Foreign matters cannot lead the distance of two cell＜0.5mm。<br><br>4. Foreign matters cannot make internal short-circuit. |
|---|---|---|
| 6 | Bar code | Bar code can not has obviously skew; numbers covered by something is not allowed.<br><br>Put it as the diagram shown, deviation＜3mm.If bar code position is right, rotate 180° can be accepted. |
| 7 | Glass | 1. Scratch: slight scratch is allowed—can not been seen from 1m by naked eyes or touch no feeling.<br><br>2. Conchoidal dent in the surface of the glass is not allowed<br><br>3. Bubble is allowed(width≤0.5mm，length≤50mm， n≤4/m2;<br>Width=0.5mm～1mm,length≤30mm，n≤1)；<br>Open bubble is not allowed.<br><br>4. No any other visible phenomenon like smoke, fog or opacity of glass. |

| No. | Item | Technical Requirement |
|---|---|---|
| 8 | Frame | Assembly：<br><br>1. The geometrical dimension of module, pitch of holes distance has accorded with design.<br><br>Tolerance±1 mm(three point measurement see photo 4).<br><br>Bulge in the middle of panel is not allowed.<br><br>2.  Patching clearance≤0.3mm,the dislocation between long and short frame≤ 0.5 mm , the dislocation between upper and lower plane(see photo 5）.<br><br>3. Difference of diagonal line≤3 mm。<br><br>4. Stamping depth of the four corner of module＞1mm，all the manufacture part have no feeling of thorn. |

1

2

3

Photo 4

Patching is ok                clearance is too large

Photo 5



CSUN OEM 组件检验标准
Q/CSUN.J27.0002 V1.0

5. Gel should be fulfilled in frame and glass. There has no lack of gel between the glass and the frame. Stuffing gap depth≤5mm (Use rule which thickness is 0.3mm)。（see photo 6）

6. Gel between frame and Back sheet should be continuous, uniform, aesthetic, no lack of gel.（see photo7）



Feeler stuffing depth≤5mm



Photo 6                                              Photo 7

Appearance：

1.   Oxide layer is flat and smooth, uniform. Wrinkle，current trace, bubble, crack, pastiness are not allowed. Oxide layer thickness has to be coincident with design requirement. Clean surface has no dirty

and residual gel，no shape change on the whole.

2. A、B、C side（see photo 8）scratch, hit damage, scrape.



Photo 8

a. Frame decoration side, A side slight cosmetic defect (black, dim defect by abrasion, dot defect by hitting, bottom unchanged scratch) at a distance of 0.5m, naked eyes can not see obviously, other defect is not allowed.

b. B side deep scratch (No oxide layer) length≤5mm, and n≤2, Slight scratch pit(Still have oxide layer), pit diameter≤10mm, depth≤0.5mm, n≤1，hit damage, scrape is allowed if not obvious at the distance of 1m to be watched by naked eyes.

c. C side deep scratch (No oxide layer) length≤10mm, n≤3. Slight scratch pit(Still have oxide layer)pit diameter≤10mm, depth≤0.5mm, and n≤2，but cannot exist in the same frame. Hit damage, scrape is allowed if not obvious at the distance of 1.5m to be watched by naked eyes.



CSUN OEM 组件检验标准
Q/CSUN.J27.0002 V1.0

| No. | Item | Technical Requirement |
|-----|------|----------------------|
| 9 | Junction box | 1.  Junction   box   assemble   position   should   accord   with   design requirement,position deviation＜1cm，parallelism with the frame≤3 mm。<br><br>2. Junction box should close to the back sheet,has no obvious tilt and gap,a little gel overflow has to be continuous, uniform,aesthetic(see photo 9),has  no crack, gap,little hole;bonding steadily,sealed well,has no water creep.<br><br>Overflow paste is aesthetic        Photo 9   → No gel overflow<br><br>3. Root of the down-lead in the box has to be sealed with the TPT open part completely by silica gel and no gap.Electrode connection is reliable,which can resist  pull≥30N,and  never  get  out  of  and  polarity  is  right,distance  between down-lead≥10 mm（according to the inside structure of the junction box）.<br><br>4. Diode polarity,quantiy is right,terminal should be complete.<br><br>5. Every part should be solid,tight cover,which can not be open by hand<br>From two 90°direction.<br><br>6. Cable has no damage,label of the cable should be good pasted. |
| 10 | Component Label Others | 1. Conponents are put well and well-appointed.<br><br>2. Character of the label should be clear,parameter correct,no damage,no print  moving.<br><br>3. The specification of back sheet label should be correct,pasting position should   accord with design requirement,well pasted,flat,no bubble.<br><br>4. Module encapsulation should be solid.<br><br>5. The  front side,rear side and frame of module should be clean,and residual   gel ,stain are not allowed.There are no visible stain and foreign material at the   distance of 1m . |

# EXHIBIT C

Case 1:14-cv-03118-WYD-MEH    Document 39-2    Filed 07/27/15    USDC Colorado    Page 205 of
9/6/13                                    Lumos Solar Mail - 答复: Warranty claim                              269

Appellate Case: 15-1256      Document: 01019465886      Date Filed: 07/27/2015      Page: 212



Clean Energy Solutions

LUMOS    Lighthouse solar

Chris Klinga <cklinga@lumossolar.com>

## 答复: **Warranty claim**
1 message

范盛楠 <sally.fan@ceeg.cn>                                          Tue, Dec 14, 2010 at 2:30 PM
To: Erika Hodge <ehodge@lumossolar.com>
Cc: "inglei.wang@chinasunergy.com" <inglei.wang@chinasunergy.com>, Scott Franklin
<scott@cleanenergysolutionsinc.com>, Geoff Manchester <Geoff@lighthousesolar.com>, Dave Sanders
<dsanders@lighthousesolar.com>, Chris Klinga <cklinga@lumossolar.com>, "xinglei.wang@chinasunergy.com"
<xinglei.wang@chinasunergy.com>

Erika,

Yes, Lester has got everything and as I know will hold a high CSUN technology level  meeting today to discuss.  He
should write you back very soon today or tomorrow.

Best!

*Sally Fan*

*Sales Manager*

*CSUN | CEEG*
*21.6237.6999  x85 office*
*21.6237.7038        fax*
*186.2118.9925     mobile*
http://www.chinasunergy.com/

http://www.ceeg.cc/English/index.html

---

发件人: Erika Hodge [ehodge@lumossolar.com]
发送时间: 2010年12月14日 23:55
收件人: 范盛楠
抄送: inglei.wang@chinasunergy.com; Scott Franklin; Geoff Manchester; Dave Sanders; Chris Klinga
主题: Re: Warranty claim

Sally,

Did Lester receive all the documents that I sent the other day?  We haven't heard anything back from him and
this is a very urgent matter.

Thank you,

*Erika Hodge*
*Operations Manager*

*LUMOS*

**3550 Frontier Ave.**
**Boulder, CO 80301**
**www.lumossolar.com**
**303 449 2394 office**
**303 442 1829 fax**
**303 803 5533 mobile**

9/6/13   Lumos Solar Mail 答复: Warranty claim

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission and any attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.

On Dec 10, 2010, at 3:19 PM, Sally Fan wrote:

Lester,

Please check the below out and will call you to discuss on the coming Monday. Thanks!

Sally

----- Original Message -----
From: Chris Klinga
To: 范盛楠
Cc: Erika Hodge ; Scott Franklin ; Geoff Manchester ; Dave Sanders
Sent: Saturday, December 11, 2010 4:35 AM
Subject: Re: Warranty claim

Sally,
We did an additional inspection of the Heiges' system today and determined that the current of the two strings of modules was 4.2 amps and 3.8 amps respectively.  At STC these strings should read 8.31 amps.  This says that we have an actual performance issue with these modules.  The link below is the data monitoring for this system.  The system details are as follows.

6000 STC Watts (24 LS250s)
10 deg tilt  270 deg Azimuth  Location: Boulder CO

Today in full sun the system reached about 1,650 Watts.  String 1 had an operating current of 4.2 Amps while string 2 had an operating current of 3.8 amps.

Data monitoring Link
http://lg291.d.lighthousesolar.com/

Please forward this info on to Lester.

I look forward to a prompt resolution.

Thank you,

**Chris Klinga**
*Product Designer*

**LUMOS**

3550 Frontier Ave.
Boulder, CO 80301
www.lumossolar.com
303 449 2394 office
303 442 1829 fax
303 859 5570 mobile

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission

9/6/13                                   Lumos Solar Mail - 答复: Warranty claim

and any attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.

On Fri, Dec 10, 2010 at 8:37 AM, Erika Hodge <ehodge@lumossolar.com> wrote:

> Sally,
>
> Can you please forward this e-mail to Lester?  The e-mail address that I have for him doesn't seem to be working.
>
> Thank you,
> Erika
>
>> Lester,
>>
>> We'd like to file a claim for the defective modules.  So far we have found a total of (44) defective modules out of the modules that we have inspected.  The (44) modules are part of two different containers, so there's a risk that we have up to a total of (1204) defective modules if all the modules in the two containers turn out to be defective.  I've attached following documents to support our claim for the (44) modules:
>>
>> 1. Serial numbers for modules that have been inspected and that are defective (we're still waiting for three more serial numbers from another customer)
>>
>> 2. Performance data from one of the jobs
>>
>> 3. Flash testing reports for the containers that the discolored modules came in (container #S69020036-1A and #S69020036-1B)

9/6/13                                                    Lumos Solar Mail 答复: Warranty claim

4. Photos of the discolored modules

Please let me know what else you need to continue with the claim process.

Thank you,


**Erika Hodge**
*Operations Manager*

**LUMOS**

**3550 Frontier Ave.**
**Boulder, CO 80301**
www.lumossolar.com
**303 449 2394** office
**303 442 1829** fax
**303 803 5533** mobile


PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission and any

attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not

the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure,

dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this

communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for

your assistance and cooperation.


This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.
[China Electric Equipment Group Corporation]


This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.
[China Electric Equipment Group Corporation]

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 216

# EXHIBIT D



Chris Klinga <cklinga@lumossolar.com>

---

# Re: 答复: PI for PO 1760
1 message

**Scott Franklin <scott@cleanenergysolutionsinc.com>**                         Thu, Dec 23, 2010 at 10:46 PM
To: 范盛楠 <sally.fan@ceeg.cn>
Cc: Erika Hodge <ehodge@lumossolar.com>, Chris Klinga <cklinga@lumossolar.com>, Rob Laak
<rlaak@cleanenergysolutionsinc.com>

Sally,

We are not making any payments on S69020043-6 until we have a clear understanding of how CSUN is going to
handle the warranty claim.  We need to have resolution on this matter immediately.  I sincerely hope it does not
take until next Tuesday for the management to reach a decision about how they are going to resolve this matter.

**Scott Franklin**

*President / CEO*

**Clean Energy Solutions**

**Lighthouse**solar | **LUMOS**

3550 Frontier Avenue

Boulder, Colorado 80301

www.lighthousesolar.com

www.lumossolar.com

303 638 4562 office

303 502 7036 mobile

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission and any attachments is confidential
and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible
for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this
communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have
received. Thank you in advance for your assistance and cooperation.

On Dec 23, 2010, at 7:28 PM, 范盛楠 wrote:

Scott,

Please find the attached PI of PO1760. In addition what about payment of PO1757?

To be clear, to proceed either of PO1757 or PO1760, CSUN needs balance payment of S69020043-6
paid off first.

Happy Christmas and wish you and your family a safe, healthy and prosperous new year!

*Sally Fan*
*Sales Manager*

**CSUN | CEEG**

*21.6237.6999 x85* office
*21.6237.7038*    fax
*186.2118.9925*   mobile
http://www.chinasunergy.com/
http://www.ceeg.cc/English/index.html

___

发件人：Scott Franklin [scott@cleanenergysolutionsinc.com]
发送时间：2010年12月24日 9:10
收件人：范盛楠
抄送：Erika Hodge; 吕敏
主题：Re: PI for PO 1760

Sally,

We would like to send the deposit for PO1760 so we can receive the modules as soon as
possible.  Please send us the final contract and PI.

Thanks,

**Scott Franklin**

*President / CEO*

**Clean Energy Solutions**

**Lighthouse**solar | **LUMOS**

3550 Frontier Avenue
Boulder, Colorado 80301

w w w .lighthousesolar.com
w w w .lumossolar.com

303 638 4562 office
303 502 7036 mobile

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission and any
attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the
addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination,
distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please
notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.

On Dec 23, 2010, at 3:58 PM, 范盛楠 wrote:

Erika,

Lumos Solar Mail - 答复: PI for PO 1760

We need you to sign on the contract of PO1760(TSP10029) again  with no monay amount change,  but as the lawer suggest, the contract has been done some polish. I should be able to send you today with PI.


Lv,

Please send me the PI of TSP10029. Thanks!

*Sally Fan*
*Sales Manager*

*CSUN  | CEEG*
*21.6237.6999  x85 office*
*21.6237.7038      fax*
*186.2118.9925     mobile*
*http://www.chinasunergy.com/*
*http://www.ceeg.cc/English/index.html*

---

发人：Erika Hodge [ehodge@lumossolar.com]
发送时间：2010年12月24日 0:13
收件人：范盛楠
抄送：Scott Franklin
主题：PI for PO 1760

Sally,

Please send us the PI for the 10% deposit on PO 1760, see below.

Thank you,
*Erika Hodge*
*Operations Manager*
*LUMOS*
*3550 Frontier Ave.*
*Boulder, CO 80301*
*www.lumossolar.com*
*303 449 2394 office*
*303 442 1829 fax*
*303 803 5533 mobile*

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission and any attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.*

---

This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution

9/6/13                               Lumos Solar Mail - 答复: PI for PO 1760

is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy

all copies of the original message.

[China Electric Equipment Group Corporation]

---

This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain

confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are

not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

[China Electric Equipment Group Corporation]

<PI TSP10029.pdf>

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 221

# EXHIBIT E

**From:** 范盛楠 sally.fan@ceeg.cn
**Subject:** 答复: warranty claim?
**Date:** January 6, 2011 at 9:41 PM
**To:** Scott Franklin scott@lumossolar.com
**Cc:** Rob Laak rlaak@cleanenergysolutionsinc.com, Erika Hodge ehodge@lumossolar.com, Chris Klinga cklinga@lumossolar.com

Scott,

I think LUMOS may replace defective panels right away and please keep all defective panels replaced in your warehouse. Basically there is no problem for replacing. The  issue is, right now, Stephen and Doctor Zhao are not in China. We have to wait until next Monday at least to have their signature.  Replacing panels definitely need to be done ASAP, no matter what is the final settlement.

To be noticed, as I replied before, pricing credit, which you brought, with no any agreement in writing stipulated,  is not possible to work.

Best!

**Sally Fan**
*Sales Manager*

***CSUN  | CEEG***
*21.6237.6999  x85 office*
*21.6237.7038        fax*
*186.2118.9925      mobile*
*http://www.chinasunergy.com/*
*http://www.ceeg.cc/English/index.html*

发件人: Scott Franklin [sfranklin@cleanenergysolutionsinc.com] 代表 Scott Franklin [scott@lumossolar.com]
发送时间: 2011年1月7日 11:21
收件人: 范盛楠
抄送: Rob Laak; Erika Hodge; Chris Klinga
主题: warranty claim?

Do you have any updates for us on the status of our warranty claim?  We need to start replacing modules right away- at least in the local Boulder area.

Thanks,

**Scott Franklin**
*President / CEO*

**LUMOS**

3550 Frontier Avenue
Boulder, Colorado 80301
www.lumossolar.com
303 449 2394 office
303 502 7036 mobile

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission and any attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.

This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.
[China Electric Equipment Group Corporation]

# EXHIBIT F



Chris Klinga <cklinga@lumossolar.com>

# CSUN Warranty Claim

1 message

**Scott Franklin** <scott@cleanenergysolutionsinc.com>                Wed, Jan 26, 2011 at 6:32 PM
To: 蔡志方 <stephen.cai@ceeg.cn>, Thomas Liu <thomas.liu@chinasunergy.com>, 王兴磊
<xinglei.wang@chinasunergy.com>
Cc: 范盛楠 Fan <sally.fan@ceeg.cn>, Erika Hodge <ehodge@lumossolar.com>, Chris Klinga
<cklinga@lumossolar.com>, Rob Laak <rlaak@cleanenergysolutionsinc.com>, Paul Hurdlow
<Paul.Hurdlow@dlapiper.com>

We have been attempting to communicate the extent and seriousness of our warranty claim for what we had
previously identified as (2) containers of 250W modules.  We officially notified CSUN via email of our initial claim
on December 3, 2010.  Since that time we have had virtually zero communication with anyone other than our
sales contact.  We have not had any response or input from any senior management, engineering support, or
quality control.  The lack of communication and responsiveness has been extremely concerning due to the extent
of the claim.

Unfortunately, the problem is not ending here.  In the interim while we have been waiting for a response from
CSUN we have been researching and inspecting modules from other shipments.  We started by looking at
shipments adjacent to the originally identified effected containers.  What we found was extremely concerning and
confirmed our suspicion that this issue was <u>not</u> limited to only (2) containers.

Attached are images from two separate installations that were inspected: University of Colorado CINC (100kW
System with 285W modules/PPA) and Grow (10 separate 5kW Systems with 185W modules).  Both systems
displayed similar discoloration, streaking, burning and cracking of cells.  Based on these inspections our
conclusion is that there are at least **5** containers effected including 185W, 250W and 285W modules as detailed
in the attached spreadsheet.

After receiving this new information that there was a potential issue with other shipments, we decided to inspect
an installation at Boulder Country Club (100kW System with 285W modules/ PPA) that was completed in
January 2010.  What we found is the same discoloration,streaking, burning and cracking of cells.  We have to
research further to see which shipment these modules came from.  This is by far the most concerning of all
systems inspected to date  since it suggest that **<u>ALL</u>** modules that we have purchased from CSUN are
potentially defective.

We have confirmed that this issue appears over time and apparently after exposure to sunlight.  We need
an immediate and very high-level technical response to this issue.

Attached is a PO for 5 containers of replacement modules which we expect to be shipped **immediately**.  This is
absolutely not the extent of this warranty claim and only intended to insure that we can satisfy customers needs
immediately.  We strongly suggest that a qualified and authorized management representative make a trip to
Colorado immediately.

Lastly, we recently received an Audit Confirmation from Deloitte Touche concerning account balances
outstanding at year end 2010.  We are uncomfortable signing the confirmation letter without including notice of
the current warranty claim.  Please advise if this warranty claim has already been reported and appropriate
warranty reserves have been made.

Looking forward to your prompt attention and reply.

**Scott Franklin**

*President / CEO*

**Clean Energy Solutions**

**Lighthouse**solar | **LUMOS**

3550 Frontier Avenue

Boulder, Colorado 80301

w w w .lighthousesolar.com

w w w .lumossolar.com

303 638 4562 office

303 502 7036 mobile

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission and any attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.

---

**5 attachments**

 **Boulder Country Club module discoloration.zip**
5073K

**PO1819 CSUN Warranty Replacement.pdf**
14K

 **CU CINC module discoloration.zip**
9059K

 **Grow module discoloration.zip**
2295K

**Containers including defective modules.xlsx**
37K

# EXHIBIT G



3550 Frontier Avenue
Boulder, Colorado 80301
(303) 449 2394
www.lumossolar.com

April 28, 2011

CSUN

Dear Thomas,

In connection with the workmanship warranty claim that we have discussed over the past three months including our meeting with you, Sally and Lester in Shanghai in early March, please accept this as a formal claim from Lumos for workmanship defects covering the following projects:

**Magnolia Energy, LLC**

Magnolia Energy, LLC is one of our largest customers and is located in Boulder, Colorado. Magnolia Energy has installed 20 solar Power Purchase Agreement ("PPA") systems over the past 24 months (most have been within the past 9 months). Magnolia Energy has recently provided us with a very detailed inspection report of each of their systems and found that 813 out of a total of 2,672 modules are showing workmanship defects (Please see their formal claim in Exhibit A attached). Based upon their inspection, Magnolia Energy has submitted a formal claim for all 813 modules in addition to all of the modules located on the Heiges residence which have been replaced by Lumos as noted below. The Magnolia Energy claim for the 19 projects, as submitted, is calculated as follows:

| | |
|---|---|
| Total Defective Modules | 813 |
| Value of Defective Modules | $415,516 |
| Labor to reinstall Modules ($75 x 813) | $60,975 |
| Total Claim | **$476,491** |

It is very important to note that this claim is for known defects as of today. Magnolia Energy reserves the right to submit addition claims through the workmanship warranty period for additional defects that develop at a later date.

**Heiges (Owned by Magnolia Energy, LLC)**

Heiges is a system that is owned by Magnolia Energy, LLC (this is not included in the above warranty claim) and was replaced on January 19, 2011 by Lumos. A summary of this claim is as follows:

| | |
|---|---|
| Total Defective Modules | 24 |
| Value of Defective Modules (24 x 250 x $1.95) | $11,700 |
| Labor to reinstall Modules ($75 x 24) | $1,800 |
| Total Claim | **$13,500** |

**Mackenzie Residence**

Mackenzie is a system that was installed by Lighthouse Solar and was replaced on January 11, 2011. A summary of this claim is as follows:

| | |
|---|---|
| Total Defective Modules | 62 |

| | |
|---|---|
| Value of Defective Modules (62 x 250 x $1.95) | $30,225 |
| Labor to reinstall Modules ($75 x 62) | $4,650 |
| Total Claim | **$34,875** |

**Additional Claim**

Based on the information provided to us by Magnolia Energy as detailed in their inspection report, we have concluded that 19.4% of all modules acquired from CSUN by Lumos Solar starting with PO 827 through PO 1578 will be subject to a workmanship claim as detailed in Exhibit B attached. Therefore, Lumos Solar is formally submitting the following claim to CSUN:

| | |
|---|---|
| Magnolia Energy Claim | $476,491 |
| Heiges | $13,500 |
| Mackenzie | $34,875 |
| Estimated Remaining Lumos Claim (see attached) | $1,892,469 |
| Grand Total Claim as of 4.26.11 | $2,417,335 |
| Less Outstanding Accounts Payable with CSUN (see attached) | $(1,371,525) |
| Net Unfunded CSUN warranty claim | **$1,045,810** |

We understand that the estimated additional Lumos claims may not be presented by the customer but we believe it is necessary to reserve for these claims now in anticipation of potential workmanship claims.  We want to also reiterate that this claim is as of today and we reserve the right to submit additional claims under the workmanship defect warranty with CSUN under the full 5 year warranty period and/or any performance claims that might arise in the future under the 25 year performance warranty.

Sincerely,

Scott Franklin
CEO
Lumos Solar

**Magnolia Energy, LLC**
**4890 Riverbend Road**
**Boulder, CO 80301**

April, 25

Lumos Solar
3550 Frontier Avenue
Boulder, CO 80301

Dear Scott,

As you and I have discussed we have completed our final inspection of all of our systems regarding the workmanship defect that we discovered several months ago.  We are including the attached report for your review that very clearly shows the defect to each module, the serial number associated with each defective module, the project name and location and the location within the array of each module.

In summary, we have found a total of 813 out of a total 2,672 modules representing 19 of our 20 systems. As you know, you replaced the modules on the Heiges residence on January 19, 2011 which totaled 24, 250 watt modules for a total system size of 11kW.  Our current claim for workmanship defect is attached and in summary includes the following:

| | |
|---|---|
| Total Defective Modules | 813 |
| Value of Defective Modules | $415,516 |

I want to emphasis that this claim is as of today and we reserve the right to submit additional claims under the workmanship defect warranty with CSUN through the full 5 year workmanship warranty period and the full production warranty.  Our investors are anxious to settle this claim so we would like a payment in this amount or replacement of the modules at your earliest convenience.

Sincerely Yours,

Allen Lee
Member
Magnolia Energy, LLC

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 230

**Magnolia Energy, LLC**
**Inspection Report**
**4/28/11**

| | |
|---|---|
| **Total Number of Systems *** | 19 |
| **Total Modules in PPA System** | 2,672 |
| **Total Normal in System** | 1,859 |
| **Total Defective in System** | 813 |
| **Defective % in System** | 30.4% |

| Breakdown of Module Type: | Total | Normal | # in Warranty Claim | % Defective | Value of Claim $1.95/watt |
|---|---|---|---|---|---|
| **CSUN 185 W Modules** | 704 | 537 | 167 | 23.7% | 60,245 |
| **CSUN 250 W Modules** | 141 | 86 | 55 | 39.0% | 26,813 |
| **CSUN 285 W Modules** | 1,483 | 893 | 590 | 39.8% | 327,893 |
| **CSUN 290 W Modules** | 344 | 343 | 1 | 0.3% | 566 |
| **Total** | **2,672** | **1,859** | **813** | **30.4%** | **415,516** |

\*   Does not inlcude Heiges which has been submitted under a separate claim.

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 231

**Lumos Solar**
**Estimated Workmanship Claim as of April 2011**
**4/27/11**

| Breakdown of Module Type: | Size | Total Acquired By Lumos | Less Mag, Heig & Mack. | Total Less Heiges/Mc | % Defective Magnolia | Estimated Other Defective Modules | Value of Claim $1.95/watt |
|---|---|---|---|---|---|---|---|
| CSUN 185 W Modules | 185 | 5,367 | 704 | 4,663 | 23.7% | 1,106 | 399,039 |
| CSUN 250 W Modules | 250 | 5,160 | 141 | 5,019 | 39.0% | 1,958 | 954,411 |
| CSUN 285 W Modules | 285 | 2,714 | 1,483 | 1,231 | 39.8% | 490 | 272,175 |
| CSUN 290 W Modules | 290 | 516 | 344 | 172 | 0.3% | 1 | 283 |
| Total | | 13,757 | 2,672 | 11,085 | 25.8% | 3,554 | 1,625,908 |

Add Labor at $75/Module                                                                      266,561
**Total Estimated Current Claim by Lumos**                                      **1,892,469**

# EXHIBIT H



**From:** **Willis.He**  willis.he@chinasunergy.com 🚩
**Subject:** RE: Moving forward
**Date:** October 30, 2011 at 4:02 PM
**To:** Scott Franklin  sfranklin@lumossolar.com
**Cc:** 谢秉侨  bingchai.xie@chinasunergy.com

Scott,

I owe an update.  We had an internal discussion last week regarding Lumos.  David has been travelling in US after SPI and he has the data disc and will drive a few of meetings to address the issue.

I have raised your concern about workmanship instead of performance.  We will look into it.

David, please have it prioritized and organize the meeting internally.

Thanks,
Willis

---

**From:** Scott Franklin [mailto:sfranklin@lumossolar.com]
**Sent:** Sunday, October 30, 2011 4:59 PM
**To:** Willis.He
**Cc:** 谢秉侨
**Subject:** Re: Moving forward

Willis,

We need to come to resolution on our outstanding warranty issue <u>immediately</u>.
 We are absolutely out of runway on this and need this cleaned up.

I look forward to your prompt reply and proposed resolution.

Thanks,

**Scott Franklin**
*President / CEO*

**LUMOS**

3550 Frontier Avenue
Boulder, Colorado 80301
www.lighthousesolar.com
303 449 2394 office
303 502 7036 mobile

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE. The information contained in this electronic mail transmission and any attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.

On Oct 5, 2011, at 10:56 AM, Willis.He wrote:

Scott,

Thanks for your follow up.  Let's meet at SPI.  David, please check out my schedule and set up
appointment with Scott.

David,

Please provide the test results from the third party test lab in Japan.

Thanks,
Willis

---

**From:** Scott Franklin [mailto:scott@cleanenergysolutionsinc.com]
**Sent:** Wednesday, October 05, 2011 11:40 AM
**To:** Willis.He
**Subject:** Moving forward

Willis,

Hope your doing well. Just wanted to follow up and see what is happening with CSUN with
respect to our conversations- warranty, potential investment/ acquisitions, etc....

We really need to get some resolution on the warranty topic as quickly as possible in order to
meet our customers expectations and keep our good reputation. At the very least, we need some
replacement modules to have on hand to fulfill replacement requests.

Looking forward to hearing from you as soon as possible.  We should also set up a time to meet at
SPI.  Here are a few potential times when I can meet:

October 19 9am
October 19 3pm
October 20 11am

Thanks,

**Scott Franklin**
*President / CEO*

**Clean Energy Solutions**
**Lighthouse**solar I **LUMOS**

3550 Frontier Avenue
Boulder, Colorado 80301
www.lighthousesolar.com
www.lumossolar.com
303 638 4562 office
303 502 7036 mobile

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission and any attachments is confidential and privileged.

This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.

# EXHIBIT I

From: **Scott Franklin**  sfranklin@lumossolar.com 
Subject: Lumos Response
Date: December 22, 2012 at 8:50 PM
To: meg.utterback@cn.kwm.com
Cc: Chris Klinga  cklinga@lumossolar.com

Ms. Blackwell,

I have received your letter dated 19 December 2012 on behalf of your client CEEG (Shanghai) Solar Science Technology Co., LTD.  We are withholding payments to CEEG, CSUN or any of their various subsidiaries until we have achieved an acceptable resolution of our outstanding, unresolved warranty claim.

On 28 April 2011 we filed a warranty claim for $2,417,335 and as of yet have had no response and no indication that the company was willing or capable of honoring its warranty.

> Grand Total Claim as of 26 April 2011:  $2,417,335
> Less Outstanding Accounts Payable with CSUN (see attached) $(1,371,525)
> Net Unfunded CSUN warranty claim **$1,045,810**

Please see the attached document "CSUN Workmanship Warranty Claim".

Respectfully,


**Scott Franklin**
*President / CEO*

**LUMOS**

3550 Frontier Avenue
Boulder, Colorado 80301
www.lumossolar.com
303 449 2394 office
303 502 7036 mobile

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission and any attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.



**EXHIBIT J**

# KING&WOOD
# MALLESONS
# 金杜律师事务所

上海市徐汇区淮海中路999号
上海环贸广场写字楼一期17层  邮编200031

17th Floor, One ICC
Shanghai International Commerce Center
999 Middle Huai Hai Road, Xuhui District
Shanghai 200031, P. R. China

T +86 21 2412 6000
F +86 21 2412 6150

www.kwm.com

24 January 2013

**BY EMAIL**

Scott Franklin
Lumos LLC
3550 Frontier Avenue, Suite C-2
Boulder, Colorado 80301 United States
Tel: + 001 303 449 2394
Fax: + 001 303 442 1829
Email: sfranklin@cleanenergysolutionsinc.com

**RE:   PAST DUE PAYMENT OWED TO CEEG (SHANGHAI) SOLAR SCIENCE TECHNOLOGY CO., LTD.**

Dear Mr. Franklin:

We are in receipt of your e-mail dated December 23, 2012, in which you stated that Lumos is withholding payments to CEEG pending resolution of a warranty claim.

The claim for money owed is under a different contract than your alleged warranty claim, which is for goods sold under separate contracts. As a result, it should not be entertained by CIETAC under PRC procedural rules in the matter which CEEG intends to file to obtain the overdue payment. Thus, legally your claim is unrelated to CEEG's request for payment and Lumos is not entitled to a set-off.

We do not see any merit to your warranty claim. As you have been apprised by CEEG, TUVRheinland, the testing facility that evaluated the panels Lumos sent back, issued a report stating that there was no defect impacting performance. CEEG sent you those results and they were never challenged or rebutted. If you have evidence that there was a performance defect, we will consider it as part of your warranty claim. Please note that the general warranty issued by CEEG does not cover incidentals such as your labor costs.

We hereby request that you immediately pay CEEG in full the past due principal amount of US$1,372,445.10. Failure to pay or make arrangement to pay before January 31, 2013 will result in our proceeding to file a claim on behalf of CEEG with CIETAC. As to your separate warranty claim, please promptly provide the specific warranty you are relying upon and any evidence in your possession of a performance defect.

Sincerely,

M. M. Utterback
Simin Yu

cc: CEEG (Shanghai) Solar Science Technology Co., Ltd.

金杜律师事务所国际联盟成员所

北京 l 布里斯班 l 堪培拉 l 成都 l 重庆 l 广州 l 杭州 l 香港 l 济南 l 伦敦 l 墨尔本 l 纽约 l 佩斯 l 青岛 l 上海 l 深圳 l 硅谷 l 苏州 l 悉尼 l 天津 l 东京
Member firm of the King & Wood Mallesons network. See www.kwm.com for more information.
Beijing l Brisbane l Canberra l Chengdu l Chongqing l Guangzhou l Hangzhou l Hong Kong l Jinan l London l Melbourne l New York l Perth l Qingdao l Shanghai l Shenzhen
Silicon Valley l Suzhou l Sydney l Tianjin l Tokyo

Appellate Case: 15-1256     Document: 01019465886     Date Filed: 07/27/2015     Page: 239

# EXHIBIT K



3550 Frontier Avenue
Boulder, Colorado 80301
(303) 449 2394
www.lumossolar.com

January 24, 2013

**BY EMAIL**

M.M. Utterback
17th Floor, One ICC
Shanghai International Commerce Center
999 Middle Huai Hai Road, Xuhui District
Shanghai 200031, P.R. China
Tel: +86 21 2412 6000
Email: meg.utterback@cn.kwm.com

Ms. Utterback,

I have received your email dated January 24, 2013.  From your correspondence, it is clear that
neither CEEG nor you have read or understood the nature of our warranty claim since you
continually refer to the performance warranty while we have consistently and repeatedly made it
clear that we were making a claim against defective **workmanship**, which is explicitly covered
under the warranty provided by CEEG.  Please see screen shot from warranty inserted below and
full warranty attached.

## Limited Warranty for PV Modules

### 1. Limited Product Warranty - Five Years Repair, Replacement or Refund Remedy

CEEG (ShangHai) SOLAR SCIENCE & TECHNOLOGY Co., Ltd. (CEEGSST)
warrants its Photovoltaic Solar Modules including factory-assembled DC connectors
and cables, if any, to be free from defect in materials and workmanship under normal
application, installation, use and service conditions. If MODULES fail to conform to
this warranty, then for a period ending sixty months from date of sale as shown in the
invoice to the direct customer of CEEGSST, CEEGSST, at its option, either repair or
replace the product, or refund the purchase price as paid by the CUSTOMER. The
repair or replacement or refund remedy shall be the sole and exclusive remedy
provided under the "Limited Product Warranty" and shall not extend beyond the sixty
months period set forth herein. It will be performed directly to the CUSTOMER only.
This "Limited Product Warranty" does not warrant a specific power output, which shall
be exclusively covered under clause 2 hereinafter ("Limited Peak Power Warranty" ).

We have consistently and repeatedly attempted to settle this dispute through "friendly negotiations" as provided in the contract.  Please see screen shot from contract inserted below and full contract attached.

### 15.   Arbitration 仲裁

Any dispute arising from or in connection with this Contract shall be settled through friendly negotiations. Failing that, then shall be submitted to China International Economic and Trade Arbitration Commission Shanghai Subcommission for arbitration which shall be conducted in accordance with the commission's arbitration rules in effect at the time of applying for arbitration. The arbitral award is final and binding upon both parties. The applicable law shall be the United Nations Convention on Contracts for the International Sale of Goods.

凡因本合同引起的或与本合同有关的任何争议，应通过友好协商解决。如未果，均应提交中国国际经济贸易仲裁委员会上海分会，按照申请仲裁时该会现行有效的仲裁规则进行仲裁。仲裁裁决是终局的，对双方均有约束力。准据法为《联合国国际货物销售公约》。

We have had effectively no engagement or "friendly negotiations" from management at CEEG during the last two years since this claim was filed.  We hosted Mr. XINGLEI WANG May 3, 2011 for several days to perform on-site inspections of the defective modules.  He confirmed that the modules he inspected with visual defects, i.e. "snail trails" would have been considered defective and not shipped from the factory if they had been inspected.



We had the following brief conversation with Mr. WILLIS HE on October 30, 2011 and nothing since then.

| | |
|---|---|
| From: **Willis.He <willis.he@chinasunergy.com>** | Hide |
| Subject: **RE: Moving forward** | |
| Date: October 30, 2011 4:02:46 PM MDT | Important 2 |
| To: Scott Franklin | |
| Cc: 谢秉侨 | |

Scott,

I owe an update.  We had an internal discussion last week regarding Lumos.  David has been travelling in US after SPI and he has the data disc and will drive a few of meetings to address the issue.

I have raised your concern about workmanship instead of performance.  We will look into it.

David, please have it prioritized and organize the meeting internally.

Thanks,
Willis

**From:** Scott Franklin [mailto:sfranklin@lumossolar.com]
**Sent:** Sunday, October 30, 2011 4:59 PM
**To:** Willis.He
**Cc:** 谢秉侨
**Subject:** Re: Moving forward

Willis,

We need to come to resolution on our outstanding warranty issue immediately.   We are absolutely out of runway on this and need this cleaned up.

I look forward to your prompt reply and proposed resolution.

Thanks,

**Scott Franklin**
*President / CEO*

**LUMOS**

3550 Frontier Avenue
Boulder, Colorado 80301
www.lighthousesolar.com
303 449 2394 office

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 244

We received the test results from TUV on November 2, 2011and replied once again that our claim was NOT about performance but about workmanship.  The TUV report does not make any evaluations or judgments about workmanship.

Our first correspondence with CEEG since then was your letter dated December 19, 2012.  We had still been operating under the spirit of the agreement and attempting to settle the matter through friendly negotiations despite the fact that CEEG has turned the matter over to legal council.

It is our belief that CEEG is intentionally ignoring our workmanship warranty claim due to its catastrophic warranty claim potential.

We would be very happy to enter "friendly negotiations" to resolve this dispute but do not consider your demand for payment by the arbitrary date of January 31, 2013 as very "friendly".  Please understand that if you pursue the course of action indicated in your email and turn the case over to arbitration, we will fight to protect our interests, and the interests of our customers with the full the force of our legal council and the resources available to us from the US Department of Commerce and the International Trade Commission.  I can assure you that we consider this matter extremely serious and will respond accordingly with all means available to us.


Sincerely,


Scott Franklin
President/ CEO
Lumos


cc: Paul Hurdlow, DLA Piper

# EXHIBIT L

案件号码:

呈: 中国国际经济贸易仲裁委员会上海分会

中电电气（上海）太阳能科技有限公司

与

LUMOS, LLC

《销售合同》争议仲裁案

---

# 仲裁申请书

---

中电电气（上海）太阳能科技有限公司

2013 年 3 月 22 日

1

# 仲 裁 申 请 书

申　请　人：中电电气（上海）太阳能科技有限公司

住　　　所：上海市松江区广富林路 5999 号

　　　　　　邮政编码：201616

法定代表人：陆廷秀

　　　　　　职务：执行董事

　　　　　　电话：（021）6029 1899

委托代理人：Meg Utterback　北京市金杜律师事务所上海分所

　　　　　　王团团　北京市金杜律师事务所上海分所

　　　　　　郁斯敏　北京市金杜律师事务所上海分所


被申请人：LUMOS, LLC

司法文书　DAVID BREWSTER & ASSOCIATES, INC.

递送地址：4890 Riverbend Road, Boulder, Colorado, 80301, U.S.

住　　　所：3550 Frontier Avenue, Suite C-2

　　　　　　Boulder, Colorado, 80301 U.S.

　　　　　　电话：001 303 449 2394

　　　　　　传真：001 303 442 1829

联　系　人：Colin T. Williams, Scott Franklin

联系人邮件：ctw@lumossolar.com

　　　　　　sfranklin@cleanenergysolutionsinc.com

　　　　　　sfranklin@lumossolar.com

2

案　　　由：买卖合同欠款纠纷

## 仲 裁 请 求:

1. 请求裁决被申请人向申请人支付两笔未付货款共计美元 1,372,445.10 元（第一笔货款总额美元 646,191.00 元，扣除被申请人已付的预付款后，被申请人尚欠美元 581,571.90 元；第二笔货款总额美元 878,748.00 元，扣除被申请人已付的预付款后，被申请人尚欠美元 790,873.20 元。），总计折合**人民币 8,611,407元** [按中国银行 2013 年 3 月 7 日公布的美元兑人民币的中行折算价 6.2745 元计算];

2. 请求裁决被申请人向申请人支付上述未付货款自付款截至日到实际支付日的利息，暂计**人民币 1,251,930 元**。[其中：第一笔货款的利息，从付款截止日的第二天 2010 年 12 月 23 日起暂计到 2013 年 3 月 7 日止，暂计人民币 543,454 元。第二笔货款的利息，从付款截止日的第二天 2011 年 1 月 21 日起暂计到 2013 年 3 月 7 日止，暂计人民币 708,476 元。以上总暂计利息人民币 1,251,930 元。计算说明见本仲裁申请的附件，请求计算至被申请人实际履行全部付款义务之日。]

3. 请求裁决被申请人向申请人赔偿逾期付款给申请人造成的汇率损失**人民币 464,816 元**。[其中：第一笔货款的汇率损失为人民币 216,403 元。第二笔货款的汇率损失为人民币 248,413 元。计算说明见本仲裁申请的附件，请求计算至被申请人实际履行全部付

3

款义务之日。]

4. 请求裁决被申请人承担申请人律师费共计**人民币 250,000 元**。

　　[250,000 元为暂计金额，当实际支出律师费超出 250,000 元时，

　　请求裁决被申请人承担申请人实际支出的律师费。]

5. 请求裁决被申请人负担本案仲裁费。

**仲 裁 依 据：**

　　申请人与被申请人之间的《销售合同》第十五条约定：

　　"凡因本合同引起的或与本合同有关的任何争议，应通过友好协商解决。如未果，均应提交中国国际经济贸易仲裁委员会上海分会，按照申请仲裁时该会现行有效的仲裁规则进行仲裁。"

**事实和理由：**

　　2010 年 5 月，申请人与被申请人签订了合同号为 S69020043 的《销售合同》（见申请人证据 C1-1），约定申请人向被申请人出售太阳能电池组件，被申请人承担相应的付款责任。《销售合同》第七条约定被申请人应当在货运提单上所列货物离港日起算的 60 天内付清货款。

　　2010 年的 10 月 23 日，按照《销售合同》，申请人向被申请人运送了总价为美元 646,191.00 元的太阳能电池组件。2010 年的 11 月 21 日，申请人再向被申请人运送了总价为美元 878,748.00 元的太阳

4

能电池组件。之后，申请人向被申请人提供了两批货物相关的发票、装箱单和提单（见申请人证据 C1-2 至证据 C1-9）。

根据《销售合同》第七条的约定，被申请人应当在提单所列离港日后的 60 天内付清全部货款。因此，两批货物的货款支付截止日应分别为 2010 年 12 月 22 日和 2011 年 1 月 20 日。在上述截止日，被申请人未能按照《销售合同》的约定支付全部货款，总计拖欠美元 1,372,445.10 元，至今尚未偿还。

此外，根据《销售合同》第九条的约定，如被申请人未能按照合同及时支付全款而给申请人造成汇率损失的，由被申请人承担。即在货款支付截止日时中国人民银行的美元兑换人民币汇率较被申请人实际支付日的汇率有所贬值，由此造成的汇率损失由被申请人承担。

为此，申请人在 2012 年 12 月 19 日和 2013 年 1 月 24 日两次向被申请人发出律师函，要求被申请人支付所欠货款。（见申请人证据 C1-12、证据 C1-13）。然而，迄今为止，被申请人仍未能偿还货款，亦未赔付由此给申请人造成的损失。

申请人和被申请人在本案所涉《销售合同》中约定适用《联合国国际货物销售合同公约》，本案应当适用《联合国国际货物销售合同公约》。此外，根据《联合国国际货物销售合同公约》第七条第二款规定，凡该公约未明确解决的属于公约范围的问题，应按照公约所依据的一般原则来解决，在没有一般原则的情况下，则应按照国际私法规定适用的法律来解决。申请人认为，本案中，在没有一般原则的情

况下，按照本仲裁所在国中华人民共和国的国际私法规定，所应适用的法律为中华人民共和国法律。

根据本案相关合同的约定，《联合国国际货物销售合同公约》和中华人民共和国法律，申请人认为：首先，被申请人未在约定期限内支付货款的行为已经构成违约，应当向申请人全额支付逾期货款。其次，被申请人逾期支付货款的还应当根据《销售合同》第九条约定，承担申请人的汇率损失。最后，申请人为本案支出的仲裁费、律师费、减少的利息收入等作为被申请人违约行为导致的申请人的损失，应当由被申请人全额予以偿付。为此，申请人为维护自身合法权益，向中国国际经济贸易仲裁委员会上海分会提出仲裁申请，请求贵会依法支持申请人的所有请求事项。

此致

中国国际经济贸易仲裁委员会上海分会

申请人：中电电气（上海）太阳能科技有限公司

仲裁代理人：

金杜律师事务所

Meg Utterback  王囡囡  郁斯敏

2013 年 3 月 7 日

6

# 附件：利息和汇率损失计算说明

**一、申请人仲裁请求 2 的利息损失计算（按中国人民银行在此期间内公布的人民币一至三年期贷款年利率计算）：**

**1. 被申请人所拖欠的第一笔贷款美元 581,571.90 元的利息损失：**

依照中国银行公布的美元兑人民币的中行折算价，2010 年 12 月 23 日美元 581,571.90 元折合人民币金额为：
581,571.90 X 6.6466 = 3,865,476 元人民币

（1）2010 年 12 月 23 日至 2010 年 12 月 25 日共 3 天，年利率为 5.6%，利息为 1,779 元人民币；

（2）2010 年 12 月 26 日至 2011 年 2 月 8 日共 44 天，年利率为 5.85%，利息为 27,259 元人民币；

（3）2011 年 2 月 9 日至 2011 年 4 月 5 日共 56 天，年利率为 6.1%，利息为 36,177 元人民币；

（4）2011 年 4 月 6 日至 2011 年 7 月 6 日共 92 天，年利率为 6.4%，利息为 62,356 元人民币；

（5）2011 年 7 月 7 日至 2012 年 6 月 7 日共 337 天，年利率为 6.65%，利息为 237,335 元人民币；

（6）2012 年 6 月 8 日至 2012 年 7 月 5 日共 28 天，年利率为 6.4%，利息为 18,978 元人民币；

（7）2012 年 7 月 6 日至 2013 年 3 月 7 日共 245 天，年利率为 6.15%，利息为 159,570 元人民币；

（1）至（7）相加后利息总计 543,454 元人民币。

**2. 被申请人所拖欠的第二笔贷款美元 790,873.20 元的利息损失：**

依照中国银行公布的美元兑人民币的中行折算价，2011 年 1 月 21 日美元 790,873.20 元折合人民币金额为：
790,873.20 X 6.5886 = 5,210,747 元人民币

（1）2011 年 1 月 21 日至 2011 年 2 月 8 日共 18 天，年利率为 5.85%，利息为 15,032 元人民币；

7

（2）2011年2月9日至2011年4月5日共56天，年利率为6.1%，利息为48,767元
人民币；

（3）2011年4月6日至2011年7月6日共92天，年利率为6.4%，利息为84,057元
人民币；

（4）2011年7月7日至2012年6月7日共337天，年利率为6.65%，利息为319,933
元人民币；

（5）2012年6月8日至2012年7月5日共28天，年利率为6.4%，利息为25,583元
人民币；

（6）2012年7月6日至2013年3月7日共245天，年利率为6.15%，利息为215,104
元人民币；

（1）至（6）相加后利息总计708,476元人民币。

被申请人所拖欠的两笔贷款利息损失之和为1,251,930元人民币。

**二、申请人仲裁请求3的汇率损失计算：**

**1. 被申请人所拖欠的第一笔贷款美元581,571.90元的汇率损失：**

按中国银行公布的美元兑人民币2010年12月23日的中行折算价6.6466元，和2013
年3月7日的中行折算价6.2745元为比较基准点，汇率损失为216,403元人民币。

**2. 被申请人所拖欠的第二笔贷款美元790,873.20元的汇率损失：**

按中国银行公布的美元兑人民币2011年1月21日的中行折算价6.5886元，和2013年
3月7日的中行折算价6.2745元为比较基准点，汇率损失为248,413元人民币。

被申请人所拖欠的两笔贷款汇率损失之和为464,816元人民币。

8

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 254

**EXHIBIT M**

**From: Utterback, Meg** meg.utterback@cn.kwm.com
**Subject:** RE: Lumos-CSUN Settlement
**Date:** May 19, 2013 at 9:58 PM
**To:** Scott Franklin sfranklin@lumossolar.com
**Cc:** Will Xing will.xing@chinasunergy.com, **Stephen Cai** stephen.cai@chinasunergy.com, **Paul Hurdlow** paul.hurdlow@dlapiper.com,
**Linda Hoak** lhoak@cleanenergysolutionsinc.com, **Chris Klinga** cklinga@lumossolar.com, **Yu, Simin1** yusimin1@cn.kwm.com,
**Wang, Jianjian1** wangjianjian1@cn.kwm.com, **周红艳** hongyan.zhou@chinasunergy.com, **panguohua**
panguohua@chinasunergy.com, **刘纬** wei.liu@chinasunergy.com

I have spoken with my client and they have indicated that they are not interested in a settlement on the terms that you propose.  Any settlement would require payment for goods received.

Feel free to contact me if you wish to discuss this further.

**Meg Utterback | Partner**
**King & Wood Mallesons**

17th Floor, One ICC, Shanghai ICC
999 Huai Hai Road (M)
Shanghai 200031, P.R. China
D +86 21 2412 6086 | M +86 13501887308 | F +86 21 2412 6150
meg.utterback@cn.kwm.com | www.kwm.com | blog: www.chinalawinsight.com

**Please consider the environment before printing. Thank you.**
This e-mail message is intended for the use of the individual or entity who is the intended recipient and may contain information that is privileged or confidential. If you have received this e-mail in error, please notify King & Wood Mallesons immediately by replying to this e-mail and delete all copies of the e-mail and the attachments thereto (if any). Thank you.

---

**From:** Scott Franklin [mailto:sfranklin@cleanenergysolutionsinc.com] **On Behalf Of** Scott Franklin
**Sent:** 2013年5月20日 10:57
**To:** Utterback, Meg
**Cc:** Will Xing; Stephen Cai; Paul Hurdlow; Linda Hoak; Chris Klinga; Yu, Simin1; Wang, Jianjian1
**Subject:** Re: Lumos-CSUN Settlement

Ms. Utterback,

Can you please advise us of your clients response to our settlement proposal?  We believe this is the friendliest and most advantageous resolution for both parties and are looking forward to putting this behind us and moving on.

Sincerely,

**Scott Franklin**
*President / CEO*

**LUMOS**

3550 Frontier Avenue
Boulder, Colorado 80301
www.lumossolar.com
303 449 2394 office
303 407 7981 direct

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE. The information contained in this electronic mail transmission and any attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.

On May 7, 2013, at 9:57 PM, Utterback, Meg wrote:

Dear Mr. Franklin:

I will forward your email and settlement proposal to my client for their review and consideration.

Please note that the letter you received was from CIETAC, the arbitration institution to which Lumos agreed in its sales contracts with CEEG (Shanghai) Solar Science Technology Co., Ltd. The contractual arbitration clause did not specify a language for the arbitration and the CIETAC default language is Chinese. Your company has been sued in arbitration in China.  I recommend you seek counsel and avoid the risk of an adverse award for failure to defend your company in the arbitration.

I will respond to your settlement proposal in due course after consideration by my client.

Thank you and best regards,

**Meg Utterback | Partner**
**King & Wood Mallesons**

17th Floor, One ICC, Shanghai ICC
999 Huai Hai Road (M)
Shanghai 200031, P.R. China
D +86 21 2412 6086 | M +86 13501887308 | F +86 21 2412 6150
meg.utterback@cn.kwm.com | www.kwm.com | blog: www.chinalawinsight.com

**Please consider the environment before printing. Thank you.**

This e-mail message is intended for the use of the individual or entity who is the intended recipient and may contain information that is privileged or confidential. If you have received this e-mail in error, please notify King & Wood Mallesons immediately by replying to this e-mail and delete all copies of the e-mail and the attachments thereto (if any). Thank you.

---

**From:** Scott Franklin [mailto:sfranklin@cleanenergysolutionsinc.com] **On Behalf Of** Scott Franklin
**Sent:** 2013年5月8日 4:57
**To:** Utterback, Meg
**Cc:** Will Xing; Stephen Cai; Paul Hurdlow; Linda Hoak; Chris Klinga
**Subject:** Lumos-CSUN Settlement
**Importance:** High

We are currently in the middle of a year end audit and need to resolve our outstanding workmanship warranty claim against CSUN since December 22, 2012 in the amount of $2,417,335.

This warranty claim is being held against an accounts payable balance of $1,364,425.46. We have never received an acceptable or reasonable proposal to resolve this claim and would like to propose that both amounts be written off of our books respectively. We are proposing the following:

> LUMOS agrees that it will release CSUN from this and all future warranty claims for any modules supplied by it to LUMOS in exchange for CSUN to release LUMOS from any outstanding accounts receivable. Specifically:
>
> $2,417,335 Warranty Reserve be written off of CSUN's books
> $1,364,425.46 Accounts Payable be written off of LUMOS's books

We believe this is the most amicable and positive resolution for both parties of this long outstanding dispute. Please confirm your acceptance of this proposal in writing and we will produce a document memorializing this agreement.

We also received the attached document in Chinese with your signature. We do not speak Chinese nor can we read the attached document.

I am hopeful that we can reach an amicable and professional resolution to this issue. Please feel free to call or email me anytime.

Thanks in advance for your consideration.

Sincerely,

**Scott Franklin**
*President / CEO*

**LUMOS**

3550 Frontier Avenue
Boulder, Colorado 80301
www.lumossolar.com
303 449 2394 office
303 407 7981 direct

PRIVILEGED AND CONFIDENTIAL COMMUNICATION NOTICE: The information contained in this electronic mail transmission and any attachments is confidential and privileged. This email is intended only for the use of the individual or entity to which it is addressed. If you are not the addressee, or the employee or agent responsible for delivering the message to the addressee, you are hereby notified that any disclosure, dissemination, distribution, copying, printing or retransmitting of this communication is strictly prohibited. If you have received this communication in error, please notify the sender by return email, and immediately delete the email you have received. Thank you in advance for your assistance and cooperation.

**EXHIBIT N**

Appellate Case: 15-1256    Document: 01019465886    Date Filed: 07/27/2015    Page: 258



3550 Frontier Avenue
Boulder, Colorado 80301
(303) 449 2394
www.lumossolar.com

June 20, 2013

**China International Economic and Trade Arbitration
Commission Shanghai Commission**

7th Floor, Jinling Mansion,
28 Jinling Road (w) Shanghai
China 200021

**By Post, Fax (+8621-63877070) and
Email (wennywang@cietac-sh.org; wangxiaotian@cietac-sh.org)**

Dear Sirs,

**Re: Case No. SG2013023**
**CEEG (Shanghai) Solar Science Technology Co. Ltd -v- Lumos LLC**

We refer to the above arbitration case and your letters dated 1st April 2013 and 27th May 2013.

As you are aware, we are a foreign company based in the United States and do not have any knowledge of the Chinese language or the legal/arbitration process in China. As most of the letters/documents you sent to us were written in Chinese, it has taken us some time to find suitable person to translate/explain the contents of the letters/documents to us. From what we have now been told, we understand that CEEG had commenced the above arbitration against our company and that a hearing is scheduled to be held in Shanghai on 27th June 2013.

We will not be ready to attend the above scheduled hearing on 27th June 2013 based on such short notice . We will need time to instruct suitable legal representative to provide us with legal advice . Further, as most of the documents are in Chinese and as explained to us, the working language of the arbitration will also have to be in Chinese, we anticipate that we will need extra time to consult our legal representative and to prepare our defense to the case in the Chinese language. In addition, we would also like to have time to consider and explore possible settlement of the dispute with the Claimant. Accordingly, we therefore request that the hearing scheduled on 27th June 2013 be postponed for at least two months so that we can have sufficient time to properly deal with the dispute and the arbitration.

We look forward to your response to our above request as soon as possible.

Kind regards,

Scott Franklin
President and CEO

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

Civil Action No. 1:14-cv-3118-WYD-MEH

CEEG (Shanghai) Solar Science & Technology Co., Ltd.,

      Petitioner,

v.

LUMOS LLC, now known as LUMOS SOLAR LLC,

      Respondent.

---

## [PROPOSED] ORDER GRANTING RESPONDENT'S MOTION TO DISMISS PETITION TO CONFIRM ARBITRATION AWARD AND OPPOSITION TO PETITIONER'S MOTION FOR ENTRY OF JUDGMENT

---

Respondent LUMOS LLC, now known as LUMOS SOLAR LLC ("LUMOS"), filed a Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to the Motion for Entry of Judgment submitted by CEEG (Shanghai) Solar Science & Technology Co., Ltd. ("CEEG").  Having considered all relevant pleadings and the applicable law, the Court finds that LUMOS' Motion and Opposition are well taken and should be GRANTED.

It is therefore the ORDER of the Court that Petitioner CEEG (Shanghai) Solar Science & Technology Co., Ltd.'s motion for entry of judgment is **DENIED** and its Petition to Confirm Arbitration Award and for Entry of Judgment is hereby **DISMISSED**.

**IT IS SO ORDERED.**

Dated: _____, 2015

                                    _____
                                      Judge of the United States District Court
                                      District of Colorado

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.  14-cv-03118-WYD-MEH

CEEG (Shanghai) SOLAR SCIENCE & TECHNOLOGY CO., LTD.,

      Plaintiff,

v.

LUMOS LLC, now known as LUMOS SOLAR LLC,

      Defendant.

---

**ORDER**

---

I.    <u>INTRODUCTION</u>

      THIS MATTER comes before the Court on a petition by a Chinese company, CEEG Solar Science & Technology Company, LTD ("CEEG"), to enforce a foreign arbitration award by the China International Economic and Trade Arbitration Commission ("CIETAC") that was entered against Defendant Lumos LLC ("Lumos"), a company founded in Boulder, Colorado.  (ECF No. 2).  Lumos has filed a motion to dismiss the petition.  (ECF No. 22).  After hearing argument from the parties at a hearing held on May 27, 2015 and carefully reviewing the parties' submissions, I find that the petition is denied, the motion to dismiss is granted, and this case is dismissed.

II.    <u>BACKGROUND</u>

      By way of background, Scott Franklin is the President and CEO of Lumos, which was founded in Boulder, Colorado in 2007.  Franklin appeared in person and testified at the May 27, 2015 hearing.  Lumos provides solar energy products to consumers.

CEEG is a Chinese company based in Shanghai that develops solar panel products.

Co-Branding Agreement

On June 29, 2009, Lumos and CEEG entered into a Co-Branding Agreement where Lumos agreed to buy and CEEG contracted to sell certain solar technology products for a period of three years.  (ECF No. 22-2).  Pursuant to the Co-Branding Agreement, Lumos agreed to order a minimum number of CEEG products over a three-year period.  The Co-Branding Agreement sets forth various terms including pricing, payment, packaging, and delivery.  With respect to "Prices," the Co-Branding Agreement provides that the "[t]he price to be paid by LUMOS to CEEG[] for the Product refers to individual contracts."  (ECF No. 22-2).  The Co-Branding Agreement also provides that "[t]he Seller warrants that all goods delivered conform in respect of quality, specification and packaging, with the stipulations in each contract, relying on datasheets of the goods and all other specifications between the two parties in written form."  (ECF No. 22-2).

Importantly, under the Co-Branding Agreement's "Choice of Language" provision, the parties acknowledged and agreed

> that they have mutually required that this Agreement and all documentation notices, judicial proceedings, and dispute resolution and arbitration entered into, given, instituted pursuant to, or relating to, this Agreement be drawn up in the English language.  Any translations of this Agreement or its attachments that are provided are done solely for the convenience of Seller, and, in all cases, the English language version of such documents shall govern.

(ECF No. 22-2).  Also, the Co-Branding Agreement's "Dispute Resolution" provision reads:

> All disputes in connection with this agreement or the execution thereof
> shall be settled through good faith negotiations.  In case no settlement can
> be reached, the case may then be submitted for arbitration to the China
> International Economic and Trade Arbitration Commission
> Shanghai Commission in accordance with its arbitration rules.  The
> arbitration shall take place in Shanghai and the decision of the
> Commission shall be final and binding upon both parties; neither
> party shall seek recourse to a law court or other authorities to appeal
> the decision.  The arbitration fee shall be borne by the losing party.

(ECF No. 22-2).

At the May 27, 2015 hearing, Scott Franklin credibly testified that the Co-Branding Agreement was the "master agreement" that Lumos and CEEG initially entered into when they commenced their business relationship.  (Bridge Tr. 14:17:18-14:19:16).  The Co-Branding Agreement was the "umbrella" that set forth the terms for how Lumos and CEEG would operate and do business together.  (*Id.*)  It "outlined the terms, the pricing, the buying commitment, warranty, general business terms of our agreement."  (*Id.* at 14:18:44-14:18:50).  Franklin further explained that the subsequent sales contracts were purchase orders that flowed from the Co-Branding Agreement.  Franklin stated that pursuant to the Co-Branding Agreement's Choice of Language provision, Lumos and CEEG always communicated in the English language.  (*Id.* at 14:17:18-14:19:54).  In fact, Franklin testified that CEEG drafted the Choice of Language provision and was always very accommodating in communicating with Lumos in English.  (*Id.*)

<u>Sales Contract</u>

Lumos argues that under the terms of the Co-Branding Agreement, Lumos and CEEG were to enter into individual sales contracts for each order.  Thus, on May 17,

-3-

2010, Lumos and CEEG entered into the sales contract at issue in this dispute ("Sales

Contract").  (ECF No. 22-1).  Pursuant to the Sales Contract, on October 23, 2010 and

November 21, 2010, Lumos received shipments of solar battery modules from CEEG.

Upon its inspection of the modules, Lumos discovered defects including "discoloration,

streaking, burning, and cracking of the cells."  (ECF No. 22-1).  Also, under the Sales

Contract,

> [a]ny dispute arising from or in connection with this Contract shall be
> settled through friendly negotiations.  Failing that, then shall be submitted
> to China International Economic and Trade Arbitration Commission
> Shanghai Subcommission for arbitration which shall be conducted in
> accordance with the commission's arbitration rules in effect at the time of
> applying for arbitration.  The arbitral award is final and binding on both
> parties.  The applicable law shall be in the United Nations Convention on
> Contracts for the International Sale of Goods.

(ECF No. 2-5).

On or about December 10, 2010, Lumos provided notice to CEEG that the

modules were defective and that Lumos would be filing a warranty claim.  On December

23, 2010, Scott Franklin wrote a follow-up email to Sally Fan, a CEEG sales manager,

providing notice that Lumos would not make any payments on the Sales Contract until

CEEG addressed its warranty claim for the defective modules.  On January 6, 2011,

Sally Fan responded to Franklin stating that Lumos should replace the defective

modules with "other non-defective modules in Lumos' inventory right away" and that

replacing them would be "no problem."  (ECF Nos. 22-1 and 22-6).  Lumos

subsequently replaced the defective modules with non-defective modules from its

inventory, but never received the substitutes from CEEG.

On January 26, 2011, Franklin sent another email to Lumos' contacts at CEEG (Sally Fan, Stephen Cai, Thomas Liu, and Xinglei ("Lester") Wang) noting the lack of response to Lumos' warranty claim.  Then, on April 28, 2011, Franklin sent a formal letter to Thomas Liu regarding the warranty claim and provided additional supporting documentation.  In May 2011, Xinglei ("Lester") Wang performed an on-site inspection of the defective modules and confirmed to Lumos that the modules were defective.

On October 30, 2011, Franklin sent an email to Willis He, the CEO of CSUN, USA, requesting resolution of the warranty issue.  He replied that he would "look into it," but Lumos heard nothing from CEEG or CSUN until December 19, 2012.  On December 19, 2012, counsel for CEEG sent Lumos a demand letter for payments due on the shipments of defective modules.  On December 22, 2012, Franklin sent a response noting that Lumos had been withholding payment pending resolution of the warranty issue.  On January 24, 2013, CEEG's counsel sent a second demand letter threatening arbitration if Lumos failed to send payment for the defective modules by January 31, 2013.  Franklin testified at the May 27, 2015 hearing that he continued to communicate with CEEG's counsel through email in an attempt to reach a business solution.

On April 4, 2013, Lumos received a document delivered by DHL written in Chinese, with no English translation provided.  All previous communications between Lumos and CEEG had been in English.  On May 7, 2013, Franklin sent CEEG's counsel an email offering a settlement for the dispute.  CEEG's counsel sent an email in response stating, in part:

Please note that the letter you received was from CIETAC, the arbitration

institution to which Lumos agreed in its sales contracts with CEEG (Shanghai) Solar Science Technology Co., Ltd.  The contractual arbitration clause did not specify a language for the arbitration and the CIETAC default language is Chinese.  Your company has been sued in arbitration in China.  I recommend you seek counsel and avoid the risk of an adverse award for failure to defend your company in the arbitration.

(ECF No. 22-1 and 22-14).  On May 19, 2013, Franklin sent CEEG's counsel a follow-up email inquiring as to CEEG's response to Lumos' settlement proposal.  CEEG's counsel replied, noting that CEEG rejected the proposal.

In the meantime, Lumos engaged the services of a translator to translate the April 4, 2013 document written in Chinese.  Lumos also hired Chinese counsel to prepare its defense.  On June 20, 2013, Franklin sent a letter to CIETAC, explaining Lumos' difficulties in translating CIETAC's correspondence and requesting additional time to prepare its defense at the arbitration.  CIETAC agreed to an extension of time of the first hearing date for the arbitration.  However, because the arbitration notice was written in Chinese, CIETAC's 15-day deadline to participate in the appointment of arbitrators had passed by the time Lumos was able to translate the notice and retain counsel.  Thus, Lumos was unable to appoint an arbitrator or consult with CEEG on the appointment of the chief arbitrator to the three-person tribunal that ultimately handed down the arbitration award.  Lumos filed an objection noting that it did not accept the composition of the arbitral tribunal.  On September 13, 2013, Lumos' objection was rejected, and on June 13, 2014, the arbitral panel issued an award in favor of CEEG and against Lumos.[1]

---

[1] The Tribunal ordered Lumos to pay the following amounts: (1) $1,372,445.10 for two outstanding payments for goods; (2) $74,991.00 in interest for the overdue

At the May 27, 2015 hearing, Scott Franklin testified that he was unaware that the Chinese documents he received on April 4, 2013 constituted an arbitration notice. He had been frequently communicating exclusively in English via email with CEEG's counsel the month prior to receiving the Chinese documents and no mention was made of the arbitration notice or that Franklin should be aware that CEEG was sending him such a document.  In fact, he testified that because all prior communications with CEEG had been in English, he assumed that the documents were unimportant or at the very least, not time-sensitive, and made a note to contact CEEG's counsel to inquire about the documents.  Approximately 30 days later or as part of the same May 7, 2013 email previously referenced herein, Franklin emailed CEEG's counsel and asked about the Chinese documents.  CEEG's counsel responded stating that this was a Chinese arbitration notice and that Lumos should retain Chinese counsel.  This email response was the first time Franklin learned about the pending Chinese arbitration.  (Bridge Tr. 14:23:50-14:32:02).  Franklin went on to describe the process of retaining Chinese counsel to represent him in the Chinese arbitration, which he characterized as a "surprisingly" complicated process.  (*Id.* at 14:28:54-14:29:00).  Shortly thereafter, Franklin learned that CIETAC's 15-day deadline to participate in the appointment of arbitrators had expired by the time Lumos was able to translate the notice and retain Chinese counsel.

---

payment; (3) $103,006.25 in costs; (4) $37,398.40 in attorney fees; and (5) $33,041.29 in arbitration costs.  (ECF No. 2).

III.   <u>DISCUSSION</u>

This is an action to confirm an arbitral award granted in China to a Chinese

corporation against a United States corporation pursuant to the New York Convention.

9 U.S.C. § 201.  The New York Convention is a multilateral treaty that governs foreign

arbitral awards.  Its purpose is to encourage the recognition and enforcement of

international arbitral awards, to relieve congestion in the courts and to provide parties

with an alternative method for dispute resolution that is quicker and less costly than

litigation.  *See Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d

1434, 1440 (11th Cir. 1998).  The New York Convention provides that "[a] court shall

confirm the award unless its finds one of the grounds for refusal or deferral of

recognition or enforcement of the award specified in the said Convention."  9 U.S.C.

§ 207.  The party opposing confirmation bears the burden on proving that one of the

seven defenses set forth in the New York Convention applies.  *Id.*  The burden is a

heavy one, and the showing is high to avoid confirmance of the award.  *Id.*  Judicial

review is "very limited" in order to undermine the goals of arbitration.  *Id.*

Article V of the New York Convention provides the following grounds of refusal to

recognize and enforce an arbitral award: "(1) the parties to the agreement were under

some incapacity or the agreement is not valid under the laws the parties have subjected

it to; (2) the party against whom the award was invoked did not receive proper notice;

(3) the award contains decisions on matters outside the scope of the arbitration

agreement; (4) the composition of the arbitral authority was not in line with the

agreement of the parties or was not in line with the law under which the award was

-8-

made; and (5) the award is not binding on the parties, or it has been set aside by a competent authority in the country where the award was made." *Guang Dong Light Headgear Factory Co., Ltd. v. ACI Intern., Inc.*, No. 03-4165-JAR, 2005 WL 1118130, *5 (D. Kan. May 10, 2005) (citing 9 U.S.C. § 207, New York Convention, art. V).

Here, Lumos first asserts that the Chinese arbitration award should not be confirmed because the Sales Contract states that all disputes between the parties "shall be settled through friendly negotiations." (ECF No. 2-5). Lumos argues that there was no bargaining process, and that CEG "did nothing more than state its position and then figuratively fold its arms and say, 'take it or leave it.'" (ECF No. 32 at 2). For reasons stated on the record at the May 27, 2015 hearing, I find little merit to this argument and reject it summarily.

Second, Lumos argues that it "did not receive notice reasonably calculated to apprise it of the pendency of the arbitration and allow it a meaningful opportunity to be heard, as required to satisfy due process." (ECF No. 32 at 2). Citing *Qingdao Free Trade Zone Genius Int'l Trading Co., Ltd. v. P and S International, Inc.*, No. 08-1292-HU, 2009 WL 2997184 (D. Or. Sept. 16, 2009), Lumos also argues that the composition of the arbitral panel was not in line with the parties' agreement or the applicable law. Specifically, CEEG's failure to properly provide notice of the arbitration in English deprived Lumos of the opportunity to participate in the selection of the arbitration panel because by the time Lumos found a translator to explain the contents of the notice and then retain counsel, the 15-day deadline had passed. In *Qingdao*, the district court denied the petition by a Chinese company to enforce an arbitral award handed down in

China because the defendant Oregon lumber company did not receive notice reasonably calculated to apprise it of the pending arbitration.  *Id.*  Similar to this case, the plaintiff in *Qingdao* argued that the defendant: (1) agreed in a sales contract to arbitrate any disputes through the Qingdao Arbitration Commission and according to its rules; (2) received a copy of the rules in English; and (3) by signing the contract, consented to the notice in Chinese.  *Id.* at *4.  The court held that

> [w]hile these circumstances could lead to the inference that [defendant] knew it had agreed to arbitrate disputes with Qingdao in China, and had reason to suspect that arbitration proceedings in China might be brought against [defendant] by Qingdao ..., they do not generate an inference that [defendant] had actual knowledge that Qingdao commenced an arbitration proceeding, to take place on a particular date in a particular place.  Nor does the contract ... contain a provision under which [defendant] agreed to service of process in Chinese.

*Id.*  CEEG opposes this argument, claiming that the governing contract is the Sales Contract, not the Co-Branding Agreement.  CEEG argues that there is no choice of law provision in the Sales Contract, "so the language of the arbitration proceeding was to be Chinese and CIETAC acted in accordance with the Agreement and provided proper notice to Lumos when it sent the Notice of Arbitration to Lumos in Chinese."  (ECF No. 29 at 8).  CEEG further contends that since Lumos ultimately participated in the arbitration proceeding in China, it obviously received notice.  I reject CEEG's position and agree with Lumos.

For reasons stated on the record at the May 27, 2015 hearing, based on my review of all of the parties' submissions, arguments, and the credible testimony of Scott Franklin, I find that CEEG did not give Lumos proper notice of the Chinese arbitration

which resulted in Lumos being deprived of the opportunity to meaningfully participate in

the selection of arbitrators on the panel.  Guided by the Second Circuit's statements in a

similar scenario, "[w]hile we acknowledge that there is a strong public policy in favor of

international arbitration, ... we have never held that courts must overlook agreed-upon

arbitral policies in deference to that policy."  *Encyclopaedia Universalis S.A. v.*

*Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 91 (2d Cir. 2005) (holding that "the issue of

how the third arbitrator was to be appointed is more than a trivial matter of form.  Article

V(1)(d) of the New York Convention itself suggests the importance of arbitral

composition, as failure to comport with an agreement's requirements for how arbitrators

are selected is one of only seven grounds for refusing to enforce an arbitral award.").

Moreover, as to the issue of proper notice, I also find Scott Franklin's testimony

credible as to the fact that the Co-Branding Agreement is the governing agreement

between Lumos and CEEG and that all subsequent sales contracts flowed from that

master agreement.  Thus, under the Co-Branding Agreement's Choice of Language

provision, all "documentation notices, judicial proceedings, and dispute resolution and

arbitration entered into, given, instituted pursuant to, or relating to, this Agreement

[shall] be drawn up in the English language."  (ECF No. 22-2).[2]  Prior to the arbitration

notice, all communications between Lumos and CEEG were conducted in English

pursuant to the Co-Branding Agreement.  Franklin testified that because all prior

communications with CEEG had been in English, he had no reason to believe the April

---

[2] I note that the Sales Contract, which CEEG urges should control in this case,
also provides that the English language "shall govern."  (ECF No. 5-1).

-11-

4, 2013 documents contained a notice of arbitration.  Like the *Qingdao* Court, I find that all of these circumstances do not generate an inference that Lumos had actual knowledge that CEEG had commenced an arbitration proceeding in China.  Lumos has carried its heavy burden of proving that two grounds for refusal to recognize and enforce an arbitral award set forth in Article V of the New York Convention apply to this case.  Thus, recognizing my limited review of arbitral awards under the New York Convention,  I find that the arbitration award cannot be confirmed under the grounds set forth in Article V(1)(b) and (d) of the New York Convention.

IV.    CONCLUSION

Based on the foregoing, it is

ORDERED that CEEG's Petition to Confirm Arbitration Award and for Entry of Judgment (ECF No. 2) is **DENIED** pursuant to Article V(1)(d) and (b) of the New York Convention.  It is

FURTHER ORDERED that Lumos' Motion to Dismiss Petition to Confirm Arbitration Award (ECF No. 22) is **GRANTED** for the reasons stated on the record at the May 27, 2015 hearing and set forth herein.  This matter is **DISMISSED WITH PREJUDICE.**

Dated:  May 29, 2015

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge


-12-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.   14-cv-03118-WYD-MEH

CEEG (Shanghai) SOLAR SCIENCE & TECHNOLOGY CO., LTD.,

     Plaintiff,

v.

LUMOS LLC, now known as LUMOS SOLAR LLC,

     Defendant.

---

## FINAL JUDGMENT

---

Pursuant to and in accordance with Fed. R. Civ. P. 58(a) and the Order, filed on

May 29, 2015, by the Honorable Wiley Y. Daniel, Senior United States District Judge,

and incorporated herein by reference as if fully set forth, it is hereby

ORDERED that judgment is hereby entered in favor of Defendant, Lumos LLC,

now known as Lumos Solar LLC, and against Plaintiff, CEEG (Shanghai) Solar Science

& Technology Co., Ltd., on Defendant's Motion to Dismiss Petition to Confirm Arbitration

Award [ECF Doc. No. 22].  It is further

ORDERED that plaintiff's complaint and action are dismissed with prejudice.  It is

further

ORDERED that Defendant shall have its costs by the filing of a Bill of Costs with

the Clerk of this Court within fourteen (14) days of entry of judgment, and pursuant to

the procedures set forth in Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

-1-

DATED at Denver, Colorado this <u>24th</u> day of June, 2015.

FOR THE COURT:

JEFFREY P. COLWELL, CLERK


<u>/s/ Robert R. Keech</u>
Robert R. Keech,
Deputy Clerk

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. 1:14-cv-3118-WYD-MEH

CEEG (Shanghai) Solar Science & Technology Co., Ltd.,

      Plaintiff/Petitioner,

v.

LUMOS LLC, now known as LUMOS SOLAR LLC,

      Defendant/Respondent.

---

## NOTICE OF APPEAL

---

Notice is hereby given that Plaintiff/Petitioner CEEG (Shanghai) Solar Science & Technology Co., Ltd., by and through its attorneys, Fairfield and Woods, P.C., hereby appeals to the United States Court of Appeals for the Tenth Circuit from the Order entered in this action on May 29, 2015 (ECF No. 35) denying Plaintiff/Petitioner's Petition to Confirm Arbitration Award and for Entry of Judgment (ECF No. 2) and granting Defendant/Respondent's Motion to Dismiss Petition to Confirm Arbitration Award and Opposition to Petitioner's Motion for Entry of Judgment (ECF No. 22) and the Final Judgment entered in this action on June 24, 2015 (ECF No. 37).

Appellate Case: 15-1256   Document: 01019465886   Date Filed: 07/27/2015   Page: 275

Respectfully submitted this 24th day of July, 2015.

FAIRFIELD AND WOODS, P.C.

By:     *s/ John S. Lutz*
John S. Lutz
Courtney P. Hirsekorn
1801 California Street, Suite 2600
Denver, CO  80202
Phone:  (303) 830-2400
Email:  jlutz@fwlaw.com
chirsekorn@fwlaw.com

ATTORNEYS FOR THE PLAINTIFF/PETITIONER

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 24th day of July, 2015, a copy of the foregoing **NOTICE OF APPEAL** was filed with the Clerk of the Court through the CM/ECF system which will send notification of such filing to the following email address:

James R. Nelson, Esq.
DLA PIPER LLP
1717 Main Street, Suite 4600
Dallas, TX  75201
jr.nelson@dlapiper.com

Meghan Paulk Ingle, Esq.
DLA Piper LLP
401 Congress Avenue, Suite 2500
Austin, TX  78701-3799
meghan.paulkingle@dlapiper.com

Thomas J. Overton, Esq.
The Overton Law Firm
1080 Kalamath Street
Denver, CO  80204
tom.overton@overtonlawfirm.com

ATTORNEYS FOR THE DEFENDANT/RESPONDENT

The undersigned further certifies that a copy of the foregoing was served on the following via email:

David J. Zhang
bin.zhang@chinasunergy.com

*s/ M. Elizabeth LaBrec*
M. Elizabeth LaBrec